**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| COGNIZANT TRIZETTO SOFTWARE GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> INFOSYS LIMITED, <br><br> Defendant. | **Case No. 3:24-cv-2158-X** <br><br> **COUNTERCLAIM** <br><br> **DEMAND FOR JURY TRIAL** |
| INFOSYS LIMITED, <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> COGNIZANT TECHNOLOGY SOLUTIONS CORP. and COGNIZANT TRIZETTO SOFTWARE GROUP, INC., <br><br> Counterclaim Defendants. | |

Counterclaim Plaintiff Infosys Limited ("Infosys") alleges the following against Counterclaim Defendants Cognizant Technology Solutions Corp. ("CTS") and Cognizant TriZetto Software Group, Inc. ("Cognizant TriZetto") (collectively "Cognizant").

## NATURE OF THE ACTION

1.      This is an antitrust case about Cognizant's anticompetitive scheme to achieve, maintain, and enhance its dominance in both the healthcare payor software market and the related IT services market for that software in violation of Sections 1 and 2 of the Sherman Act as well as the Texas Free Enterprise Antitrust Act. Cognizant has engaged in various endeavors that stifle

1

competition from more innovative and efficient rivals, like Infosys, thereby depriving customers of unfettered competition that would provide lower prices and better products and services in the United States healthcare system. Cognizant's monopolistic strategies include imposing restrictive contractual obligations with no legitimate purpose and barring Infosys from participating in training programs it was traditionally offered while continuing to make training available to others. Both of these strategies are designed to make it more difficult for Infosys to compete against Cognizant in the IT services market. At the same time, Cognizant has taken steps to obstruct and delay Infosys's ability to develop a competing software product by erecting barriers to entry and luring away all of the product's executive sponsors and incentivizing them to stifle product development in the months leading up to their departures. Because of Cognizant's anticompetitive scheme, healthcare payors covering 65% of the United States's insured population continue to use Cognizant's outdated software and pay more for that software and related IT services than they would absent Cognizant's conduct in a competitive market.

2.     For decades, Infosys and CTS have competed to provide IT services to healthcare companies that use healthcare payor software to process insurance claims. Two of the oldest and most commonly used payor software products are Facets and QNXT. Erisco Managed Care Technologies ("Erisco") developed Facets over 30 years ago. Quality Care Solutions, Inc. ("QCSI"), with support from Infosys, developed QNXT over 20 years ago.

3.     In the early 2000s, software company TriZetto Group, Inc. ("TriZetto"), acquired both Erisco (2000) and QCSI (2007), and with them the Facets and QNXT products. In 2008, Apax Partners ("Apax"), a private equity firm, acquired TriZetto. Before, during, and after the TriZetto and Apax acquisitions, Infosys and Cognizant competed to provide IT services to payors, including those using Facets and QNXT.

2

4.    In August 2014, Apax put TriZetto up for sale. At the time, CTS was the dominant company in the healthcare IT services segment, with $13 billion in revenue in 2013. But rivals, like Infosys, were starting to take business from Cognizant, resulting in three successive quarters of declining healthcare revenue in 2014.[1] CTS's stock price fell 17%.[2]

5.    CTS announced plans to acquire TriZetto in September 2014, "creating a fully-integrated healthcare technology and operations leader."[3] CTS touted that its acquisition of TriZetto would "accelerate significantly its market position" by allowing it to offer "integrated engagement opportunities," i.e., both licensing and servicing Facets and QNXT. CTS's President boasted that the transaction would "give [CTS] a dominant position in the US healthcare market" because it would now control both the healthcare payor software market and the IT services market for that software.[4]

6.    At the time, CTS was already providing IT services to 16 of the top 20 U.S. payors and four of the top five U.S. pharmacy benefit management companies.[5] Industry observers therefore remarked that CTS "is ideally placed in healthcare with few like-sized competitors" and

---

[1] "Cognizant to Acquire TriZetto for $2.7 Billion," Sept. 15, 2014, available at: https://martinwolf.com/cognizant-to-acquire-trizetto-for-2-7-billion/.

[2] Id.

[3] "Cognizant to Acquire TriZetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader," Sept. 15, 2014, available at: https://news.cognizant.com/2014-09-15-Cognizant-to-Acquire-TriZetto-Creating-a-Fully-Integrated-Healthcare-Technology-and-Operations-Leader.

[4] "Cognizant to buy TriZetto for $2.7 billion to expand healthcare business," Sept. 16, 2014, available at: https://www.livemint.com/Companies/v2CbKKfxSBHJj4PhhTjPAJ/Cognizant-to-buy-IT-services-provider-Trizetto-for-27-bill.html.

[5] "Cognizant Completes Acquisition of TriZetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader," Nov. 20, 2014, available at: https://news.cognizant.com/2014-11-20-Cognizant-Completes-Acquisition-of-TriZetto-Creating-a-Fully-Integrated-Healthcare-Technology-and-Operations-Leader.

that the acquisition "has the potential of taking it to a different league altogether."[6] And, indeed, CTS's healthcare revenue more than doubled post-acquisition, from about $2.25 billion in 2013 to $4.67 billion in 2018. Industry observers also warned that the acquisition could have an adverse effect on competition, noting that many competitors also had "a steady revenue stream . . . implementing TriZetto solutions,"[7] but the acquisition would "make it tougher" for them to compete "in the US healthcare market."[8]

7.      The industry analysts were prescient. Before CTS's acquisition of TriZetto, Infosys and CTS competed on the merits of their respective offerings to provide IT services (e.g., development, integration, and testing) to users of Facets and QNXT. But that competitive dynamic changed after CTS acquired TriZetto (i.e., Facets and QNXT). Cognizant began weaponizing the newfound power it gained through its acquisition of TriZetto's payor software products, taking decisive steps to make it harder for more efficient rivals like Infosys to compete head-to-head with Cognizant.

8.      Specifically, Cognizant uses its power to impose contractual obligations on its competitors that have no legitimate purpose other than to foreclose competition in the IT services market and make it more difficult for IT service providers to enter the healthcare payor software market. These anticompetitive restrictions take various forms, including (1) imposing most favored vendor or first right of refusal provisions in Cognizant's agreements with payors, which effectively grant Cognizant the right to prevent its software clients from awarding IT services work to its

---

[6] "Cognizant Acquires TriZetto: The New 'Big Blue' of Healthcare IT? Sherpas in Blue Shirts," Sept. 15, 2014, available at: https://everestgrp.com/2014-09-cognizant-acquires-trizetto-the-new-big-blue-of-healthcare-it-sherpas-in-blue-shirts-15544.html.

[7] *Id.*

[8] "Cognizant to buy TriZetto for $2.7 billion to expand healthcare business," Sept. 16, 2014, *supra* n.4.

competitors like Infosys, (2) limitations on product training (so competitors have diminished ability to train personnel to perform services), and (3) requiring competitors like Infosys to enter into contracts directly with Cognizant that impose (a) limitations on the scope of work they can perform for payor clients, (b) restrictions on which of their employees can service customer accounts, (c) prohibitions on developing complementary products that could interface with Cognizant's software, and (d) one-way non-solicitation provisions that protect Cognizant's employees from poaching while allowing Cognizant to weaken its rivals' ability to compete (by hiring away talented software support engineers from rivals, like Infosys, while rivals are precluded from doing the same).

9.      As the software provider, Cognizant has the power to impose these exclusionary contractual provisions on its clients and other IT services providers because payors have limited alternatives to Facets and QNXT. It also takes significant time, money, and disruption for a payor to switch software. Payors therefore have no ability to discipline Cognizant's behavior.

10.     The acquisition also gave Cognizant the ability and incentive to protect its dominance in the healthcare payor software market from any competitive threat. For nearly a decade, the Facets and QNXT products have been the market leader with limited competition due to the significant barriers to entry into this market. Cognizant thus had little need to innovate or reduce prices, despite the rapid advancement of software and technology in other fields. As a result, Cognizant's decades-old products continue to dominate the healthcare payor landscape, ensnaring healthcare payors in antiquated products that cost more than they should.

11.     Infosys is uniquely positioned to challenge Cognizant's stranglehold over the healthcare payor software market because of its strong reputation with healthcare payors and expertise developing similar software products in healthcare and other industries.

12.     In 2019, Infosys decided to challenge Cognizant's dominance over the healthcare payor software market. It began developing Infosys Helix, a payor software platform, in response to client demand for customizable, cloud-based products capable of leveraging artificial intelligence. Infosys Helix is built using modern technology and presents a legitimate threat to Cognizant's dominance. To date, Infosys has devoted tens of millions of dollars to develop Infosys Helix.

13.     In an effort to stymie Infosys's ability to develop a competing software product, Cognizant engaged in a campaign to erect new barriers to entry through its onerous NDAA provisions discussed above and systematically luring away senior executives with responsibility for the development and marketing of Infosys Helix. Worse, Cognizant's recruitment induced these executives to undermine Infosys's ability to bring Infosys Helix to market while they remained employed by Infosys—causing them to delay and obstruct the product they were ostensibly responsible for developing, promoting, and delivering.

