**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| COGNIZANT TRIZETTO SOFTWARE GROUP, INC., <br><br>         Plaintiff, <br><br>    v. <br><br> INFOSYS LIMITED, <br><br>         Defendant. | Case No. 3:24-cv-2158-X <br><br> The Honorable Brantley Starr |
| INFOSYS LIMITED, <br><br>         Counterclaim Plaintiff, <br><br>    v. <br><br> COGNIZANT TECHNOLOGY SOLUTIONS CORP. and COGNIZANT TRIZETTO SOFTWARE GROUP, INC., <br><br>         Counterclaim Defendants. | |

**COGNIZANT TECHNOLOGY SOLUTIONS CORP.'S AND COGNIZANT TRIZETTO
SOFTWARE GROUP, INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS INFOSYS LIMITED'S COUNTERCLAIM**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD......................................................................................................... 5

ARGUMENT ....................................................................................................................... 5

I.     Infosys Fails to Plead A Violation Of Section 2 Of The Sherman Act ................. 5

       A.     Infosys Fails to Allege Plausible Relevant Markets ................................... 6

       B.     Infosys Does Not Allege Monopoly Power .................................................. 9

       C.     Infosys Alleges No Exclusionary Conduct ................................................ 13

       D.     Infosys Fails To Allege Attempted Monopolization .............................. 20

       E.     Infosys Fails To Allege Antitrust Injury .................................................. 21

II.     Infosys Fails to Plead A Violation Of Section 1 Of The Sherman Act ............. 22

III.    Infosys's Parallel Claims Under the Texas Free Enterprise and Antitrust
Act Fail......................................................................................................................... 25

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc.*,
  735 F.2d 884 (5th Cir. 1984) ..................................................................................17

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
  300 F.3d 620 (5th Cir. 2002) .........................................................................6, 7, 8, 25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................5, 16

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)...............................................................................................14

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)................................................................................18, 20, 22

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................5

*Big River Indus., Inc. v. Headwaters Res., Inc.*,
  971 F. Supp. 2d 609 (M.D. La. 2013).....................................................................11

*Blix Inc. v. Apple, Inc.*,
  2021 WL 2895654 (D. Del. July 9, 2021) ...............................................................22

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)....................................................................................2, 12, 22

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)...............................................................................................19

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
  429 U.S. 477 (1977)...............................................................................................22

*C.E. Servs., Inc. v. Control Data Corp.*,
  759 F.2d 1241 (5th Cir. 1985) ................................................................................21

*Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am.*,
  885 F.2d 683 (10th Cir. 1989) ................................................................................10

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
  846 F.2d 284 (5th Cir. 1988) ..................................................................................24

*Coronavirus Rep. v. Apple, Inc.*,
  85 F.4th 948 (9th Cir. 2023) .....................................................................................6

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ..................................................................................24

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*,
    679 F.2d 516 (5th Cir. 1982) ...................................................................9, 10, 12

*Exxon Corp. v. Berwick Bay Real Est. Partners*,
    748 F.2d 937 (5th Cir. 1984) ...................................................................10, 11, 13

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
    852 F. Supp. 2d 1171 (N.D. Cal. 2012) ..................................................12

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ...................................................................15, 20

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
    723 F.3d 1019 (9th Cir. 2013) .................................................................15

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ...................................................................5

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
    423 F.3d 374 (3d Cir. 2005)......................................................................9

*IDX Systems Corp. v. Epic Systems Corp.*,
    285 F.3d 581 (7th Cir. 2002) ...................................................................19, 20

*Kolon Indus. v. I.E. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) ...................................................................10

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)...................................................................................15, 23, 24

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) ............................................................21

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
    302 F.3d 1207 (11th Cir. 2002) ...............................................................13

*Marucci Sports, L.L.C. v. NCAA*,
    751 F.3d 368 (5th Cir. 2014) ...................................................................23, 24

*In re Mem'l Hermann Hosp. Sys.*,
    464 S.W.3d 686 (Tex. 2015).....................................................................25

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) .................................................................13

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans
    Archdiocesan Cemeteries*,
    56 F.4th 1026 (5th Cir. 2023) ..................................................................23

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) .............................................................................7

*Novell Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ...............................................................15, 16, 18

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)..........................................................................................23

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009).............................................................1, 2, 14, 15, 18

*In re Pools Prods. Distrib. Mkt. Antitrust Litig.*,
    940 F. Supp. 2d 367 (E.D. La. 2013) .............................................................20, 24

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
    615 F.3d 412 (5th Cir. 2010) ...........................................................................7, 8

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .............................................................................9, 10

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) ...........................................................................11

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
    28 F.3d 1379 (5th Cir. 1994) .............................................................................11, 22

*Shah v. VHS San Antonio Partners, L.L.C.*,
    985 F.3d 450 (5th Cir. 2021) ...........................................................................9

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,
    841 F.3d 827 (10th Cir. 2016) ...........................................................................20

*Spectrofuge Corp. v. Beckman Instruments, Inc.*,
    575 F.2d 256 (5th Cir. 1978) ...........................................................................7

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)..........................................................................................20, 21

*Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*,
    68 F.4th 792 (2d Cir. 2023) ...........................................................................3

*Taylor Publ'g Company v. Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000) ...........................................................................17

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..............................................................................6

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*,
    89 F.3d 233 (5th Cir. 1996) .................................................................13

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919).............................................................................14

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956).........................................................................6, 9

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).......................................................................5, 13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001).......................................................5, 9, 10

*United States v. Sungard Data Sys., Inc.*,
    172 F. Supp. 2d 172 (D.D.C. 2001) .....................................................7

*Universal Analytics, Inc. v. MacNeal–Schwendler Corp.*,
    914 F.2d 1256 (9th Cir. 1990) ............................................................17

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)................................................................14, 18, 20

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965).............................................................................9

*Walker v. Beaumont Indep. Sch. Dist.*,
    938 F.3d 724 (5th Cir. 2019) ...............................................................5

*Wampler v. Sw. Bell Tel. Co.*,
    597 F.3d 741 (5th Cir. 2010) .............................................................23

**Statutes**

15 U.S.C. § 1.........................................................................................22

15 U.S.C. § 2...........................................................................................5

Tex. Bus. & Com. Code § 15.04............................................................25