14.     For example, the primary executive sponsor of Infosys Helix was Ravi Kumar S. ("Kumar"), who was Infosys's then-President—placing him among the top four Infosys executives. Kumar had championed Infosys Helix from his senior position at Infosys, lauding it as a next-generation "challenger to the traditional platforms." But Kumar's optimism and excitement for the Infosys Helix product suddenly changed in Spring 2022. He began to pull back support of Infosys Helix, declining requests for needed resources, which delayed the completion of Infosys Helix by at least 18 months. In October 2022, Kumar resigned from Infosys, and shortly thereafter, was announced as CTS's new Chief Executive Officer.

15.     Cognizant's anticompetitive scheme to stall Infosys Helix's launch included the targeted recruitment of key senior executives responsible for Infosys Helix, including Kumar,

Shveta Arora and Ravi Kiran Kuchibhotla, and incentivizing them to delay and obstruct the development and marketing of Infosys Helix in the months leading up to their departures. This conduct was designed to disarm Infosys's new competitive threat to Cognizant's dominance over the healthcare payor software market.

16.    Cognizant has acted with anticompetitive malice aimed at stifling competition from Infosys. Cognizant is so fearful of legitimate competition from Infosys that it has resorted to draconian measures to prevent that competition. In addition to recruiting away Infosys leadership, Cognizant is attempting to prevent Infosys from replacing payors' non-Cognizant software with Infosys Helix by raising artificial barriers to interoperability with Cognizant products. For example, Cognizant—against its client's wishes—seeks to block a payor client's ability to use the Adaptor, a system integration tool developed by Infosys for Payor 1 that connects Infosys Helix and QNXT at a client who replaced its homegrown software with Infosys Helix, thereby blocking the implementation of Infosys Helix at Payor 1.

17.    Cognizant's anticompetitive scheme is causing significant financial harm to Infosys. It is also harming payors—i.e., the direct purchasers of the software and related IT services—by depriving them of the benefits of unfettered competition from Infosys and other more efficient rivals that would lead to the availability of higher quality products and services at lower cost.

18.    Cognizant's conduct is also stifling innovation by substantially delaying Infosys from bringing a disruptive cloud-based solution, leveraging innovations like artificial intelligence ("AI") to market, despite strong demand from payors for such products. Cognizant's software is built on outdated technology that is decades old, making it much more technically difficult to build similar cloud-based functionalities that leverage AI.

19.    Rather than compete on the merits, Cognizant has used and is using its dominant position in the healthcare payor software market and related IT services market to exclude competition, enabling it to maintain supra-competitive prices for antiquated software and charge premium prices for related support services of low quality compared to services offered by rivals like Infosys. These higher costs imposed on payors are passed down to consumers in the form of higher premiums, copays, deductibles, and other out-of-pocket costs associated with health insurance.

20.    Infosys seeks an order to enjoin Cognizant's anticompetitive practices, thereby restoring competition, and to recover monetary damages for the injury to Infosys caused by Cognizant's conduct.

## THE PARTIES

21.    Infosys Limited is a company headquartered in Bengaluru, India. Infosys and its subsidiaries have several locations in the United States, with its principal U.S. office located in Richardson, Texas. Infosys provides next-generation IT services and consulting, including in the healthcare market. Infosys is leveraging its decades of experience to create an innovative new payor software platform, Infosys Helix, to address payor demands for new innovative technology that better suits their needs.

22.    Cognizant Technology Solutions Corporation is a company incorporated in Delaware with its principal place of business in Teaneck, New Jersey. CTS is an IT services firm and consulting firm, including in the healthcare market. Though incorporated in Delaware, more than 70% of Cognizant's employees are based in India. CTS acquired payor software products QNXT and Facets in 2014 through an acquisition of TriZetto.

23.    Cognizant TriZetto Software Group, Inc. is a wholly-owned subsidiary of CTS, incorporated in Delaware, with its principal place of business in Englewood, Colorado. Cognizant

TriZetto was formed in 2014 in connection with the TriZetto acquisition and is the named party in the Non-Disclosure and Access Agreements ("NDAAs") discussed herein.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 2 of the Sherman Act, 15 U.S.C. § 2. This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

25.     This Court has personal jurisdiction over CTS because CTS maintains an office in Plano, Texas, within the District. CTS has operated in Plano, Texas, since 2019 with over 500 employees at that location. Personal jurisdiction exists because CTS has sufficient minimum contacts with the Northern District of Texas as a result of business conducted within the District.

26.     Venue in this district is proper because CTS has an office in this District, transacts business in this District, and is subject to personal jurisdiction in this District.

27.     This Court has personal jurisdiction over Cognizant-TriZetto because this counterclaim is made in response to Cognizant-TriZetto's August 23, 2024, complaint against Infosys in this District. *See Adam v. Saenger*, 303 U.S. 59 (1938).

28.     Venue in this District is proper because Cognizant TriZetto consented to venue in this District for purposes of this litigation. *See* Complaint ¶ 10, ECF No. 1, *Cognizant TriZetto Software Group, Inc. v. Infosys Limited*, No. 3:24-cv-2158 (N.D. Tex.).

## FACTUAL ALLEGATIONS

**A.    Other Companies, Including Infosys, Developed QNXT and Facets Prior to CTS's Acquisition of TriZetto.**

29.    Cognizant TriZetto describes QNXT and Facets as "next-generation software systems"[9] but it has been a full generation—more than two decades—since the development of these products. The products are last-generation, not next-generation. Further, Cognizant did not develop either platform; rather, Cognizant acquired them inorganically in 2014 when it purchased TriZetto.

30.    Facets was originally developed by Erisco over 30 years ago. TriZetto acquired Erisco and the Facets product in 2000.

31.    QNXT was originally developed by QCSI over 20 years ago. Beginning in 2003, QCSI engaged Infosys to assist with porting the programming language of QNXT from Visual Basic to a .Net application. Infosys continued to work on the development of QNXT after TriZetto acquired QCSI, and with it the QNXT product, in 2007. At the time of TriZetto's acquisition, the majority of QCSI's customers were second- or third-tier healthcare providers. QCSI was just starting to enter the top-tier market by licensing QNXT to larger customers, including, for example, Payor 1.

32.    By the end of 2007, TriZetto had acquired both Facets and QNXT and created segmentation within the healthcare payor software market, offering Facets to the top tier healthcare payors, while the remaining tiers were typically QNXT customers. For example, more than 20 of the 38 BlueCross BlueShield organizations in the United States use Facets as their payor software platform. In August 2008, private equity firm Apax acquired TriZetto.

---

[9] Complaint ¶ 14, ECF 1.

**B.      CTS's Acquisition of TriZetto in 2014.**

33.      In August 2014, Apax decided to sell TriZetto. At that time, approximately 90% of CTS's healthcare segment revenue came from providing IT support to the Facets and QNXT platforms. That revenue represented a quarter of CTS's overall revenue. As of September 2014, it was reported that, with "approximately $2.5 billion in annualized revenue, Cognizant's healthcare practice is consistently ranked among the top 10 on the Healthcare Informatics Top 100, Cognizant serves 28 of the top 30 global pharmaceutical companies, 16 of the top 20 health plans in the U.S., 4 of the top 5 pharmacy benefit management companies in the U.S., 9 of the top 10 biotech companies, and 12 of the top 15 medical device companies."[10] However, despite that ranking, CTS in 2014 had reported three successive quarters of declining revenue in its healthcare business.[11] CTS saw that it could use the market power it would acquire through purchasing the software platforms associated with the majority of its healthcare IT services work to turn its poor performance around—and that doing so would be well worthwhile even if it meant paying a premium over TriZetto's true market value.

34.      While there were multiple strategic bidders for TriZetto, including Infosys, CTS was the prevailing bidder because it was willing to pay a monopoly premium for TriZetto. At the time, CTS valued TriZetto at nearly four times its 2013 annual revenue of around $700m. Industry observers opined that CTS overpaid "for an asset which isn't growing nearly as fast as Cognizant."[12]

---

[10] "Cognizant Completes Acquisition of Trizetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader," Nov. 20, 2014, *supra* n.5.

[11] "Cognizant to Acquire TriZetto for $2.7 Billion," Sept. 15, 2014, *supra* n.1.

[12] James Crabtree, "Cognizant Rejects Claims it Overpaid for TriZetto," New York Institute of Finance, Sept. 15, 2014, available at: https://www.nyif.com/articles/cognizant-rejects-claim-it-overpaid-for-trizetto.

CTS did so because it could leverage the power it gained in the healthcare payor software market to give itself an advantage over its rivals for lucrative IT services contracts.

35.    CTS paid a monopoly premium to acquire TriZetto because the acquisition gave CTS the market power to protect its share of the healthcare IT services market from stronger and more efficient rivals like Infosys. CTS paid $2.7 billion for TriZetto, with the transaction closing in November 2014. Its strategy was simple: CTS understood TriZetto brought "to Cognizant significant and complementary new market opportunities"[13] as well as "[e]nhanced competitiveness in integrated engagement opportunities"[14] and asserted that the acquisition "represents a great opportunity to integrate services across our three horizons—traditional IT services; high-growth businesses such as management consulting, business process services and IT infrastructure services; and emerging delivery models."[15] A key rationale for the acquisition was thus to acquire market power in the IT services market by gaining control over the software on which most payors depended. The pattern of exclusionary conduct described below would not have been possible without the leverage CTS gained over customers and rivals by acquiring TriZetto's software.