**Other Authorities**

3 Areeda & Hovenkamp, Antitrust Law ¶702b .....................................17

*Most valuable tech companies in India by market cap 2024*, TIMES OF INDIA (Oct.
    16, 2024), https://tinyurl.com/5cyxhpvf .............................................12

**INTRODUCTION**

This case began when Cognizant TriZetto Software Group ("TriZetto"), a healthcare software provider, sued Infosys Limited ("Infosys"), an IT servicer of that software, for trade secret theft. As an IT service provider, Infosys had access to some of the most sensitive and valuable intellectual property that TriZetto developed and owns. TriZetto therefore required Infosys to sign Non-Disclosure and Access Agreements ("NDAAs") that imposed certain limits on Infosys's access to and use of that highly confidential trade secret information. Infosys violated those agreements, misappropriated TriZetto's trade secrets, and stole its confidential information, all in an effort by Infosys to develop or enhance its own competing software and service offerings. TriZetto was thus forced to sue Infosys, alleging misappropriation of trade secret and other claims. Approximately six months later, Infosys has attempted to manufacture a counternarrative by filing antitrust counterclaims against TriZetto and its parent Cognizant Technology Solutions Corp. ("CTS") (collectively "Cognizant"). In a cynical twist, Infosys now alleges that the very NDAAs it agreed to and then willfully violated are themselves unlawful under the antitrust laws, and that Cognizant has used them—and other methods—to restrict competition in alleged markets for healthcare software and related IT services. But none of Infosys's allegations come close to stating an antitrust claim, and this Court should dismiss Infosys's counterclaims in their entirety.

Infosys's primary complaint here is that Cognizant, via its NDAAs and restrictions in customer license agreements, has limited Infosys's access to Cognizant's intellectual property. But, even setting aside that Infosys's own conduct confirms the restrictions are needed, this claim fails out of the gate. "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc*., 555 U.S. 438, 448 (2009). That means Cognizant has no duty under the antitrust law to provide Infosys *any* access to its intellectual property, much less to provide it on "terms and

1

conditions that [Infosys] finds commercially advantageous." *Id.* at 450. Infosys's claims run headlong into this blackletter law and fail for this reason alone.

Infosys also fails to satisfy the other essential elements of its claims. Antitrust laws ensure that *competition* is protected. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993). Accordingly, a plaintiff must allege harm not merely to a specific business, but to competition in a plausibly alleged antitrust market as a whole. Infosys's Counterclaim falls far short. First, for each of the markets it asserts, it provides none of the requisite details. It does not identify what products are in the alleged markets, explain why it claims certain companies or products are in and others are out, or otherwise define the necessary market contours. Second, Infosys identifies no conduct by Cognizant that harms *competition* in those markets—no increased consumer prices, no reduction in software, no harm to quality. It instead complains about tough competition: Because it was not allowed to compete on the terms it preferred, competition was harder. Because Cognizant protected its IP, competition was harder. Because Cognizant recruited away top talent, competition was harder. And because Infosys declined to offer training to its rivals, competition was harder. All of that is lawful competition. Infosys's attempt to frame Cognizant's non-disclosure agreements (which it breached) that protect Cognizant's trade secrets (which it stole) as anticompetitive restraints falls far short. The antitrust laws are no defense to Infosys's wrongdoing, and this Court should dismiss these poorly pleaded claims.

## BACKGROUND[1]

TriZetto offers software solutions to healthcare companies for processing healthcare insurance claims, and CTS provides IT services to companies that use such software solutions—those

---

[1]  As it must, Cognizant accepts as true the allegations in Infosys's Counterclaim solely for purposes of this motion. All citations to the Counterclaim are cited by the paragraph at issue.

sold by TriZetto and also other software providers.  ¶¶ 2–5, 32.  TriZetto's two most used software solutions are Facets and QNXT.  ¶¶ 2–3.

In 2014, CTS purchased TriZetto for $2.7 billion to integrate TriZetto's "expertise and intellectual property" and to improve CTS's "competitiveness in integrated engagement opportunities."  ¶ 5 & n.3.  After the acquisition, CTS's then-CEO explained that acquiring TriZetto would put the CTS-TriZetto combination "at the forefront of creating new models for the healthcare needs of tomorrow" and "deliver[ing] end-to-end solutions that allow healthcare organizations to improve operational efficiency, drive innovation and embrace next generation delivery models made possible by digital technologies."  ¶ 6 n.5.

Licensees of software like Facets and QNXT often turn to outside IT servicers to help maintain their systems.  *See* ¶ 45.  Some licensees choose CTS, but others choose different third-party IT servicers, including Infosys, as they are free to do.  *See* ¶¶ 45–48.  Such arrangements create a risk for TriZetto, however, because they permit third parties to access TriZetto's intellectual property and potentially misappropriate its trade secrets.  Underscoring that reality, the Second Circuit recently affirmed a finding of trade secret misappropriation by a different competitor of some of the same TriZetto intellectual property implicated in this case.  *See Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 806 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 352 (2023).  As one way to guard against these risks, TriZetto requires such third-party IT servicers to sign NDAAs.  *See, e.g.*, ¶¶ 54, 59.

According to Infosys, these NDAAs can contain restrictions on a third-party IT servicer's work, including "limitations on the scope of work they can perform for payor clients," "restrictions on which of [the IT servicer's] employees can service customer accounts," "prohibitions on developing complementary products that could interface with Cognizant's software," and "one-way

3

non-solicitation provisions that protect Cognizant's employees from poaching."  ¶ 8.  Infosys also alleges that TriZetto includes most-favored-vendor provisions ("MFV provisions") in some of its customers' license agreements to provide oversight over the third-party vendors that these licensees choose and requires such vendors to sign NDAAs that allow TriZetto to control their level of access.  ¶¶ 46–47.

In January 2025, Infosys filed its Counterclaim challenging Cognizant's use of these NDAAs and other allegedly anticompetitive tactics, which it alleges restrict competition in two purported markets: the Healthcare Payor Software Products market (hereinafter "payor software market") and the IT Services for Healthcare Payors market (hereinafter "IT services market"). ¶¶ 109–23.  According to Infosys, the payor software market comprises "[s]oftware products for healthcare payors" in the United States, which assists those payors in "process[ing] insurance claims."  ¶¶ 2, 109.  Two of the software solutions in this market are TriZetto's Facets and QNXT products.  Infosys also alleges that it has recently developed its own "payor software platform," Infosys Helix ("Helix"), which has already "found success," acquired 2,500 customers, and entered into contracts valued in the "eight figures."  ¶¶ 2, 12, 116–17.