36.    CTS touted the deal in an announcement on September 15, 2014. CTS reported the acquisition would "accelerate significantly its market position and strategy."[16] As Gordon Coburn, then-president of CTS, said, the acquisition "will give us a dominant position in the US healthcare

---

[13] "Cognizant to Acquire TriZetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader," Sept. 15, 2014, *supra* n.3.

[14] *Id.*

[15] *Id.*

[16] *Id.*

market. . . . TriZetto, when closed, will take [CTS's] healthcare services revenue to approximately 30% of company revenue."[17] Industry analysts agreed:

- In light of the more than 200,000 CTS employees based in India at the time, one commentator noted that: "This buyout will help [CTS] take the pole position among all Indian IT outsourcers in the healthcare software space, where the US market alone is believed to offer a $2.7-trillion business opportunity."[18]

- An analyst from Jefferies stated that TriZetto would "significantly enhance" Cognizant's "competitive position in the health care vertical."[19]

37.    CTS also asserted the acquisition would broaden CTS's "solutions offerings and creates an opportunity for us to cross-sell our business process, infrastructure management and consulting services to the TriZetto clients where we currently do not have relationships"[20] and provide a "greater longer term opportunity . . . for us to combine TriZetto's platforms with our services and program management capabilities to create end-to-end integrated platform-based solutions that bring together infrastructure, applications, the cloud and business process services."[21]

---

[17] "Cognizant to buy TriZetto for $2.7 billion to expand healthcare business," Sept. 16, 2014, *supra* n.4.

[18] "Cognizant to acquire US-based Trizetto for about $2.7 billion," Sept. 16, 2014, available at: https://economictimes.indiatimes.com/tech/ites/cognizant-to-acquire-us-based-trizetto-for-about-2-7-billion/articleshow/42531798.cms?from=mdr.

[19] "Cognizant to Buy TriZetto for $2.7 Billion for Health Unit," Bloomberg, Sept. 15, 2024, available at: https://www.bloomberg.com/news/articles/2014-09-15/cognizant-to-buy-trizetto-for-2-7-billion-in-health-care-growth.

[20]    Cognizant    2014    Annual    Report,    at    1,    available    at: https://cognizant.q4cdn.com/123993165/files/Annual/2014/Cognizant_2014AnnualReport.pdf.

[21] *Id.* at 45.

38.    Industry analysts questioned the impact the acquisition would have on competition. As one opined:

> The deal will . . . have myriad implications for the overall healthcare IT services competitive landscape. Most competitors of Cognizant already have a steady revenue stream (large or small) implementing TriZetto solutions, most importantly Facets™, which is used by most payors in the U.S. How this impacts its engagements and partnerships will be tricky. Whether Cognizant will want to (and if so, how) assume a dichotomous role of a partner and competitor will be another interesting area to watch. . . . Two things that are definitely salient here—one, Cognizant is going all out to bet big on healthcare; and two, this acquisition has the potential of taking it to a different league altogether! There are already murmurs in the healthcare IT industry equating Cognizant to a new 'IBM,' when it comes to its negotiating power at the table. This is another step in ensuring it stays ahead of peers as the competitive intensity in the market increases. The deal definitely has characteristics of a long-term strategic bet than a tactical maneuver.[22]

When it announced the deal, CTS anticipated approximately $1.5 billion of potential revenue synergies—the ability to provide IT services to former TriZetto clients—cumulatively over the following five years.[23]

## C.    The Healthcare Payor Software and Related-IT Services Markets.

39.    QNXT and Facets are traditional healthcare payor software platforms that have offered a complete end-to-end product, from enrollment to claims payment, for over twenty and thirty years, respectively. The purchasers of these platforms are typically large healthcare organizations such as health insurance companies (i.e., payors). While the software is customizable for each client, the client must license the entire product suite. Despite these shortcomings, the majority of payors long ago integrated QNXT or Facets into their day-to-day operations. Today, 65% of the insured population in the U.S. is currently covered by a payor using QNXT or Facets.

---

[22] Cognizant Acquires TriZetto: The New 'Big Blue' of Healthcare IT? Sherpas in Blue Shirts, Sept. 15, 2014, *supra* n.6.

[23] "Cognizant to Acquire TriZetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader," Sept. 15, 2014, *supra* n.3.

40.     In comparison, Infosys Helix is a next-generation payor software platform that is cloud- and module-based, allowing customers to license only the capabilities they need, rather than requiring them to license the full panoply of offerings. In its future state, Infosys Helix will offer dozens of functionalities directed at providers, plan sponsors, members, and others. Infosys Helix currently has more than a dozen functionalities fully developed and deployed, with dozens of additional functionalities under active development.

41.     Software platforms are typically governed by license agreements. These license agreements ordinarily contemplate and address issues like intellectual property, confidentiality, and third-party access. While software providers such as Cognizant grant clients access to the software platform and associated intellectual property, the software providers typically maintain ownership of intellectual property in the software.

42.     Implementation and integration of a new software platform with a client's existing technology landscape is a resource-intensive undertaking that requires a significant amount of time and effort. This makes it burdensome for payors using the Facets or QNXT products to transition to a new product to perform their core administrative functions. Even just integrating a new product into an existing technology landscape without phasing out old products can be challenging because data must be mapped from existing system fields to the new system and its likely differently named fields, and the IT services vendor must ensure that once mapped, the system functions reliably and as expected, while avoiding data loss and any downtime during the transition.

43.     This process can take months to accomplish successfully. As a result, payors cannot easily switch software providers—in addition to the ordinary cost and burden problems caused by a switch of an important software platform, doing so could require payors to halt operations or run

parallel redundant technology during the transition period. Payors thus cautiously consider when to upgrade or replace their existing software platforms.

44.    Payor software products require frequent and regular IT support. Most payors, however, lack the scale necessary to cost-effectively provide their own IT support services for every software platform they use. As a result, many payors outsource IT support services to technology firms like Infosys and CTS. Typically, unlike with software platforms, the client owns the IT service provider's work product.

45.    Payors prefer to use a single vendor independent from their software provider to provide IT services because it broadens the available options for IT vendors, while allowing them to achieve synergies from using one vendor for all of their IT needs, rather than contracting their IT needs out in a piecemeal fashion to the maker of every software product they use. The higher number of IT vendors that can service payors' needs in turn leads to lower prices and improved quality. It also makes payors less beholden to a single company in the event service quality deteriorates or they attempt to use their market power to impose onerous terms like requiring restrictive NDAAs with third-party IT vendors.

46.    As a result, payors frequently enter into service agreements with IT service providers to implement and integrate the software after they license the software. Cognizant's software license agreements, however, typically include a "most favored vendor" ("MFV") provision, which either identifies a list of approved vendors its clients can use, or provides a first right of refusal provision concerning retention of certain third-party vendors, namely its competitors in the IT services market like Infosys. These provisions either limit up-front which third parties the payor may hire, or require the payor to obtain Cognizant's approval before engaging a vendor. In both instances, the effect is to give Cognizant the contractual ability to exclude its primary competition in the IT services market

by discouraging or preventing payors from hiring third parties, like Infosys, to provide them with IT services for the Facets and QNXT products they are using in their businesses.

47.    Even when a Cognizant license agreement lacks a MFV provision, Cognizant has the ability to exclude rivals. That is because Cognizant can maintain that its TriZetto software cannot be sublicensed to any IT vendor without its approval and a signed NDAA between Cognizant and the vendor. This provision is therefore a de facto MFV, which forces the payor to seek Cognizant's approval before hiring a third-party IT vendor.

**D.    Cognizant Imposes Overly Restrictive NDAAs to Eliminate the Competitive Threat from Infosys and other Competitors.**

48.    Before it was acquired by CTS, TriZetto did not have an incentive to impose onerous provisions on third parties providing IT support services to payors using QNXT or Facets. TriZetto did not provide IT services for its products and typically partnered with third-party IT vendors, like Infosys, for such services. It therefore had an incentive to impose reasonable access and confidentiality terms. For example, a May 2013 Third Party Access Agreement between TriZetto and Syntel Inc. contained only two paragraphs on a single page, neither of which prevented Syntel from developing competing products or offering competing services.

49.    After CTS's acquisition of TriZetto in 2014, Infosys continued to provide IT services to payors that used QNXT or Facets without an NDAA. For example, Infosys has provided IT services related to a large health plan's use of Facets since July 2015 under a long-term contract without a Cognizant NDAA. Similarly, Infosys has provided IT services related to QNXT for a different large managed care company since 2011 without a Cognizant NDAA. But when Infosys emerged as a stronger competitive threat to Cognizant in 2018 for IT services, and then software in 2020, Cognizant began imposing progressively more restrictive terms in its NDAAs.

50.     Starting in 2018, Infosys began to win significant IT services work, including at least 11 accounts valued at hundreds of millions of dollars, away from Cognizant. Infosys enjoyed these successes because it was providing higher quality services at more competitive prices than Cognizant. In response, Cognizant began using its market power in the healthcare payor software market, where payors covering 65% of the insured population relied on QNXT or Facets, to implement restrictive NDAAs to help Cognizant foreclose competition in the IT services market and protect the dominant market position it had overpaid so dearly to acquire and expand.

### i.     The NDAA with Payor 1 Introduces Overly Broad Definitions and a Limited Scope of Work.

51.     Infosys has a longstanding relationship with a large managed care company, hereinafter called Payor 1. Payor 1 uses the QNXT platform. In August 2018, Payor 1 issued a Request for Proposal ("RFP") for a significant new contract, valued at hundreds of millions of dollars, for IT outsourcing and transformation, including IT services for QNXT.