The IT services market allegedly comprises those companies, including CTS and Infosys, who provide technical support to payors to enable them "to effectively use the payor software they rely on to process claims and perform other core administrative functions."  ¶ 119.  Such IT services can include "developing, integrating, testing, and troubleshooting such software."  *Id.*

In the payor software market, Infosys alleges two forms of anticompetitive conduct: (1) creating barriers to entry for competing software systems through the NDAAs and (2) recruiting away Infosys's employees who were most involved in its competing software product, Helix. *See* ¶¶ 48–63, 92–105.  In the IT services market, Infosys alleges three forms of anticompetitive

4

conduct—(1) restrictive terms in NDAAs, including one-sided non-solicitation agreements; (2) most-favored vendor provisions; and (3) prohibitions on software training for Infosys employees. *See* ¶¶ 64–77.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must assert "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court may dismiss claims "on the basis of a dispositive issue of law" or if the plaintiff fails to plead sufficient facts to "state a claim to relief that is plausible on its face." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) (citation omitted). A facially plausible claim is one that establishes more than a "sheer possibility" that the plaintiff's claim is true. *Iqbal*, 556 U.S. at 678. Although the Court must accept well-pleaded facts in a complaint as true, the "allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and must "make relief plausible, not merely conceivable, when taken as true," *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009).

## ARGUMENT

**I.    Infosys Fails to Plead A Violation Of Section 2 Of The Sherman Act**

Plaintiff alleges that Cognizant engaged in unlawful monopolization, or attempted to monopolize various markets, in violation of the Sherman Act. 15 U.S.C. § 2. But it fails to allege facts establishing a relevant market, or monopoly power in it, or any exclusionary conduct by Defendants—all essential elements of a Section 2 claim. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) ("A firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct."). That failure compels dismissal.

5

### A.    Infosys Fails to Allege Plausible Relevant Markets

"A threshold step in any antitrust case is to accurately define the relevant market," and failing to do so "alone is fatal to an antitrust claim." *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955, 957 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2526 (2024). A proposed product market must include all "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001).

As discussed above, Infosys attempts to allege two separate markets: the payor software market, which includes products like Facets, QNXT, and Helix, and the IT services market, which provides IT support for those products. ¶¶ 109–23. Infosys fails to plausibly allege either market, and the Court should dismiss its claims on this basis alone.

***Payor Software Market.*** Infosys claims that "[s]oftware products for healthcare payors" is a relevant market. ¶ 109. But this vague description does nothing to elucidate the boundaries of the market. Infosys alleges that there are different varieties of payor software—which it categorizes as "core products" or "other programs" (¶ 113)—but it says nothing about whether it includes both categories in the market, much less why. Nor does it provide allegations about what else constitutes a "software product for healthcare payors" that belongs in the market. The most Infosys alleges is that the market includes the products at issue in its Counterclaim: Facets, QNXT, and

Infosys's Helix product (¶¶ 113-17).  But a proposed relevant market "must encompass the product at issue **as well as *all* economic substitutes for the product.**"  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (emphasis added); *see also PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) ("*Leegin II*") (affirming dismissal, in part, because plaintiff's proposed market definition failed  to "encompass[s] interchangeable substitute products or recogniz[e] the cross-elasticity of demand for [defendant's] goods").  Here, Infosys offers no clues about what products are substitutes for Facets, QNXT, and Helix, and thus has "fail[ed] to define its proposed relevant market with reference to the rule of reasonable inter-changeability and cross-elasticity of demand."  *Apani*, 300 F.3d at 628.

Equally problematic is Infosys's attempt to exclude from this market "proprietary software products built by large healthcare payors."  ¶ 109.  Infosys claims they are not substitutes for com-mercial software because "[m]ost payors lack sufficient scale, resources, and expertise to build their own payor software."  ¶ 111.  But whether a customer in this market *can* build its own soft-ware[2] has nothing to do with whether such software, *when built*, serves as a substitute for com-mercial offerings.  And courts assessing this issue have consistently concluded that "when a cus-tomer can replace the services of an external product with an internally-created system, this captive output . . . should be included in the same market."  *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 186 (D.D.C. 2001) (cleaned up) (collecting cases); *see also, e.g.*, *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 278 (5th Cir. 1978) ("independent service or-ganizations compete for contract and call-by-call emergency work with manufacturers (who gen-

---

[2]  Infosys's rationale is also nonsensical because it admits that users of commercial payor software are "typically large healthcare organizations" (¶ 39)—precisely the type of customers that, by In-fosys's allegations, *do* have the capacity to build and switch to in house software.

erally do not compete among themselves for such work) in a market where in-house service personnel provide the consumer with a reasonably interchangeable substitute"). In line with this precedent, Infosys acknowledges that customers *do switch* between commercial and homegrown offerings. ¶ 16 (alleging a customer "replaced its homegrown software with Infosys Helix"); ¶ 85 (alleging a customer "replac[ed] four internally-created . . . systems with an Infosys Helix coverage module"). Infosys's failure to "encompass all interchangeable substitute products" in its market definition warrants dismissal. *Apani*, 300 F.3d at 628.

   ***IT services for healthcare payors.*** Infosys's definition of the purported "IT services for healthcare payors" market is even more amorphous. *See* ¶¶ 118–23. Infosys alleges that both it and Cognizant (specifically, CTS) compete in this market, and it alleges in passing that "Cognizant enjoys a high and stable market share of greater than 50% of the healthcare payor IT services market." ¶ 129. But here too, Infosys provides no details about the nature of IT services work, much less facts establishing this market. A few basic questions illustrate this: Are technicians for Facets interchangeable with technicians for QNXT, Helix, or any other payor software? Are the updates and other deliverables for one of these payor software products usable for all the other products in the market? Is Infosys including in-house technical experts within its market definition, or only third-party options? Infosys offers no answers, and without them, it is entirely unclear what products and services are included in this market as substitutes and which are not. Without such clarity, it is impossible to assess whether Infosys has gerrymandered its market definition to inflate Cognizant's apparent market share. Dismissal is thus appropriate. *Leegin II*, 615 F.3d at 417–19; *Apani*, 300 F.3d at 628.