52.     Infosys and Cognizant submitted competing RFP responses to Payor 1 for this business opportunity. Cognizant failed to make even the short list for consideration for the contract. Instead, in October 2018, Payor 1 selected Infosys and another IT services vendor for the short list.

53.     Ultimately, Payor 1 selected Infosys for the project. This was the first time since the TriZetto acquisition that Infosys had out-competed Cognizant for a significant IT services contract for a payor which was using Cognizant's QNXT platform. Infosys prevailed by offering competitive pricing and superior quality.

54.     Following the loss, Cognizant schemed to use its substantial market power over Payor 1 to sabotage the relationship. It first demanded that Infosys enter into a Confidentiality Agreement that included a non-compete term prohibiting Infosys employees servicing Payor 1's QNXT needs with access to QNXT source code from working on competing products for a year

following such work, regardless of whether access to QNXT source code was relevant to the employees' work—which it was not. A few months later, Cognizant demanded that Infosys enter into a separate NDAA (the "Payor 1 NDAA") for its Payor 1 work involving QNXT. In order to accomplish its contracted work with Payor 1, Infosys had no choice but to enter into the Confidentiality Agreement and NDAA with Cognizant TriZetto.

55.     The executed Payor 1 NDAA, effective November 19, 2018, was anything but a conventional NDAA narrowly crafted to promote the parties' working relationship while protecting confidential information. Instead, Cognizant demanded numerous provisions that lacked any legitimate purpose other than to limit Infosys's ability to meet Payor 1's needs, such as a provision restricting which Infosys personnel could service the Payor 1 account.

56.     In addition, the Payor 1 NDAA sought to limit the scope of services Infosys could provide to Payor 1 by defining a finite set of services for which Infosys was allowed to use broadly defined Confidential Information. Infosys sought to make the list of services only exemplary— "including but not limited to"—so it could still appropriately perform the services Payor 1 had hired Infosys to provide. But Cognizant rejected that change and the executed Payor 1 NDAA contains a specifically enumerated list of what Cognizant allows Infosys to do for Payor 1.

57.     This provision has no legitimate purpose and only serves to limit Infosys's ability to compete with Cognizant by restricting the type and volume of work that Infosys can do for a mutual client to what Cognizant deemed allowable. The provision therefore weakens Infosys's ability to compete for IT services and increases barriers it faces to enter the healthcare payor software market. For instance, if a payor hires Infosys because it is encountering a major problem with Facets that it needs to resolve, and Cognizant imposes this provision, Infosys would be unable to help the payor with other issues it encounters with Facets unless Cognizant grants it permission to address them.

This provision also weakens Infosys's ability to compete for future IT services work against Cognizant by preventing Infosys from satisfying the client's full need for IT services support, making Infosys not a viable option when a payor wants a single vendor for all its IT services. Similarly, the provision prevents Infosys from offering the mutual client an alternative to Cognizant's software. Cognizant was able to impose this provision because Payor 1 did not have a meaningful alternative to Cognizant TriZetto's software. And Cognizant's imposition of this provision sends a clear message to customers that using a vendor other than Cognizant for IT services will result in challenges for the customer, including the need to negotiate NDAAs and accept limitations on work that another vendor can accomplish for the customer.

58.    This type of provision is especially restrictive because of the overbroad definition of "Confidential Information" that Cognizant TriZetto imposes in its NDAAs, which includes "Cognizant software, third-party software provided by Cognizant, or related user documentation," among other items. This expansive definition ensures that Infosys cannot provide *any* IT services not expressly authorized in the NDAA to payors involving Cognizant software without Cognizant's blessing—even if Infosys staff would be able to address the customer's issues without access to any confidential information from Cognizant.

### ii.    Cognizant Requires Specifically Identified Authorized Recipients in its NDAAs.

59.    In 2020, Infosys won new work from a large health plan, hereinafter called Payor 2, to provide IT services, including services for Payor 2's use of Facets. In response, Cognizant required a NDAA (the "Payor 2 NDAA"), which built on the prior NDAA terms (e.g., a finite list of services Infosys was allowed to provide to Payor 2) while adding even more restrictive provisions. The Payor 2 NDAA required the specific identification of Infosys employees allowed to work on the customer account.

20

60.     The Payor 2 NDAA specifically identifies "Authorized Recipients" by name, location, and title, and limits the total number of Authorized Recipients to 50, despite Infosys's estimation that 250 was a more appropriate number of staff members for this engagement. When Infosys sought to add a new staff member to the Payor 2 account—due to increased needs on the client account or other changes in Infosys's staffing—the Payor 2 NDAA required notice to Cognizant within ten days, including the Authorized Recipient's name, title, and domicile.

61.     The requirement to specifically identify Authorized Recipients has significant impacts on Infosys and its ability to compete in the IT services market and also raises barriers to enter the healthcare payor software market. Such provisions hinder Infosys's ability to provide IT services to its clients because they (i) cause Infosys to provide services to its customers with insufficient manpower when more than the allowed number of Authorized Recipients are required for Infosys to meet its standard of excellent performance; and (ii) improperly prevent Infosys from providing that appropriate manpower as the NDAA limits Infosys's ability to add necessary staffing to meet client requirements without approval from Cognizant, which Cognizant has no duty or incentive to authorize. Such provisions also require additional governance and oversight on Infosys's part that can be difficult to administer and raises costs. Additionally, these provisions limit the number of Infosys employees who are able to gain valuable experience working with QNXT or Facets, further inhibiting Infosys's ability to pitch prospective clients that use those products for IT services contracts. Finally, these lists of Infosys employees with QNXT and Facets experience provide Cognizant with a solicitation list that it can—and has—used to hire away experienced Infosys employees knowledgeable about Facets and QNXT, further weakening Infosys's ability to compete in the IT services market.

62.     The Payor 2 NDAA also precludes Infosys employees that work on products like Infosys Helix from working on the Payor 2 account, further exacerbating the anticompetitive harms enumerated in the paragraph above. Courts and antitrust enforcers have recognized that dominant firms precluding developers from working on competing products in this manner constitutes exclusionary conduct.

63.     These provisions do not protect a legitimate business interest; instead, they are designed to and serve to restrict Infosys's ability to compete by imposing additional burdens on payors and Infosys. They cause Infosys to lose lucrative contracts despite its ability to provide IT services to payors more efficiently than Cognizant and cause payors and Infosys to spend additional time and money. These provisions have the purpose and effect of raising Infosys's costs and degrading the quality of its IT services, as well incentivizing payors to work with Cognizant for IT services to avoid the additional costs and burdens of Cognizant's restrictive demands. They are also intended to raise barriers to threaten Cognizant's dominance in the healthcare payor software market. These provisions are a stark demonstration of Cognizant's market power because these provisions are imposed against the wishes of Cognizant's customers and foreclose competition.

### iii.    Cognizant Requires a One-Sided Non-Solicitation Provision and Extends the Non-Compete Provision as a Confidentiality Obligation.

64.     The Payor 2 NDAA also includes a one-sided non-solicitation provision that only prohibits Infosys from soliciting Cognizant's employees: "**Non-Solicitation of Cognizant Employees**. During the period You are providing Services and for one (1) year after the Services end, You must not solicit for employment or hire any Cognizant employees with whom Your employees performing Services are directly communicating in connection with the Services. General advertisements shall not be considered solicitations." Infosys sought to make this provision mutual during NDAA negotiations in the spirit of promoting a working relationship to collectively

22

service Payor 2, but Cognizant refused. It instead used its market power to impose a one-way non-solicitation provision with no legitimate purpose other than to weaken Infosys's ability to compete.

65.     Courts have recognized that mutual non-solicitation provisions in certain agreements can serve a legitimate purpose by allowing the parties to such agreements to fulfill a common objective without fear that doing so will compromise their workforce. The one-way provision Cognizant imposed, however, has no legitimate purpose. It is designed to facilitate Cognizant's ability to steal key Infosys employees, while preventing Infosys from engaging in its own defensive recruitment of Cognizant employees. The problem is exacerbated by Cognizant's requirement that Infosys disclose the list of its employees working on the mutual customer account, i.e., its employees with valuable experience servicing QNXT and Facets. Infosys had no choice but to accept this provision in order to accomplish its contracted work with Payor 2.

66.     Cognizant also enhanced its non-compete provisions in the Payor 2 NDAA. While the definition of Authorized Recipient includes similar language to that in the Payor 1 NDAA ("are not involved in specifying, designing, developing, managing, marketing, testing, or selling Your commercial software products or providing training for them to the extent such products are directly competitive with any Proprietary Software"), the Payor 2 NDAA innovated in its restrictiveness by adding a non-compete provision to the Confidential Obligations. As a result, an Authorized Recipient cannot "directly or indirectly use Source Material or Proprietary Software to create or enhance any non-Cognizant products that provides related functionality." Proprietary Software is defined broadly to be "Cognizant software, third-party software provided by Cognizant, Cognizant content products that describe or implement the configuration of Cognizant software products, and related user documentation." This new provision, in particular its inclusion of indirect use, in combination with the broad definition of Proprietary Software, has the purpose and effect of

preventing companies like Infosys from developing products that interface with Cognizant's software, even when those products do not rely on protectable information.