### B.    Infosys Does Not Allege Monopoly Power

Infosys also fails to allege that Cognizant has monopoly power in any alleged market. "Monopoly power is 'the power to control prices or exclude competition.'" *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 525 (5th Cir. 1982) (quoting *E. I. du Pont de Nemours & Co.*, 351 U.S. at 391. In particular, "a firm is a monopolist if it can profitably raise prices substantially above the competitive level," *Microsoft*, 253 F.3d at 51, "without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable." *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (quotation marks omitted).

To establish a firm's monopoly power, a plaintiff must first define the relevant product market, so that the firm's market power can be assessed accurately. *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("Market definition is crucial. Without a definition of the relevant market, it is impossible to determine market share."); *see also Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the] market there is no way to measure [defendant's] ability to lessen or destroy competition."); *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 454 (5th Cir. 2021) (same). Because, as discussed above, *see supra* 6–8, Infosys fails to plausibly allege either of its purported markets, its market power allegations are also fundamentally flawed and cannot support its antitrust claims.

Even assuming that Infosys did satisfactorily define the relevant product markets, it still fails to allege that Cognizant has monopoly power in either market. Monopoly power can be demonstrated either directly (by conduct analysis) or indirectly (by structural analysis). *Microsoft*, 253 F.3d at 51. "[D]irect evidence" of monopoly power includes "evidence of restricted output and supracompetitive prices." *Rebel Oil*, 51 F.3d at 1434. "Because such direct proof is only

rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power. Under this structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51 (citations omitted); *Dimmitt*, 679 F.2d at 521 ("[E]vidence of a defendant's market share is the principal tool used by courts to determine the existence of monopoly power."). Barriers to entry include licensing requirements, "entrenched buyer preferences for established brands," high startup costs, and economies of scale. *Rebel Oil*, 51 F.3d at 1439.

Although the Supreme Court has not defined a minimum market share necessary to demonstrate monopoly power, the "Supreme Court has never found a party with less than 75% market share to have monopoly power." *Kolon Indus. v. I.E. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014); *see also Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am.*, 885 F.2d 683, 694 n.18 (10th Cir. 1989) ("[L]ower courts generally require a minimum market share of between 70% and 80%."). Similarly, the Fifth Circuit has stated that "monopolization is rarely found when the defendant's share of the relevant market is below 70%." *Exxon Corp. v. Berwick Bay Real Est. Partners*, 748 F.2d 937, 940 (5th Cir. 1984).

Plaintiff's allegations fall short on every front.

***Payor Software Market.*** Infosys alleges no facts constituting direct evidence of monopoly power—only conclusory allegations. *See, e.g.*, ¶ 139. There are no well-pleaded allegations of price increases for payor software once Cognizant allegedly started engaging in anticompetitive conduct nor allegations of reduced output in the purported payor software market. Nor is there any fact showing TriZetto has somehow limited the supply of payor software; to the contrary, Infosys alleges that its own, recently offered Helix product has "found success." ¶ 116.

As for indirect evidence, Infosys attempts to meet its burden by including one conclusory

allegation that Cognizant has a 65% share of the payor software market.  ¶¶ 125, 129.  Infosys does not explain how it calculated that share, but other allegations in the complaint indicate that Infosys is relying on an analysis of Cognizant's share of "the United States's insured population" whose claims are processed on Facets and QNXT.  ¶ 1.  But that is the wrong metric as a legal matter because that is not the allegedly monopolized market—*i.e.* the market in which *payors* license software.  *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008) (rejecting market power allegations based on total gasoline *sales* to consumers because relevant market related to sale of *franchises* to retail station operators).  In any event, 65% is well below the presumptive threshold of a 70% share in this circuit for a monopolization claim and fails on that basis alone.  *Exxon*, 748 F.2d at 940.

Infosys also fails to allege that Cognizant's market share is protected by barriers to entry or otherwise.  *See Big River Indus., Inc. v. Headwaters Res., Inc.*, 971 F. Supp. 2d 609, 617 (M.D. La. 2013) (requiring the plaintiff to amend in part because "the Complaint fails to allege . . . whether competing suppliers face barriers to entry"); *see also Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1388 (5th Cir. 1994) (reversing a judgment for the plaintiff and noting that the "absence of barriers to entry" was evidence that the "current players cannot exclude competition").  With one exception, Infosys's allegations on this front are conclusory.  *See, e.g.*, ¶ 10 ("For nearly a decade, the Facets and QNXT products have been the market leader with limited competition due to the significant barriers to entry into this market."), ¶ 142 ("Cognizant has . . . erect[ed] barriers to entry into the healthcare payor software market that discourage and foreclose competition").  Infosys's lone specific allegation regarding barriers to entry—that standing up a payor software requires "substantial resources, a high degree of technical sophistication, subject-matter expertise, and a strong reputation with payors," ¶ 127—rings hollow given that Infosys

simultaneously alleges that it has succeeded not only in launching Helix but in acquiring 2,500 customers with contract values that "total[] eight figures," ¶¶ 116–17.

Given that Infosys has a market cap exceeding $80 billion, its failure to allege more is telling. *See Most valuable tech companies in India by market cap 2024*, TIMES OF INDIA (Oct. 16, 2024), https://tinyurl.com/5cyxhpvf (market cap of 7.77 trillion rupees, or $88.9 billion). And while Infosys suggests that Cognizant's protections for its intellectual property pose an entry barrier by slowing the development of Helix (¶ 138), shielding one's intellectual property from free-riding by a competitor is not a legally recognized "barrier to entry" in the payor software market. *See Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1184 (N.D. Cal. 2012) (finding no authority establishing a "duty to give away . . . technology for others to clone.").