67.     Cognizant appears to have inserted this restriction out of fear that the functionality of complementary products and services, such as the system integration tool developed by Infosys for Payor 1, may lead to the development of software that can replace Cognizant's software. Such systems are necessary because Cognizant has derailed efforts to make its software interoperable with other software so that payors are forced to rely on the Facets or QNXT ecosystem for as many core administrative functions as possible.

68.     By adding this provision to the Confidential Obligations, Cognizant is attempting to eliminate competition from new product and service offerings, such as Infosys Helix and interfaces supporting system integration, and has effectively extended the term of the non-compete provision from the three year term on the face of the Payor 2 NDAA to "a minimum period of five (5) years after the date You receive the Cognizant Confidential Information," with Confidential Information broadly defined to include "Cognizant software, third-party software provided by Cognizant," and "related documentation." The provision has no legitimate purpose; it serves only to limit Infosys's staffing and capabilities.

69.     Each of these overly-restrictive provisions and broad definitions that defy industry norms were repeated in the NDAA executed between Infosys and Cognizant TriZetto in April 2022 for an insurance company, hereinafter called Payor 3, which contains a non-compete provision in the definition of Authorized Recipient, one-sided non-solicitation provision, limited list of allowed services, specifically identified Authorized Recipients, and the extension of the non-compete provision by folding the provision into the Confidential Obligations.

70.    The same exclusionary provisions and definitions discussed in the preceding paragraphs were also included in an NDAA executed between Infosys and Cognizant TriZetto in December 2022 for an additional health insurance company, hereinafter called Payor 4. Cognizant's NDAAs are "form agreements," meaning they all contain these exclusionary provisions and, to extent they were not in prior versions, are updated with these provisions when the NDAAs are renewed. Therefore, on information and belief, Cognizant has entered into (and continues to enter into) NDAAs containing the same exclusionary provisions and definitions with other companies who provide IT services to payors using QNXT and Facets.

71.    These provisions serve no legitimate purpose. The provisions instead have the purpose and effect of leveraging Cognizant's monopoly power in the healthcare payor software market to weaken Infosys's ability to compete with Cognizant for IT services work and raise barriers to entry into the healthcare payor software market to protect Cognizant's dominance in that market.

**E.    Cognizant Prohibits Training on QNXT and Facets.**

72.    Cognizant also improperly protects its dominant position in the IT services market by refusing to allow training on its QNXT and Facets products for IT services vendors like Infosys. This decision to withhold training lacks any efficiency rationale other than to harm Cognizant's rivals by raising their costs and to foreclose healthy competition that would benefit payors and their customers.

73.    When QCSI owned QNXT, QCSI offered a certified service partners program to provide comprehensive training on the QNXT platform for IT services vendors. Infosys was a Certified Service Partner for QCSI. It was in QCSI's economic interest to provide a robust training program to service partners, like Infosys, because QCSI would profit from encouraging training of qualified service providers because training provides a higher quality of consulting services to

25

clients and results in greater overall satisfaction with the payor software platform, which encourages adoption and retention of their software. It also benefited Infosys because Infosys had a cost-efficient way to learn about changes to the software so it could effectively provide IT services for that software on an ongoing basis to clients who used QNXT.

74.    For the same reasons, TriZetto also offered vendors an ability to be a certified vendor for QNXT and Facets, meaning that the vendor and its staffed employees could participate in a certification program for the then-current version of the product. This training included configuration, providing sample business use cases that offered configuration solutions for all software modules.

75.    A few years ago, Cognizant rolled out a comprehensive certified service partner program but, unlike the prior owners of the software, Cognizant limited access to the program to small market players (i.e., less efficient and capable rivals), excluding Cognizant's most significant competitors (like Infosys) from participation. Cognizant's decision to limit access to its certified service partner program did not make economic sense because the cost to Cognizant of extending the program to all service providers was minimal while Cognizant could charge additional fees to the larger service providers, thus profiting more by providing greater access to the certified service partner program.

76.    Cognizant's actions have ensured that the market is **not** competitive, as detailed above. Cognizant is not interested in profits from the provision of training and resulting overall satisfaction with its payer software platforms, or a competitive market for services that would lead to the adoption and use of its software platforms—its goal is to create an uncompetitive market in which Cognizant uses its market power to deter its payor customers from using competitor solutions

that would benefit customers and contribute to an efficient market with higher quality products and lower costs.

77.    Despite Cognizant's anticompetitive conduct, Infosys has been able to pitch for IT services work related to Cognizant's products over the past decade because of both Infosys's historic knowledge and Cognizant's lack of innovation in its products, which have not changed significantly in a decade or more. However, the availability of training to Infosys and other strong competitors would have made Infosys and others more competitive with Cognizant for IT services, thereby enabling unfettered competition that benefits consumers.

**F.    Executive Sponsors Lead Infosys's Efforts to Develop Infosys Helix to Challenge Cognizant's Dominance.**

78.    Cognizant's software products have existed for decades and faced little competition. Cognizant therefore lacked any meaningful incentive to respond to client demand for innovation or lower its prices. Infosys recognized the client demand for new innovative products and began developing Infosys Helix—a cloud-based, AI-powered solution based on modern programming language.

79.    Infosys is uniquely positioned to challenge Cognizant's dominance over the healthcare payor software market. Infosys has the requisite subject matter expertise in the healthcare industry and technical know-how to build a better solution for payors than Cognizant's antiquated products. Infosys also has support from key payors to build this solution based on its track record and reputation in the industry.

80.    In 2019, Infosys decided to enter the healthcare payor software market. That same year, Payor 1 selected Infosys for a contract valued at hundreds of millions of dollars for end-to-end managed services for infrastructure, application maintenance, and cloud migration.

81.     Infosys leveraged its relationship with Payor 1 in late May 2020 to explore modernization of Payor 1's larger technology landscape, including introducing Infosys Helix as a possible solution to certain problems Payor 1 faced with its homegrown payor enrollment system.

82.     Infosys is using an anchor client model for its development of Infosys Helix. This means that the development of various functionalities of Infosys Helix is prioritized by the needs of the anchor clients, which helps support the significant development costs entailed in creating a new software platform. Payor 1 was one of the first Infosys Helix anchor clients. As a result, the first functionalities Infosys developed for Infosys Helix coincide with the functionalities pitched to meet Payor 1's needs.

83.     As a new Infosys product, Infosys Helix required significant internal support to advance, including critical executive-level support. For Infosys Helix, the primary executive sponsor was then-President Ravi Kumar S. Kumar controlled the Infosys Helix development budget. In addition, he led Infosys's global delivery organization, independent validation services, engineering services, emerging technology solutions, business intelligence and analytics, cloud and infrastructure, and enterprise package applications service lines.

84.     In the fall of 2020, Kumar was made aware of the early stages of the negotiations with Payor 1 for a potentially significant customer deal involving Infosys Helix. At the time, Payor 1 used Cognizant's QNXT software with other Payor 1-developed software.

85.     Infosys submitted a proposal to Payor 1 in December 2020 to take over Payor 1's Medicaid enrollment function, using Infosys Helix, as well as replacing four internally-created Payor 1 systems with an Infosys Helix coverage module and integrating with QNXT. Kumar was informed and updated on the proposal that was submitted to the customer.

86.     As negotiations with Payor 1 continued during the first months of 2021, Kumar was approached for support on staffing issues to move forward with the potential Payor 1 deal, including the financial benefit of the deal to Infosys, as well as Infosys Helix development approvals. As part of those requests, Infosys provided competitively sensitive business and strategy information to Kumar, including the existing pipeline and revenue projections for Infosys Helix. At that time (February 2021), Infosys's confidential internal projections included clients representing several possible deals projected to bring in substantial revenue to Infosys in 2022 and 2023.

87.     Over the next few months, Kumar regularly received confidential updates on additional progress securing clients and revenue related to Infosys Helix. As Infosys Helix appeared to gain traction with potential customers, Kumar appointed Shveta Arora, Senior Vice President, Global Head of Consulting, as a co-executive sponsor for Infosys Helix to help orchestrate development across service lines. Arora shared Kumar's optimism about the new product, remarking that, "With whatever I have heard so far on Infosys Helix, I am very excited about the effort and look forward to partnering on this to help realize the vision." Kumar also relied heavily on Ravi Kiran Kuchibhotla, Senior Vice President and Head of Strategy, who actively supported Infosys Helix, coordinating service lines and staffing to accelerate its build to help close client deals in 2021.

88.     Infosys closed its Infosys Helix deal with Payor 1 in Spring 2021. The value of the contract was significant. Both Kumar and Arora lauded it as a critical step to bringing much needed competition to QNXT and Facets. Kumar asserted that Infosys Helix was "a challenger to the traditional platforms and I'm quite sure if we persist, we can pull through market momentum around Infosys Helix," while Arora predicted that "Infosys Helix has the potential to catapult Infosys positioning in the overall Healthcare market."

29

89.    Kumar, Arora, and Kuchibhotla continued to receive confidential updates about the Infosys Helix business plan and product pipeline through 2021. As of September 2021, Infosys had multiple signed contracts for Infosys Helix, creating substantial value for the company, and a potential pipeline representing substantially more potential revenue around Infosys Helix.