**IT Services Market.** Infosys's allegations of monopoly power in the purported IT services market fare no better. Once again, Infosys fails to make more than threadbare assertions that Cognizant charges high prices to establish direct evidence of monopoly power. ¶¶ 139–43. And it altogether fails to allege concurrent output restrictions as required. *See Brooke Grp.*, 509 U.S. at 237; *Dimmitt*, 679 F.2d at 530. Infosys also provides no basis for concluding that Cognizant has the power to exclude competition: The Counterclaim alleges vaguely that Infosys "has lost contracts for IT services" because of Cognizant's NDAAs, ¶ 137, but names no customers nor specific occasions when it actually lost business, *see, e.g.*, ¶¶ 51–71 (no allegation of losing business with Payors 1–4); *see also* ¶ 77 ("Despite Cognizant's anticompetitive conduct, Infosys has been able to pitch for IT services work related to Cognizant's products over the past decade . . . .").

As for indirect evidence, Infosys avers that Cognizant has a "market share of greater than 50% of the healthcare payor IT services market because it substantially controls who payors can

work with to address IT needs related to Cognizant's dominant software products through the license agreements and NDAAs described above." ¶ 129.  It is unclear whether Infosys means that Cognizant actually provides IT services to more than 50% of customers in the alleged market, or that Cognizant has purported "control" over more than 50% by virtue of its license agreements. The latter would be patently insufficient to allege Cognizant's share *of the IT services market*.  *See United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236–37 (5th Cir. 1996) ("Economic power derived from contractual agreements such as franchises . . . has nothing to do with market power, ultimate consumers' welfare, or antitrust." (cleaned up)); *see also Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1219 (11th Cir. 2002) ("mere existence and exercise of contract power does not show that a defendant had market power or violated the law"). Regardless, 50% is legally insufficient to establish monopoly power.  *Exxon*, 748 F.2d at 940.

### C.    Infosys Alleges No Exclusionary Conduct

Even if Infosys had alleged relevant markets and Cognizant's monopoly power within those markets, its Section 2 claim would still fail because it has not alleged Cognizant acquired or maintained that market power "through exclusionary conduct."  *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *see also Grinnell*, 384 U.S. at 570–71 (stating that a Section 2 claim requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.").

None of the conduct about which Infosys complains is actionable under the antitrust laws. At its core, the Counterclaim turns on Cognizant's purported refusal to engage with Infosys, a direct competitor, on that competitor's preferred terms when it comes to either software licenses, training, or access to trade secret information.  ¶ 8.  But it is well established that a company can

13

choose who it deals with and on what terms, as the Sherman Act generally "does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *see also Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) (there are "few existing exceptions from the proposition that there is no duty to aid competitors"); *linkLine Commc'ns*, 555 U.S. at 448–51 (same). And because "a firm has no antitrust duty to deal with its competitors . . . [it] certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." *linkLine Commc'ns*, 555 U.S. at 450. In short, neither Cognizant's decisions about when or how to deal with Infosys nor any other grievance Infosys asserts is exclusionary; accordingly, its claims fail.[3]

### a.    Payor Software Market

Infosys alleges that Cognizant unduly restricts competition in the payor software market through (1) its use of NDAAs with third-party IT servicers of its software and (2) its recruiting efforts. But neither is sufficient to state a Section 2 claim.

**The NDAAs Are Not Anticompetitive.** As noted above, *see supra* 2–4, Cognizant (specifically TriZetto) licenses Facets and QNXT to healthcare payors, who are then free to hire Cognizant (specifically CTS) or a third-party IT servicer for technical support of that software. ¶¶ 41, 44. When a licensee hires a third-party IT servicer, like Infosys, TriZetto requires such third-party IT servicers to sign NDAAs, which contain a range of restrictions on how TriZetto's trade secrets

---

[3] The Supreme Court recognized a "limited exception" to the general permissibility of refusing to deal in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). *Trinko*, 540 U.S. at 409. This exception resides "at or near the outer boundary of § 2 liability," and its applicability rests on a defendant's "willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* There is no suggestion that Cognizant's alleged conduct sacrificed short-term profits— or any benefit whatsoever—"to achieve an anticompetitive end." *Id.*

and intellectual property may be used, as well as which employees at third-party IT servicers may do the work.  *See, e.g.*, ¶¶ 8, 54, 59.

Infosys complains about the NDAAs it entered into with Cognizant in connection with four healthcare payors.  Infosys alleges that these NDAAs prevent it from competing fully in the payor software market, including through non-compete provisions, limitations on the scope of servicing Infosys can do on Cognizant's products, restrictions on the number of Infosys employees who can service Cognizant products, and bars on Infosys employees who worked on the development of Helix from servicing Cognizant's products.  ¶¶ 54–71.

These allegations fail from the start, because it is perfectly lawful under the antitrust laws for Cognizant to choose the terms it offers third-party IT services, like Infosys.  *See linkLine Commc'ns*, 555 U.S. at 448 ("[B]usinesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.").  Rather than restrain trade, the Supreme Court has recognized that such restrictions can be *procompetitive*.  For example, antitrust laws *encourage* efforts to prevent "free-riding," *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1026 (9th Cir. 2013), as they increase "interbrand competition," which is "the primary purpose of the antitrust laws," *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007) (citation omitted).  Here, by implementing reasonable restrictions on the use of its intellectual property, Cognizant has created the conditions by which it can work with various third-party IT servicers, to the benefit of its licensees, without giving away valuable trade secrets.  *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) (not ascribing antitrust liability to Qualcomm's requirement that chip purchasers license its patents).

Consistent with that general principle, courts recognize that "[e]ven a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival." *Novell*

*Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013).  Here, all the alleged contract re-

strictions Infosys complains about relate to limits on its access to Cognizant's intellectual property.

For example, Infosys complains about NDAA provisions prohibiting IT servicer employees with

"access to QNXT source code from working on competing products," ¶ 54; "defining a finite set"

of uses for which IT servicers can employ TriZetto's "Confidential Information," ¶ 56; and "re-

quir[ing] the specific identification of [IT servicers'] employees allowed to work on the customer

account," ¶ 59.  But Cognizant is not required under the antitrust laws to give Infosys any access

at all, much less the level of access it prefers.  *See Novell*, 731 F.3d at 1074.  Accordingly, Infosys's

NDAA-based allegations fail to plead anticompetitive conduct as a matter of law.

**Cognizant's Hiring of Infosys Employees Is Not Anticompetitive Conduct.**  Infosys's

complaints that it lost employees to Cognizant similarly fail to allege any recognized anticompet-

itive conduct.  Infosys alleges that Cognizant hired Infosys employees—including Cognizant's

current CEO, Ravi Kumar—to slow its development of a competitive product (Helix).  ¶¶ 106–07.