90.    Kumar, Arora, and Kuchibhotla maintained their support for Infosys Helix through the remainder of 2021. Kumar even recorded an Infosys Helix promotional video for upcoming industry conventions that Kumar suggested be "amplif[ied]" as part of the company's campaign to advance Infosys Helix.

91.    Kumar, Arora, and Kuchibhotla knew that one of Infosys's strategies to "displace" and aggressively compete against Cognizant was to leverage Infosys's software platforms, including Infosys Helix, because there was "CTS fatigue in key large accounts" and Infosys could exploit that market dynamic by promoting its new product.

## G.    Executive Sponsors Suddenly Retract Internal Support While Negotiating to Join Cognizant Leadership.

92.    In 2022, Kumar began communicating with Cognizant about potentially joining Cognizant.

93.    Despite Infosys Helix's remarkable success in obtaining contracts in its first year with Kumar's full support, in 2022, Kumar pulled back his support. For months, he refused to authorize additional staffing support that Infosys Helix needed to meet its go-live date for Payor 1. In March 2022, for example, Kumar was asked for additional engineering support for Infosys Helix, with the request noting that due to a lack of appropriate staffing (caused by Kumar), Infosys had pushed back its planned go-live date for Infosys Helix with Payor 1 and had lost an additional substantial opportunity with Payor 1 because of the delay. Infosys also lost an opportunity to sell a new coverage model to another client because the client wanted to test the product and Infosys had

not yet staffed the necessary resources to develop it in a manner that would allow appropriate testing, again because of Kumar's delays.

94.    Despite being presented with these lost opportunities and related challenges, Kumar continued to push back on requests for resources to support the development of Infosys Helix and instead proposed that Infosys Helix "slow down," suggesting Infosys should not "invest so much engg $ [engineering money]" on Infosys Helix.

95.    Kumar continued to ignore requests for additional engineering support for Infosys Helix in the Spring of 2022, with the assistance of Arora and Kuchibhotla, canceling meetings to discuss the issue, even though the lack of staffing had resulted in "a situation now [where the] client is shaming us on the delays" and a fear within Infosys that the client would cancel the contract due to Infosys's delay in providing necessary engineering support.

96.    In late July 2022, requests for staffing approval by Kumar were escalated with urgency to the Global Head of the Healthcare vertical, as the Infosys Helix functionality was on "a critical path" by that point with "a serious go-live risk that can potentially result in the entire seven figure SOW termination by the client due to repeated go-live delays." The request included a revenue versus cost analysis that reflected a potential substantial net realization benefiting Infosys. Kumar did not respond by email to the request.

97.    A few days later, Kumar received another request for staffing support noting that Infosys was at a crucial juncture with Infosys Helix and was struggling to deliver on sold business to Payor 1 and another anchor client. Kumar again did not respond.

98.    On August 16, 2022, Kumar was included on an email describing the importance of Payor 1 to the success of Infosys Helix, describing Infosys Helix as "critical" to Infosys's growth future and reiterating that Payor 1 was an anchor client for Infosys Helix. Kumar finally approved

the necessary engineering staffing for the Payor 1 deadlines. But his approval came with an important caveat: that the staffing must be to billable work aimed at concrete needs from clients. In other words, Kumar approved staffing for already-contracted work but was foreclosing staffing for further development of Infosys Helix's future-state goals.

99.    A few days later, on August 22, 2022, Kumar met with Cognizant's Chief of Staff to the Chief Executive Officer.

100.    Because of Kumar's decisions while he was a leader at Infosys, Infosys did not allocate new programmer talent to Infosys Helix, hire new personnel for the product, or backfill product support positions for attrition. Infosys Helix was slowed down materially by Kumar. His decisions effectively meant that, at the time, Infosys "cannot do any new development" for Infosys Helix.

101.    Kumar continued receiving competitively sensitive details concerning the business plan and strategy. In late August, Kumar received a confidential document for the Infosys Helix steering committee with detailed information about the product, functionality, business pipeline, potential clients, and other opportunities related to Infosys Helix. Kumar received additional confidential updates regarding business plans and marketing strategy for Infosys Helix through September, such as an email about a possible collaboration with another major company potentially taking Infosys Helix to its clients.

102.    Kumar left Infosys in October 2022, and Cognizant announced him as part of its leadership team shortly thereafter. Kumar officially joined Cognizant as the company's new Chief Executive Officer in January 2023. Cognizant used its power in the payor software and related-IT services markets to lure away Kumar, incentivizing disloyal behavior that delayed and degraded the launch of Infosys Helix, harming Infosys and preserving Cognizant's dominance.

103.    After Kumar's departure, Arora continued in her role of executive sponsor for Infosys Helix. Arora was regularly updated on the development needs and business plan for Infosys Helix after Kumar's departure. Arora was aware, for example, that Infosys Helix was projected to be profitable by 2025 and that, over the course of 2023, had secured new client opportunities.

104.    However, despite client demand and the need to advance Infosys Helix to the marketplace to compete with Cognizant, Arora continued the pattern of obfuscation and, ineffectual delay established by Kumar. For example, despite Kumar's approval of additional engineering staffing for Infosys Helix billable client work in August 2022, Arora did not get these essential roles actually staffed until nearly a year later. The pattern of inaction continued to cause delay in Infosys's Helix development and tarnish its reputation with anchor clients. Kuchibhotla followed Arora's lead, similarly, lacking urgency in coordinating staffing and delaying the provision of other necessary resources in support of Infosys Helix.

105.    Arora gave notice in October 2023 and joined Cognizant in December 2023, with Kuchibhotla following in 2024. Cognizant stole the executive sponsors of Infosys Helix and incentivized their disloyal actions to delay and stifle Infosys Helix as part of its anticompetitive scheme to protect its dominance.

**H.    Cognizant's Conduct Has Delayed Infosys Helix and Threatened its Viability**.

106.    To date, Infosys has invested significant funds and resources to build Infosys Helix, but the product and business were delayed by at least a year and a half due to decisions made by Kumar, with the help of Arora and Kuchibhotla, while they were plotting their move to Cognizant. Discovery will reveal if Kumar, Arora, Kuchibhotla, or anyone else at Cognizant used Infosys's confidential or trade secret information to benefit Cognizant, as well as the extent to which they and Cognizant timed their departures from Infosys to harm the advancement of Infosys Helix.

Infosys will if appropriate seek leave to amend this Counterclaim to assert any appropriate facts and claims related to trade secret misappropriation that are revealed during the discovery process.

107.    After Kumar joined Cognizant, he also used his inside knowledge of Infosys Helix's functionality, strategy, and target clients from his time acting as its executive sponsor to prevent key accounts from exploring Infosys Helix. Cognizant delayed Infosys Helix's development further by hiring Arora and Kuchibhotla, who it knew were significant to Infosys Helix's executive-level support within Infosys following Kumar's departure.

108.    To date, through the misconduct outlined above, Cognizant has successfully excluded a disruptive new entrant to the healthcare payor software market. Cognizant has artificially raised entry barriers through its exclusionary NDAA provisions and engaged in gross impropriety by using its power to encourage employee disloyalty at Infosys and obtain its competitively sensitive information.

## RELEVANT MARKETS

### A.    Healthcare Payor Software Products.

109.    Software products for healthcare payors located in the United States is a relevant market. This market excludes proprietary software products built by large healthcare payors for their exclusive purpose.

110.    There are no substitutes for these products, which healthcare payors rely on to perform essential core administrative functions.

111.    Most payors lack sufficient scale, resources, and expertise to build their own payor software.

112.    Software products not specifically designed for healthcare payors are not viable substitutes because such payors have many bespoke needs that non-specialized software is not equipped to address. A hypothetical monopolist of healthcare payor software products could

34

therefore impose a small, but significant, non-transitory increase in price on payors who purchase this software.

113.    Cognizant competes in this market. Cognizant describes QNXT as an "enterprise-wide core administration platform" with "easily configurable modules for payors." Similarly, Cognizant describes Facets as a "next-generation solution that integrates consumer, care, claims and revenue management in a flexible platform." In addition to these core products, Cognizant provides many other programs to healthcare payors like Elements, which integrates with both products to provide an "enrollment administration manager and workflow" option that is Cognizant's "comprehensive enrollment solution."

114.    Infosys is attempting to enter this market with its innovative, cloud-based Infosys Helix product, as well as the Adaptor, a system integration tool developed by Infosys for Payor 1 to integrate Infosys Helix with QNXT to ensure seamless functionality. Infosys's new products can provide similar or higher quality functionality to Cognizant's dominant, decades-old on-premise products.

115.    Infosys has invested tens of millions of dollars into the development of Infosys Helix's functionalities.

116.    This investment by Infosys has paid early returns. Despite the prevalence of long-term contracts and the difficulty involved in transitioning software platforms used by customers, Infosys Helix has found success in launching initial functionalities. By May 2023, 2,500 customer users utilized Infosys Helix in their workflow.

117.    In its first four years, Infosys entered into contracts with large payors like Payor 1, and several other larger managed care company payors for Infosys Helix functionalities. The contract value of these deals totals eight figures.

**B.    IT Services for Healthcare Payors.**

118.    IT services for healthcare payors located in the United States is a relevant market.

119.    IT services allow payors to effectively use the payor software they rely on to process claims and perform other core administrative functions, and can include developing, integrating, testing, and troubleshooting such software.