These allegations are both preposterous and legally deficient.

To start, Infosys's suggestion that Cognizant "timed" the hiring of its CEO "to harm the

advancement of Infosys Helix" or to learn Infosys's "confidential or trade secret information" are

absurd and facially implausible.  ¶ 106.  As Infosys acknowledges, Cognizant is a publicly traded

company with tens of billions of dollars in annual revenue.  ¶ 4.  It thus defies "common sense" to

suggest that Cognizant's board of directors would select the company's CEO—or "time" his ap-

pointment—in order to snub Infosys, or for *any* reason other than to install a company leader who

can promote Cognizant's business growth and strategic interests.  *Iqbal*, 556 U.S. at 679.  It like-

wise blinks reality to suggest that Cognizant would select a CEO, or hire the other two named

16

employees, based on their alleged slow-rolling of Helix, *see* ¶¶ 92–108, as opposed to their demonstrated skills in the marketplace, *see* ¶¶ 83–89.

Infosys's theory of predatory hiring is equally deficient.  Infosys complains that Cognizant won the competition for talent by "lur[ing] away Kumar" and two other employees.  ¶ 102.  But that is not monopolization.  "[T]he mere hiring away of employees from a rival is lawful" under the antitrust laws.  *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc.,* 735 F.2d 884, 894 (5th Cir. 1984) (quotation marks omitted).  "[H]iring talent cannot generally be held exclusionary even if it does weaken actual or potential rivals and strengthen a monopolist . . . [because] there is a high social and personal interest in maintaining a freely functioning market for talent."  3 Areeda & Hovenkamp, Antitrust Law ¶ 702b, at 141.  "The fact that the employee then uses her own skills and contacts—and not, for example, misappropriated trade secrets—to generate business for her new employer, even at the expense of her old employer, provides no basis for antitrust liability."  *Adjusters Replace-A-Car*, 735 F.2d at 894; *Taylor Publ'g Company v. Jostens, Inc.*, 216 F.3d 465, 479 (5th Cir. 2000) (explaining same).  As one Circuit explained, unlawful predatory hiring occurs only "when talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor."  *Universal Analytics, Inc. v. MacNeal–Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) (per curiam).  "Such cases can be proved by showing the hiring was made with such predatory intent," such as "to harm the competition without helping the monopolist, or by showing a clear nonuse in fact."  *Id.*

Infosys does not allege any misappropriation by its former employees, or nonuse by Cognizant.  At most, the Counterclaim alleges that Kumar used his "inside knowledge" to "prevent key accounts from exploring Infosys Helix," ¶ 107, but understanding a rival's product sufficiently well to convince customers not to choose it is competition—not trade-secret theft.  Similarly, that

17

Kumar, Arora, and Kuchibhotla were incentivized to leave Infosys by the opportunity to work at Cognizant says nothing about whether Cognizant recruited these individuals primarily to harm Infosys, let alone competition in the Payor Software market.

> ### b.    IT Services Market

Infosys identifies three forms of allegedly anticompetitive conduct in the IT services market: (1) restrictive NDAAs, (2) most-favored-vendor provisions, and (3) prohibitions on training on Facets and QNXT for Infosys employees. All three fail as a matter of law.

**NDAAs Are Not Anticompetitive In The IT Services Market.** Infosys claims the NDAAs limit which services it is allowed to provide licensees of Facets and QNXT, making it more costly and inefficient to provide permitted services. *See, e.g.*, ¶ 141. But, as set forth above, Cognizant has no duty under the antitrust laws to deal with Infosys on any particular terms. *Novell*, 731 F.3d at 1066, 1068. The Supreme Court has twice ordered dismissal of such claims alleging "insufficient assistance in the provision of service to rivals." *Trinko*, 540 U.S. at 410; *see also linkLine Commc'ns*, 555 U.S. at 457. And Infosys pleads nothing to show that Cognizant's NDAAs have somehow excluded competitors from the IT services market.

For example, Infosys identifies NDAAs that governed its work for four alleged (but unnamed) Payors. But Infosys does not allege that it was unable to offer acceptable services *to any of them*. To the contrary, Infosys alleges that it *continues* to offer services to them, and to beat Cognizant for IT services contracts. ¶ 50 ("Starting in 2018, Infosys began to win significant IT services work, including at least 11 accounts valued at hundreds of millions of dollars, away from Cognizant."), ¶ 77 (conceding that Infosys has been able to effectively compete for IT services work over the past decade). And even if the NDAAs somehow impacted *Infosys*'s ability to provide services, that is not the relevant question; the antitrust laws are concerned with harm to *competition*, not to a competitor. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990)

("The antitrust laws were enacted for 'the protection of *competition*, not *competitors*.'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)) (emphasis in original)). Infosys pleads no facts plausibly indicating that Cognizant's NDAAs have had the overall effect of *excluding* IT services competitors from the market and thereby reducing customer choice.

Infosys also complains that "one-sided non-solicitation provisions" in the NDAAs executed between Cognizant and Infosys for Payor 2, Payor 3, and Payor 4 have harmed competition. ¶¶ 64, 69–71. But again, Infosys provides no facts to support this conclusion. Infosys nowhere alleges that a non-solicitation provision in any NDAA has limited an IT servicer's ability to offer services to customers and compete against Cognizant.

**Inclusion Of The Most Favored Vendor Provision Is Not Anticompetitive Conduct.** Infosys also takes issue with the MFV provisions that Cognizant allegedly includes in some of its licensee contracts with customers. *See* ¶¶ 46–47. As alleged, these provisions in vertical agreements between Cognizant (specifically TriZetto) and the licensees of Facets and QNXT condition third-party access to Cognizant's intellectual property on Cognizant's sign-off. ¶¶ 46–47. There is nothing anticompetitive about that.