120.    There are no substitutes for these services, which healthcare payors rely on to ensure that their software products are working properly and their staff are able to perform essential core administrative functions.

121.    Payors lack sufficient scale, resources, and expertise to provide their own IT services for their software.

122.    IT services vendors without significant experience in the healthcare payor field are not significant competitors in this market because they do not have the subject matter expertise to meet client needs. A hypothetical monopolist of healthcare payor IT services could therefore impose a small but significant non-transitory increase in price on payors.

123.    Cognizant is a close competitor to Infosys for contracts to provide IT services to healthcare payors, especially those payors using Cognizant's QNXT or Facets products that recognize the value of Infosys's expertise and experience helping to develop QNXT.

<u>**MARKET POWER**</u>

**A.    Healthcare Payor Software Products.**

124.    Cognizant has held a dominant share of the healthcare payor software market since at least 2014 when CTS acquired TriZetto.

125.    CTS has publicly stated it enjoys a 65% share of the healthcare payor software market and, as of 2024, CTS asserted that it intends to "double down" on its healthcare business.

126.    Cognizant's software clients include some of the largest healthcare payors in the country. For instance, more than half of the 38 Blue Cross Blue Shield affiliates use Facets. Barriers to entry are high as evidenced by Cognizant's durably high market share over the past decade despite significant demand from healthcare payors for innovative cloud-based products.

127.    Entry into this market requires substantial resources, a high degree of technical sophistication, subject-matter expertise, and a strong reputation with payors.

**B.    IT Services for Healthcare Payors.**

128.    Cognizant has maintained a dominant share of the healthcare payor IT services market by leveraging its control of the healthcare payor software market to provide IT services to the vast majority of payors who use its software products.

129.    Cognizant enjoys a high and stable market share of greater than 50% of the healthcare payor IT services market because it substantially controls who payors can work with to address IT needs related to Cognizant's dominant software products through the license agreements and NDAAs described above. In particular, Cognizant uses its agreements with the payors that license its software products to control which firms they can and cannot select for their IT needs.

130.    Cognizant's ability to restrict Infosys's IT services work with Payor 1, Payor 2, Payor 3, and Payor 4 through its contractual demands is direct evidence of Cognizant's power to exclude competition in this market.

131.    Cognizant's market power is also demonstrated by its ability to impose contractual terms against the wishes of its clients that exclude competition. Cognizant bullies its clients and partners into accepting undesirable terms because payors cannot easily switch away from Cognizant's payor software products. It is costly and time consuming for payors to switch software they rely on for mission-critical functions. Risk management companies like healthcare payors have a low tolerance for risk, and switching software can cause potentially costly disruptions—

particularly in light of Cognizant's actions to impede products and services like Infosys Helix and system integration tools, such as the Adaptor, because it fears payors will migrate away from Cognizant's products.

<b>COGNIZANT'S SCHEME TO EXCLUDE<br>COMPETITION AND UNREASONABLY RESTRAIN TRADE</b>

132.    Cognizant has engaged in the course of exclusionary conduct described herein to foreclose competition in the healthcare payor IT services market and protect its dominance in the healthcare payor software market.

133.    This pattern of exclusionary conduct is multi-faceted and includes (a) restrictive provisions in NDAAs that unreasonably limit competition in the healthcare payor IT services market as well as raise barriers to entry into the healthcare payor software market, (b) MFV provisions in Cognizant's license agreements with payors giving it a first right of refusal to perform IT services work related to its software, (c) refusals to provide training on its software to significant competitors, such as Infosys, while providing training to other less significant competitors, and (d) encouraging disloyal employee behavior and possible misappropriation of competitively sensitive information to delay and foreclose competition in the healthcare payor software market from Infosys Helix—an innovative cloud-based software.

<b>COGNIZANT'S EXCLUSIONARY INTENT AND<br>LACK OF PROCOMPETITIVE JUSTIFICATIONS</b>

134.    Cognizant has no legitimate justifications for its exclusionary tactics, which are not reasonably necessary to protect any genuine trade secret information. Cognizant only began deploying such tactics after Infosys emerged as a more significant competitive threat in both relevant markets. If Cognizant's NDAAs were essential to safeguard its confidential information, it would not have permitted Infosys to provide IT services without an executed NDAA for a large health plan's use of Facets since July 2015 or for a large managed care company's use of QNXT

38

since 2011. Cognizant's conduct defies standard industry practice for software developers to require only a licensing agreement with their clients, rather than any sort of confidentiality or non-disclosure agreement with clients' third-party service providers with whom the developer has no direct business relationship.

135.    Filings in Cognizant's lawsuit against Infosys for allegedly misappropriating its trade secrets provide additional, direct evidence of Cognizant's anticompetitive intent. Cognizant has admitted in those filings that it has sought to exclude competition from Infosys through its "strict" NDAAs that are aimed at preventing Infosys from "develop[ing] competing products." *See* Cognizant's Brief in Opposition to Infosys's Motion to Dismiss, ECF 38, at 1, 25; *see also id.* at 6, 17 (admitting that Cognizant seeks to prevent Infosys from helping healthcare payors that wish to migrate away from its products).

## INJURY TO INFOSYS

136.    Infosys has suffered millions of dollars in lost sales and increased costs due to Cognizant's anticompetitive conduct described above.

137.    Infosys has lost contracts for IT services contracts because Cognizant has enforced its restrictive NDAA provisions discussed above in ways that prevented Infosys from winning that work. Cognizant's conduct has also imposed additional and unnecessary costs on Infosys to provide IT services for payors who use QNXT and Facets resulting in lower profits than Infosys would otherwise achieve but for Cognizant's conduct.

138.    Similarly, Infosys has lost contracts for payor software because Cognizant has raised barriers to entry and recruited away the key executive sponsors for Infosys Helix and caused them to delay Infosys Helix's development while they remained employed at Infosys. But for Cognizant's conduct, Infosys would have obtained significant revenue from selling Infosys Helix to payors and

would be farther along in development to earn even more revenue from selling its software to other payors.

## INJURY TO COMPETITION

139.    Cognizant's conduct has harmed competition in the healthcare payor software and related IT services markets, thereby harming payors—the direct purchasers of these products—in the form of paying higher prices for lower quality products and services. The American public is also harmed because it is well recognized that payors will pass on higher costs to their customers— the insured—in the form of higher premiums, deductibles, co-pays, and other out-of-pocket costs associated with healthcare insurance.

140.    Infosys is uniquely positioned to deliver high-quality, competitively priced products and services to healthcare payors because it is one of the few firms with the resources, technical know-how, and subject-matter expertise in the healthcare vertical to meet payors' needs and gain payors' trust.

141.    But for Cognizant's conduct, payors would pay lower prices for IT services because IT providers would compete on the merits to provide payors with the highest quality, lowest priced IT services. Cognizant's conduct, for the reasons explained above, has unreasonably restrained competition from Infosys and others for these services.

142.    Similarly, Cognizant's conduct is causing payors to pay more for their antiquated software products, which require more costly IT services than modern software products. Cognizant has achieved this result by erecting barriers to entry into the healthcare payor software market that discourage and foreclose competition as well as substantially delaying Infosys from bringing innovative products like Infosys Helix and system integration tools, such as the Adaptor, to the market that would apply competitive pressure on Cognizant to lower its prices and innovate its product offerings.

40

143.     Because software and IT services are a major expense for payors, Cognizant's anticompetitive conduct has significantly contributed to the persistently high and growing healthcare costs that the public must bear. Payors' IT spending alone typically costs between 3% and 4.5% of their total revenues, which can translate to hundreds of millions of dollars for large payors.[24] Americans purchasing health insurance are the ones that are ultimately left to pick up this tab.

## COUNT I

### Violations of Section 2 of the Sherman Act - Monopolization

### (15 U.S.C. § 2)

144.     Infosys restates and realleges the allegations of all foregoing paragraphs.

145.     The relevant geographic market is the United States.

146.     The relevant product markets are the markets for (1) healthcare payor software products, and (2) information technology services for healthcare payors using such software.

147.     Cognizant possesses monopoly power in the relevant markets.

148.     Cognizant is willfully maintaining its monopoly power in the relevant markets by engaging in the pattern of anticompetitive acts described above.

149.     As a direct and proximate result of Cognizant's violations of Section 2 of the Sherman Act, Infosys has suffered injury to its business and property, and further injury is threatened if Cognizant's actions are not enjoined.

150.     Cognizant's actions have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

---

[24] "How Much Should You Spend on Healthcare IT? As a % of Revenue," accessed Jan. 9, 2025, available at: https://peaketechnology.com/healthcare-it-budgeting-101/.

151.    As a direct and proximate result of Cognizant's violations of Section 2 of the Sherman Act, innovation has been stifled and healthcare payors have been deprived of superior software products and related-IT services.

152.    As a direct and proximate result of Cognizant's violations of Section 2 of the Sherman Act, healthcare payors have been forced to pay artificially high prices in the relevant markets.

153.    Infosys seeks damages as may be determined by a jury and a permanent injunction prohibiting Cognizant from continuing to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

154.    Pursuant to the Clayton Act, 15 U.S.C. § 15, Infosys is entitled to automatic trebling of any damages, as well as reasonable attorneys' fees and costs.