Protecting one's intellectual property through contractual restrictions is *procompetitive—* it encourages companies to invest in new technologies and improvements to their intellectual property, and does not create an antitrust violation. *See supra* 15. For example, in *IDX Systems Corp. v. Epic Systems Corp.*, the Seventh Circuit found that similar vertical agreements between a software provider and its customer that required the customer not to furnish the software for inspection to third-parties or to disclose information about the software were not anticompetitive; rather, the agreement was "vertical in nature and protect[ed] intellectual property without affecting competition." 285 F.3d 581, 585 (7th Cir. 2002). Judge Easterbrook explained that "[n]othing in the

19

antitrust laws gives one producer a right to sponge off another's intellectual property." *Id.* Cognizant is thus allowed to protect its intellectual property from competitors who may be servicing it, and doing so is not an antitrust violation. *See SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 843 (10th Cir. 2016) (holding there is no "independent antitrust duty to share . . . intellectual property" with a competitor); *Qualcomm*, 969 F.3d at 996 (finding "reasonable" licensing practices that required downstream users of Qualcomm's technology to license related patents).

**Refusing To Train A Competitor Is Not Anticompetitive Conduct.** Finally, Infosys alleges that Cognizant has harmed competition in the IT services market by refusing to offer training to Infosys—its competitor. But outside extraordinary situations not found here, even a monopolist has no duty to aid its competitors. *Trinko*, 540 U.S. at 411. Nor does Infosys explain how a lack of training has harmed ***competition***, rather than Infosys alone. *Atl. Richfield*, 495 U.S. at 338. Nor could it, as Infosys *acknowledges* that Cognizant "provid[es] training to other less significant competitors." ¶ 133. And Infosys concedes it effectively provides IT services for Cognizant's software products regardless. *See* ¶ 77. Here too, Infosys's affirmative allegations defeat its claims.

### D.   Infosys Fails To Allege Attempted Monopolization

Infosys also raises an attempted monopolization claim, based on the same set of purportedly anticompetitive conduct. ¶¶ 155–64. This claim suffers from many of the same infirmities.

A claim for attempted monopolization has three elements: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). To establish a dangerous probability of achieving monopoly power, courts consider the defendant's market share and its ability to control prices or exclude competition in the relevant market. *See In re Pools Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 385

(E.D. La. 2013).  As with a monopolization claim, a plaintiff alleging attempted monopolization must allege a relevant market.  *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1244 (5th Cir. 1985).  As discussed above, Infosys fails to allege plausibly its purported markets (and, thus, any monopoly power therein), *see supra* 6–8, or any exclusionary conduct, *see supra* 13–20, thus its attempted monopolization claim fails from the start.

The third element—"specific intent to monopolize"—fails as well.  *Spectrum*, 506 U.S. at 456.  Infosys includes only one specific factual allegation to demonstrate that TriZetto intended to monopolize the alleged markets:  selective quotations from TriZetto's November 11, 2024 brief in opposition to Infosys's motion to dismiss.  ¶ 135 ("Cognizant has admitted in those filings that it has sought to exclude competition from Infosys through its 'strict' NDAAs that are aimed at preventing Infosys from 'develop[ing] competing products.' (quoting Dkt. 38, at 1, 25)).  This assertion is both disingenuous and unpersuasive.  TriZetto did not "admi[t]" that it sought to "exclude competition" in any market.  *Id.*  Rather, TriZetto stated that it sought to protect its intellectual property through "strict" NDAAs, but Infosys nevertheless breached those NDAAs, misappropriated TriZetto's trade secrets, and used those trade secrets "to develop competing products for Infosys's own financial gain."  Dkt. 38, at 1, 25.  Read in context, these quotations show TriZetto's intent to protect its intellectual property, not to monopolize any purported market.  Finally, Infosys's Counterclaim "alleges just the opposite" of a specific intent to monopolize, by admitting that Cognizant supports other IT servicers by providing them training on Facets and QNXT, ¶ 133.  *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 285 (4th Cir. 2012).

### E.    Infosys Fails To Allege Antitrust Injury

Infosys's claims also fail because Infosys has not alleged any recognized antitrust injury.  Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows

from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977).  It is axiomatic that "[t]he antitrust laws were enacted for the protection of *competition*, not *competitors*."  *Atl. Richfield*, 495 U.S. at 338 (cleaned up); *Roy B. Taylor Sales*, 28 F.3d at 1382 ("[T]he antitrust laws protect competition, not competitors.").  Here, Infosys alleges *only* harm to itself—not competition—and thus has not pleaded antitrust injury.

At bottom, Infosys alleges that Cognizant's NDAAs and MFV provisions "imposed additional and unnecessary costs on Infosys to provide IT services for payors" using Facets and QNXT, and that these provisions "delay[ed] Infosys Helix's development."  ¶¶ 137–38.  But this is not the stuff of antitrust injury.  The antitrust "laws do not create a federal law of unfair competition." *Brooke Grp.*, 509 U.S. at 225; *see also id.* ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws . . . .").  And allegations Cognizant slowed Infosys down, or made its work harder, will not do.  *See Blix Inc. v. Apple, Inc.*, 2021 WL 2895654, at *5 (D. Del. July 9, 2021), *aff'd*, 2022 WL 17421225 (Fed. Cir. Dec. 6, 2022) (finding allegations "that [defendant] ha[d] thrown 'sand in the gears'" of a competitor—instead of "the gears of competition"—insufficient (quotation marks omitted)).  Nowhere does Infosys identify any actual harm to competition, such as reduced output of software or higher prices.  To the contrary, Infosys alleges that despite Cognizant's alleged conduct, it has "found success" with its own payor software product, acquired 2,500 customers, and entered into contracts valued in the "eight figures."  ¶¶ 2, 12, 116–17.  In sum, Infosys has not identified any harm to competition and so has not pled antitrust injury.

## II.      Infosys Fails to Plead A Violation Of Section 1 Of The Sherman Act

In addition to its two Section 2 claims for monopolization and attempted monopolization, Infosys also alleges that TriZetto violated Section 1 of the Sherman Act.  *See* ¶¶ 165–75.  Section 1 makes unlawful "[e]very contract, combination . . . or conspiracy, in restraint of trade."  15 U.S.C.

§ 1.  Courts have long held that Section 1 "outlaw[s] only *unreasonable* restraints."  *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quotation omitted).  Accordingly, to state a Section 1 claim, Infosys must allege (1) an agreement (2) that unreasonably restrained trade (3) in the relevant market.  *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 373–75 (5th Cir. 2014).