## COUNT II

**Violations of Section 2 of the Sherman Act – Attempted Monopolization**

**(15 U.S.C. § 2)**

155.    Infosys restates and realleges the allegations of all foregoing paragraphs.

156.    The relevant geographic market is the United States.

157.    The relevant product markets are the markets for (1) healthcare payor software products, and (2) information technology services for healthcare payors using such software.

158.    With a specific intent to monopolize the relevant markets, Cognizant has engaged in the pattern of anticompetitive acts described above, all of which constitute overt acts in furtherance of its attempt to monopolize with a dangerous probability of success.

159.    As a direct and proximate result of Cognizant's violations of Section 2 of the Sherman Act, Infosys has suffered injury to its business and property, and further injury is threatened if Cognizant's actions are not enjoined.

160.    Cognizant's actions have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

161.    As a direct and proximate result of Cognizant's violations of Section 2 of the Sherman Act, innovation has been stifled and healthcare payors have been deprived of superior software products and related-IT services.

162.    As a direct and proximate result of Cognizant's violations of Section 2 of the Sherman Act, healthcare payors have been forced to pay artificially high prices in the relevant markets.

163.    Infosys seeks damages as may be determined by a jury and a permanent injunction prohibiting Cognizant from continuing to attempt to monopolize the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

164.    Pursuant to the Clayton Act, 15 U.S.C. § 15, Infosys is entitled to automatic trebling of any damages, as well as reasonable attorneys' fees and costs.

## COUNT III

### Violation of Section 1 of the Sherman Act– Unreasonable Restraint of Trade
### (15 U.S.C. § 1)

165.    Infosys restates and realleges the allegations of all the foregoing paragraphs.

166.    The relevant geographic market is the United States.

167.    The relevant product markets are the markets for (1) healthcare payor software products, and (2) information technology services for healthcare payors using such software.

168.    Cognizant has market power in the relevant markets.

169.    Cognizant's NDAAs and MFV provisions in license agreements described in the foregoing paragraphs are contracts that unreasonably restrain trade because they foreclose

competition in the relevant markets by raising rivals' costs, weakening rivals' competitive offerings, and increasing barriers to entry.

170.    As a direct and proximate result of Cognizant's violations of Section 1 of the Sherman Act, Infosys has suffered injury to its business and property, and further injury is threatened if Cognizant's actions are not enjoined.

171.    Cognizant's actions have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

172.    As a direct and proximate result of Cognizant's violations of Section 1 of the Sherman Act, innovation has been stifled and healthcare payors have been deprived of superior software products and related-IT services.

173.    As a direct and proximate result of Cognizant's violations of Section 1 of the Sherman Act, healthcare payors have been forced to pay artificially high prices in the relevant markets.

174.    Infosys seeks damages as may be determined by a jury and a permanent injunction prohibiting Cognizant from continuing to attempt to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

175.    Pursuant to the Clayton Act, 15 U.S.C. § 15, Infosys is entitled to automatic trebling of any damages, as well as reasonable attorneys' fees and costs.

**<u>COUNT IV</u>**

**Violations of the Texas Free Enterprise and Antitrust Act (TFEAA)
– Monopolization**

**(Tex. Bus. & Com. Code Ann. § 15.05(b))**

176.    Infosys restates and realleges the allegations of all foregoing paragraphs.

177.    Cognizant possesses monopoly power in the relevant markets.

178.    The relevant geographic market is the United States.

179.    The relevant product markets are the markets for (1) healthcare payor software products, and (2) information technology services for healthcare payors using such software.

180.    Cognizant is willfully maintaining its monopoly power in the relevant markets by engaging in the pattern of anticompetitive acts described above.

181.    As a direct and proximate result of Cognizant's violations of the TFEAA, Infosys has suffered injury to its business and property, and further injury is threatened if Cognizant's actions are not enjoined.

182.    Cognizant's actions have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

183.    As a direct and proximate result of Cognizant's violations of Section 15.05(b) of the TFEAA, innovation has been stifled and healthcare payors have been deprived of superior software products and related-IT services.

184.    As a direct and proximate result of Cognizant's violations of Section 15.05(b) of the TFEAA, healthcare payors have been forced to pay artificially high prices in the relevant markets.

185.    Infosys seeks damages as may be determined by a jury and a permanent injunction prohibiting Cognizant from continuing to monopolize in violation of the TFEAA.

186.    Pursuant to the TFEAA, Infosys is entitled to automatic trebling of any damages, as well as reasonable attorneys' fees and costs.

## COUNT V

### Violations of the Texas Free Enterprise and Antitrust Act (TFEAA) – Attempted Monopolization

### (Tex. Bus. & Com. Code Ann. § 15.05(b))

187.    Infosys restates and realleges the allegations of all foregoing paragraphs.

188.    The relevant geographic market is the United States.

189.    The relevant product markets are the markets for (1) healthcare payor software products, and (2) information technology services for healthcare payors using such software.

190.    With a specific intent to monopolize the relevant markets, Cognizant has engaged in the pattern of anticompetitive acts described above, all of which constitute overt acts in furtherance of its attempt to monopolize with a dangerous probability of success.

191.    As a direct and proximate result of Cognizant's violations of Section 15.05(b) of the TFEAA, Infosys has suffered injury to its business and property, and further injury is threatened if Cognizant's actions are not enjoined.

192.    Cognizant's actions have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

193.    As a direct and proximate result of Cognizant's violations of the TFEAA, innovation has been stifled and healthcare payors have been deprived of superior software products and related-IT services.

194.    As a direct and proximate result of Cognizant's violations of Section 15.05(b) of the TFEAA, healthcare payors have been forced to pay artificially high prices in the relevant markets.

195.    Infosys seeks damages as may be determined by a jury and a permanent injunction prohibiting Cognizant from continuing to attempt to monopolize the relevant markets in violation of the TFEAA.

196.    Pursuant to the TFEAA, Infosys is entitled to automatic trebling of any damages, as well as reasonable attorneys' fees and costs.

## COUNT VI

**Violations of the Texas Free Enterprise and Antitrust Act (TFEAA)
– Unreasonable Restraint of Trade**

**(Tex. Bus. & Com. Code Ann. § 15.05(a))**

197.    Infosys restates and realleges the allegations of all foregoing paragraphs.

198.    The relevant geographic market is the United States.

199.    The relevant product markets are the markets for (1) healthcare payor software products, and (2) information technology services for healthcare payors using such software.

200.    Cognizant has market power in the relevant markets.

201.    Cognizant's NDAAs and MFV provisions in license agreements described in the foregoing paragraphs are contracts that unreasonably restrain trade because they foreclose competition in the relevant markets by raising rivals' costs, weakening rivals' competitive offerings, and increasing barriers to entry.

202.    As a direct and proximate result of Cognizant's violations of Section 15.05(a) of the TFEAA, Infosys has suffered injury to its business and property, and further injury is threatened if Cognizant's actions are not enjoined.

203.    Cognizant's actions have substantially harmed competition, and, if not enjoined, threaten to further harm competition in the relevant markets.

204.    As a direct and proximate result of Cognizant's violations of Section 15.05(a) of the TFEAA, innovation has been stifled and healthcare payors have been deprived of superior software products and related-IT services.

205.    As a direct and proximate result of Cognizant's violations of Section 15.05(a) of the TFEAA, healthcare payors have been forced to pay artificially high prices in the relevant markets.

206.    Infosys seeks damages as may be determined by a jury and a permanent injunction prohibiting Cognizant from continuing to attempt to unreasonably restrain trade in violation of Section 15.05(a) of the TFEAA.

207.    Pursuant to the TFEAA, Infosys is entitled to automatic trebling of any damages, as well as reasonable attorneys' fees and costs.

## JURY DEMAND

208.    Infosys requests trial by jury as to all claims triable to a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Infosys respectfully requests that the Court:

209.    Enter judgment in favor of Infosys and against Cognizant with respect to each of the Counts above.

210.    Award a permanent injunction prohibiting Cognizant from engaging in the pattern of exclusionary acts described above.

211.    Declare invalid and unenforceable Cognizant's NDAAs with Infosys.

212.    Award Infosys three times its damages suffered, as well as reasonable attorneys' fees and costs.

213.    Award Infosys any such other relief as the Court deems appropriate.

Dated: January 9, 2025                              Respectfully submitted,

                                                    JENNER & BLOCK LLP

                                                    By: /s/ *Brent Caslin*
                                                    Brent Caslin (*pro hac vice*)
                                                    Nick Saros (*pro hac vice* pending)
                                                    Kelly M. Morrison (*pro hac vice*)
                                                    515 S. Flower Street, Suite 3300
                                                    Los Angeles, CA 90071
                                                    Tel.: (213) 239-5100

BCaslin@jenner.com
NSaros@jenner.com
KMorrison@jenner.com

Shoba Pillay (*pro hac vice*)
Paul B. Rietema (Bar. No. 24133324)
Laura E. Pelanek (*pro hac vice*)
Lindsey A. Lusk (*pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
SPillay@jenner.com
PRietema@jenner.com
LPelanek@jenner.com
LLusk@jenner.com

Douglas E. Litvack (*pro hac vice* pending)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
DLitvack@jenner.com

*Attorneys for Defendant and Counterclaim*
*Plaintiff Infosys Limited*

## <u>CERTIFICATE OF SERVICE</u>

On January 9, 2025, I filed foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5 (b)(2).

/s/ *Brent Caslin*
Brent Caslin