Infosys alleges that "Cognizant's NDAAs and MFV provisions in license agreements . . . are contracts that unreasonably restrain trade" by "foreclos[ing] competition in the relevant markets by raising rivals' costs, weakening rivals' competitive offerings, and increasing barriers to entry."  ¶ 169.  For many of the same reasons that Infosys's Section 2 claims fail, Infosys has not alleged facts establishing either the second or third element of its Section 1 claim.

**Infosys Fails To Adequately Allege Its Purported Product Markets.**  "The first step" in evaluating a Section 1 claim is "determining the relevant market."  *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010).  A Section 1 claim must be dismissed if it fails to allege an adequate product market.  *Id.* at 746; *see also New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1037 (5th Cir. 2023) (affirming dismissal of Section 1 claim for "failure to plead a legally sufficient product market").  As explained, Infosys's alleged product markets are legally insufficient.  *See supra* 6–8.

**Cognizant's NDAAs And MFV Provisions Do Not Unreasonably Restrain Trade.**  The attempt to cast the NDAA and MFV provisions as unreasonable restraints of trade fails as well.  In evaluating whether a practice restrains trade in violation of Section 1, "[t]he rule of reason is the accepted standard," under which a "factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."  *Leegin*, 551 U.S. at 885 (quotation marks omitted).  Although the Supreme Court has recognized a narrow subcategory of restraints as *per se* illegal, "includ[ing] horizontal agreements

23

among competitors to fix prices or to divide markets," *id.* (citation omitted), it has made clear that vertical restraints (those between parties at different levels of distribution) "are to be judged according to the rule of reason," *id.* at 890–92, 907.

Both challenged provisions are vertical restraints. The NDAAs amount to an agreement between Cognizant and IT services vendors, and the MFV provisions are part of Cognizant's contracts with licensees of its software. Under the rule of reason, *Leegin*, 551 U.S. at 882, Infosys must allege that the NDAAs and MFV provisions created anticompetitive effects in the relevant markets, *Marucci*, 751 F.3d at 374; *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293 (5th Cir. 1988) (defining anticompetitive effects to include reduced output, increased prices, or "reduce[d] consumer welfare"). To do so, it is not enough for Infosys to allege that Cognizant's NDAA and MFV provisions collectively harmed competition. Instead, Infosys must allege facts demonstrating that each contractual provision, when "considered individually, [is] capable of causing any substantial harm to competition." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 208 (4th Cir. 2002); *see In re Pool Prods.*, 940 F. Supp. 2d at 396 (explaining courts should consider whether agreements, "considered individually, involved unreasonable restraints of trade").

Infosys comes up short in three ways. First, Infosys fails to explain how any individual MFV provision or NDAA harms competition. The Counterclaim does not even identify any specific contract with a MFV clause or the percentage or number of contracts purportedly containing such provisions. *See* ¶¶ 46–47. Instead, Infosys merely asserts that these clauses, generally and in the aggregate, harm competition. ¶¶ 46, 70–71. That is not enough. *Dickson*, 309 F.3d at 208.

Second, even if Infosys could lump together the effects of the MFV and NDAA provisions, Infosys alleges no facts establishing any anticompetitive effect, whatsoever. *See supra* 14–16, 18–

24

19.  Infosys identifies only four specific NDAAs, ¶¶ 51–70, with a conclusory allegation on information and belief that similar NDAAs exist, ¶ 70, and includes no allegations regarding any specific MFV provisions, *see supra* 19–20.  Unsurprisingly, Infosys does not contend that these NDAAs and unspecified MFV provisions somehow prevented Infosys from continuing to offer its IT services, much less that any other competitor was hindered in its operations.

Third, Infosys's assertions are belied by its own admission that it has continued to successfully compete in both alleged markets.  *See, e.g.*, ¶ 116; *see supra* 10–12.

**Infosys Fails to Allege Any Recognized Antitrust Injury.**  Finally, even if the Court were to accept Infosys's conclusory allegations regarding the harm flowing from Cognizant's alleged forms of anticompetitive conduct, the Counterclaim fails to explain how these actions harmed ***competition*** as opposed to Infosys alone.  *See supra* 21–22.

III.    **Infosys's Parallel Claims Under the Texas Free Enterprise and Antitrust Act Fail**

Infosys's claims under the Texas Free Enterprise and Antitrust Act ("TFEAA") fail for the same reasons.  The TFEAA must be "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes."  Tex. Bus. & Com. Code § 15.04.  This extends to the definition of the relevant markets.  *See Apani*, 300 F.3d at 628 ("Texas courts have adopted federal standards for determining violations of the TFEAA, including the use of a relevant market to determine whether substantial reductions in competition have occurred."); *see also In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 708 (Tex. 2015) (same).  The failure of Infosys's claims under the Sherman Act thus requires dismissal of its TFEAA claims as well.

## CONCLUSION

The Court should dismiss Infosys's Counterclaim for failure to state a claim.

Dated:  March 10, 2025

/s/   Rachel S. Brass

Rachel S. Brass (*admitted pro hac vice*)
  California Bar:  219301
L. Kieran Kieckhefer (*admitted pro hac vice*)
  California Bar:  251978
Elizabeth McCloskey (*admitted pro hac vice*)
  California Bar:  268184
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel:  415.393.8200
Fax:  415.393.8306
emccloskey@gibsondunn.com
kkieckhefer@gibsondunn.com
rbrass@gibsondunn.com

John T. Cox III
  Texas Bar:  24003722
Betty Yang
  Texas Bar:  24088690
Bradley G. Hubbard
  Texas Bar:  24090174
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Tel:  214.698.3226
Fax:  214.571.2900
tcox@gibsondunn.com
byang@gibsondunn.com
bhubbard@gibsondunn.com

Samuel G. Liversidge (*admitted pro hac vice*)
  California Bar:  180578
S. Christopher Whittaker (*admitted pro hac vice*)
  California Bar:   283518
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel:  213.229.7000
Fax:  213.229.7520
sliversidge@gibsondunn.com
cwhittaker@gibsondunn.com

*Attorneys for Counterclaim Defendants*
*Cognizant TriZetto Software Group, Inc. and*
*Cognizant Technology Solutions Corp.*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of the filing to all counsel of record.

Dated:  March 10, 2025                                  */s/ Rachel S. Brass*
                                                              Rachel S. Brass