**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| COGNIZANT TRIZETTO SOFTWARE GROUP, INC., | Case No. 3:24-cv-02158-X |
| Plaintiff, | The Honorable Brantley Starr |
| v. | |
| INFOSYS LIMITED, | |
| Defendant. | |
| INFOSYS LIMITED, | |
| Counterclaim Plaintiff, | |
| v. | |
| COGNIZANT TECHNOLOGY SOLUTIONS CORP. and COGNIZANT TRIZETTO SOFTWARE GROUP, INC., | |
| Counterclaim Defendants. | |

**INFOSYS LIMITED'S OPPOSITION TO COGNIZANT TECHNOLOGY
SOLUTIONS AND COGNIZANT TRIZETTO SOFTWARE GROUP'S MOTION
TO DISMISS INFOSYS LIMITED'S COUNTERCLAIM**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

FACTUAL BACKGROUND .........................................................................................2

LEGAL STANDARD......................................................................................................4

ARGUMENT ....................................................................................................................4

I.      Infosys Properly Pled Violations for Monopolization and Attempt Under Section 2.............................................................................................................................4

        A.    Cognizant has Monopoly Power. ..............................................................5

                1.    Direct Allegations of Cognizant's Monopoly Power...................5

                2.    Indirect Allegations of Cognizant's Monopoly Power. ...........................6

                        a.    Payor Software and Related IT Services Are Relevant Product Markets. ..................................................................6

                        b.    Cognizant Has Durable Dominant Shares in Both Markets, Protected by Entry Barriers...........................................10

        B.    Cognizant Has Engaged in a Course of Exclusionary Conduct...........................13

                1.    Cognizant's Collective Actions Are Exclusionary. ...................................14

                2.    Cognizant's Acts Are Individually Exclusionary. .....................................16

                3.    Cognizant's "No Duty to Deal" Defense Is Misplaced. ............................19

        C.    Infosys Properly Pled Attempted Monopolization................................................21

II.     Infosys Properly Pled a Section 1 Violation for Unreasonable Restraint of Trade. ..........22

III.    Infosys Properly Pled an Antitrust Injury. .......................................................24

IV.    Infosys Properly Pled Violations of Texas Antitrust Laws. .............................................25

CONCLUSION................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aetna Inc. v. Blue Cross Blue Shield of Mich.*,
   No. 11-15346, 2012 WL 2184568 (E.D. Mich. June 14, 2012) ...........................................16

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
   300 F.3d 620 (5th Cir. 2002) ...........................................................................................7

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................................4

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)...........................................................................................4, 18, 19, 21

*Associated Radio Serv. Co. v. Page Airways, Inc.*,
   624 F.2d 1342 (5th Cir. 1980) ........................................................................7, 10, 15, 19

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr*,
   176 F. Supp. 3d 606 (W.D. La. 2016)...............................................................................10

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007)...............................................................................5, 7, 13, 14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977).........................................................................................................24

*C.E. Servs., Inc. v. Control Data Corp.*,
   759 F.2d 1241 (5th Cir. 1985) ...........................................................................................7

*Cargill, Inc. v. Monfort of Colo., Inc.*,
   479 U.S. 104 (1986).........................................................................................................25

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*,
   148 F.3d 1080 (D.C. Cir. 1998) .......................................................................................14

*Chi. Bridge & Iron Co. N.V. v. FTC*,
   534 F.3d 410 (5th Cir. 2008) ...........................................................................................13

*Constr. Cost Data, LLC v. Gordian Grp., Inc.*,
   No. 16-114, 2017 WL 2266993 (S.D. Tex. Apr. 24, 2017),
   *R. & R. adopted*, 2017 WL 2271491 (S.D. Tex. May 22, 2017)..........................................6, 7

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962).........................................................................................................24

ii

*Conwood Co., v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ....................................................................13, 15

*Corrante v. Charles Schwab Corp.*,
    No. 22-470, 2023 WL 2244680 (E.D. Tex. Feb. 24, 2023)......................................6

*Dark Catt Studios Holdings, Inc. v. Valve Corp.*,
    No. 21-872, 2022 WL 1443677 (W.D. Wash. May 6, 2022) .................................16

*Dexon Comput., Inc. v. Cisco Sys., Inc.*,
    No. 22-53, 2023 WL 2941414 (E.D. Tex. Feb. 7, 2023).................................23, 25

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) .................................................................................24

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
    732 F.2d 480 (5th Cir. 1984) .................................................................................10

*Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
    123 F.3d 301 (5th Cir. 1997) .................................................................................24

*Drs. Hosp. of Laredo v. Cigarroa*,
    No. 21-1068, 2022 WL 3567353 (W.D. Tex. Aug. 17, 2022).................................25

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024) ...................................................................... *passim*

*E.I. du Pont Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) .................................................................................21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)....................................................................................7, 13, 16

*Elec. Med. Tr. v. U.S. Anesthesia Partners, Inc.*,
    No. 23-4398, 2024 WL 5274650 (S.D. Tex. Sept. 27, 2024) .................................11

*Exxon Corp. v. Berwick Bay Real Estate Partners*,
    748 F.2d 937 (5th Cir. 1984) .................................................................................11

*F.T.C. v. Actavis*,
    570 U.S. 136 (2013)................................................................................................17

*Frame-Wilson v. Amazon.com, Inc.*,
    664 F. Supp. 3d 1198 (W.D. Wash. 2023)..............................................................23

*Griggs v. Hinds Junior Col.*,
    563 F.2d 179 (5th Cir. 1977) .................................................................................25

*Hardy v. City Optical Inc.*,
  39 F.3d 765 (7th Cir. 1994) .................................................................23

*Heatransfer Corp. v. Volkswagenwerk, A.G.*,
  553 F.2d 964 (5th Cir. 1977) ...............................................................22

*Illumina, Inc. v. F.T.C.*,
  88 F.4th 1036 (5th Cir. 2023) ............................................................6, 7

*Impax Labs., Inc. v. F.T.C.*,
  994 F.3d 484 (5th Cir. 2021) ...........................................................18, 23

*In re Indep. Serv. Orgs. Antitrust Litig.*,
  203 F.3d 1322 (Fed. Cir. 2000).............................................................2

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)...............................................................................22

*Littell v. Hous. Indep. Sch. Dist.*,
  894 F.3d 616 (5th Cir. 2018) ................................................................4

*In re Loestrin 24 Fe Antitrust Litig.*,
  261 F. Supp. 3d 307 (D.R.I. 2017)........................................................16

*McWane, Inc. v. F.T.C.*,
  783 F.3d 814 (11th Cir. 2015) ..............................................................18

*Morice v. Hosp. Serv. Dist. #3*,
  430 F. Supp. 3d 182 (E.D. La. 2019) ......................................................7

*N.Y. v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015).................................................................16

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans
  Archdiocesan Cemeteries*,
  56 F.4th 1026 (5th Cir. 2023) ................................................................7

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ............................................................21

*OGD Equip. Co. v. Overhead Door Corp.*,
  No. 17-898, 2019 WL 5390590 (E.D. Tex. Aug. 7,  2019),
  *R. & R. adopted*, 2019 WL 4253939 (E.D. Tex. Sept. 8, 2019) ............10

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009)...................................................................19, 20, 21

iv

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) .................................................................6

*In re Pool Prods. Dist. Mkt. Antitrust Litig.*,
  940 F. Supp. 2d 367 (E.D. La. 2013) .................................................22, 23, 24

*PSKS, Inc. v. Leegin Creative Leather Prods. Inc.*,
  615 F.3d 412 (5th Cir. 2010) ..............................................................7

*Pulse Network, L.L.C. v. Visa, Inc.*,
  30 F.4th 480 (5th Cir. 2023) .............................................................24, 25

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
  173 F.3d 995 (6th Cir. 1999) ...............................................................6

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
  96 F.4th 327 (2d Cir. 2024) ................................................................8

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
  No. 08-16, 2013 WL 4806905 (E.D. Tex. Sept. 9, 2013) .................................14

*Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*,
  786 F. Supp. 2d 1190, 1197 (S.D. Tex. 2009) ...........................................6

*Sanger Ins. Agency v. HUB Int'l, Ltd.*,
  802 F.3d 732 (5th Cir. 2015) ..............................................................24

*Spectrofuge Corp. v. Beckman Instruments, Inc.*,
  575 F.2d 256 (5th Cir. 1978) ...............................................................9

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) .....................................................................4, 21

*Stewart Glass & Mirror Inc. v. U.S.A. Glass, Inc.*,
  940 F. Supp. 1026 (E.D. Tex. 1996) .......................................................11

*Swift & Co. v. U.S.*,
  196 U.S. 375 (1905) .......................................................................23

*Taylor Pub. Co. v. Jostens, Inc.*,
  216 F.3d 465 (5th Cir. 2000) ..............................................................19

*Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*,
  No. 22-1648, 2024 WL 2785142 (N.D. Ill. May 30, 2024) .................................21

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ...............................................................7

v

*Tops Mkts. Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998) ...................................................................22

*Torrey v. Infectious Diseases Soc'y of Am.*,
    No. 17-190, 2021 WL 6773094 (E.D. Tex. Sept. 1, 2021) ......................11

*U.S. v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ...................................................................16

*U.S. v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .................................................................................5

*U.S. v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024) ...........................................................13

*U.S. v. Grinnell Corp.*,
    384 U.S. 563 (1966) ...........................................................................4, 10

*U.S. v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................8, 9

*U.S. v. Live Nation Ent., Inc.*,
    No. 24-3973, 2025 WL 835961 (S.D.N.Y. Mar. 14, 2025) ....................20

*U.S. v. Microsoft Corp.*
    56 F.3d 1448 (D.C. Cir. 1995) ...............................................................17

*U.S. v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) (per curiam) (en banc) ..................... *passim*

*U.S. v. Sungard Data Sys.*,
    172 F. Supp. 2d 172 (D.D.C. 2001) .........................................................9

*Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*,
    No. 15-32, 2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) .............. *passim*

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ...............................................................................19

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ..............................................16, 19, 20, 21

*Walker v. U-Haul of Miss.*,
    747 F.2d 1011 (5th Cir. 1984) ...............................................................24

*Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*,
    331 F. Supp. 2d 513 (E.D. Tex. 2004) ...................................................20

**Statutes**

Sherman Act, 15 U.S.C. § 1 ..................................................................................22, 23, 25

Sherman Act, 15 U.S.C. § 2 ................................................................................4, 13, 14, 25

Tex. Bus. & Com. Code § 15.04 ..............................................................................25

**Treatises**

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law (4th and 5th eds. 2024)..................14, 20

**Court Rules**

Federal Rule of Civil Procedure 12(b)(6) ..............................................................................4

## **INTRODUCTION**

This dispute began well before Cognizant filed suit. It began when Infosys emerged as a rare threat to Cognizant's healthcare dominance. Cognizant's acquired software products are not "next generation," as advertised, but last generation—i.e., decades old. Infosys launched Infosys Helix to provide healthcare payors with a modern software product they have long demanded. This innovation threatened to unravel Cognizant's dominance. Rather than compete on the merits, Cognizant illegally deployed its monopoly power to stop Infosys. This case is therefore not actually about trade secret theft but instead Cognizant's scheme to stop Infosys—and anyone else—from challenging its dominance.

By its own admission, Cognizant is the dominant provider of healthcare payor software and related IT support in the United States. But Cognizant did not achieve its dominance through innovation, product superiority, business acumen, or historical accident. Cognizant bought its dominance—paying dearly to acquire TriZetto—and entrenched it unlawfully. Cognizant thwarts free and fair competition by wielding its power to erect artificial barriers to entry, interfere with competitors, and outright exclude competition. These are textbook antitrust violations.

Nevertheless, Cognizant has moved to dismiss Infosys's Counterclaim employing a kitchen sink approach, arguing Infosys failed to plead virtually every element of its claims. To do so, Cognizant misstates the law, reimagines Infosys's allegations, ignores detailed allegations, and raises fact disputes that are improper on a motion to dismiss.

Infosys properly pled violations of the federal Sherman Act and the Texas Free Enterprise and Antitrust Act. As Infosys comprehensively alleged with direct and indirect evidence, Cognizant has monopoly power—or at minimum a dangerous probability of acquiring such power—in two distinct yet related markets: healthcare payor software and related IT services.

1

Cognizant has intentionally engaged in a course of exclusionary conduct to maintain and enhance its dominance in these markets. This conduct, as a whole or in isolation, is anticompetitive under well-established precedent. And Infosys has standing to bring antitrust claims because Cognizant's anticompetitive conduct harms Infosys and American consumers—healthcare payors—by raising prices, reducing quality, and limiting options.

Cognizant's defenses to antitrust liability are improper at this stage, and meritless in any event. Its "no duty to deal" defense is contrary to Infosys's allegations. So too its purported "IP rights" defense—which is no defense anyway because "[i]ntellectual property rights do not confer a privilege to violate the antitrust laws." *U.S. v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001) (per curiam) (en banc) (quoting *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000)). Cognizant's claim that trade secret laws grant it an unfettered right to exclude competition is "no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability." *Id.* Its other defenses raise fact disputes.

The Court should deny Cognizant's Motion to Dismiss in its entirety.

## FACTUAL BACKGROUND

Cognizant Technology Solutions Corp. ("CTS"), the parent entity of Cognizant TriZetto Software Group, Inc. ("Cognizant TriZetto"; collectively with CTS, "Cognizant"), is a multi-billion-dollar IT services firm with 70% of its workforce in India. Infosys Counterclaim, ECF No. 46 ("CC") ¶¶ 22-23. CTS has long been the dominant provider of IT support services to healthcare companies, providing essential IT support for third-party healthcare software products. *Id.* ¶ 4. In 2014, when Cognizant's IT dominance began to soften, CTS acquired TriZetto Group, Inc. ("TriZetto"). *Id.* ¶¶ 29, 32-38. TriZetto's Facets and QNXT were the most widely used software platforms to process claims for healthcare payors. *Id.* ¶¶ 39, 78. By acquiring Facets and QNXT,

Cognizant became "vertically integrated," offering payors two essential services: claims processing software and IT support for that software. *Id.* ¶¶ 5, 36-37.

Infosys Limited ("Infosys") provides next-generation IT services and consulting to American healthcare companies. *Id.* ¶ 21. Decades ago, Infosys helped develop QNXT. *Id.* ¶¶ 2, 31. Infosys was a key TriZetto partner before the Cognizant acquisition. *Id.* ¶ 48. After the acquisition, however, Cognizant gained the power to undermine competition for healthcare payor software and related IT services using its dominant position in both markets. *Id.* ¶¶ 36-38. Cognizant started to turn this power against Infosys when it emerged as a significant rival. *Id.* ¶¶ 49-50. When Infosys began to outcompete Cognizant on the merits in the healthcare IT services market, Cognizant responded with increasingly restrictive and overbroad non-disclosure agreements ("NDAAs") and by withholding training on QNXT and Facets. *Id.* ¶¶ 46-47, 49-50, 56, 64, 66, 72-77. Cognizant did so solely to thwart competition. *Id.* Meanwhile, Cognizant stopped innovating QNXT and Facets, using its dominance to reap monopoly profits for increasingly outdated software. *Id.* ¶ 10.

Cognizant doubled down on its anticompetitive practices when Infosys began developing Infosys Helix in response to American healthcare payors' demand for an innovative and technologically superior alternative to Cognizant's antiquated Facets and QNXT. *Id.* ¶¶ 12, 19. Rather than compete on the merits, Cognizant wielded its power to stop Infosys Helix. It engaged in a systematic campaign to erect new barriers to entry through more onerous NDAA provisions and, starting in 2022, engaged in predatory hiring and induced disloyal behavior from key Infosys employees to sabotage Infosys Helix. *Id.* ¶¶ 51-68, 92-105. Then, Cognizant filed this manufactured case against Infosys for purported trade secrets violations, leaving Infosys with no choice but to file antitrust counterclaims.

3

## LEGAL STANDARD

Under Rule 12(b)(6), the question is whether Infosys states a claim for relief, accepting as true all of its well-pleaded facts and construing them in the most favorable light. *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018). Infosys's pleading is detailed—but need not be. All that is required is to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.* at 663, and is more than speculative, *Littell*, 864 F.3d at 622.

## ARGUMENT

### I.    Infosys Properly Pled Violations for Monopolization and Attempt Under Section 2.

A monopolization claim under Section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (referring to the second element as "exclusionary," "anticompetitive," or "predatory" conduct). As alleged, Cognizant has monopoly power in two distinct yet related markets (healthcare payor software and related IT services) and has engaged in a course of exclusionary conduct to maintain and enhance its dominance of those markets.

Attempted monopolization under Section 2 has three elements: (1) anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The Counterclaim easily satisfies the first two elements, and Cognizant does not even dispute the third.

4

**A. Cognizant has Monopoly Power.**

Monopoly power is "the power to control prices or exclude competition." *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Monopoly power may be pled directly—through allegations of supra-competitive prices and restricted output—or inferred from the structure and composition of the relevant market. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). Infosys has properly pled Cognizant's monopoly power under either approach.

**1.    Direct Allegations of Cognizant's Monopoly Power.**

Infosys directly alleges monopoly power: Cognizant extracts supra-competitive prices while limiting output. CC ¶ 19. Cognizant charges payors (the relevant consumers) inflated prices. *Id.* ¶¶ 10, 19. And Cognizant aggressively limits output—not only its own, but that of others. Cognizant has frozen its own output by not adding modernized capabilities and features, such as AI, to its dominant and long-outdated software, Facets and QNXT. *Id.* ¶¶ 10, 18. Even worse, Cognizant cements its own output restriction by preventing consumers (payors) from obtaining expanded capabilities and features from other sources. *Id.* ¶¶ 8, 16-17. Cognizant also restricts actual and potential competitors from offering and innovating expanded capabilities and features. *Id.* ¶¶ 8, 15-16, 18. Cognizant even restricts output through labor restrictions, imposing unlawful contractual restrictions on other companies' workers that they have no choice but to accept because of Cognizant's dominance. *Id.* ¶¶ 8, 54, 64-65.

Infosys has also detailed examples of Cognizant's direct exercise of monopoly power to impose contract provisions—against payors' wishes—excluding competition and reducing output. *See id.* ¶¶ 51-68. Indeed, Cognizant's license agreements with payors contain express output

5

restrictions, limiting the companies a payor can select to provide IT support services, which raises prices and decreases quality and services. *Id*. ¶¶ 45-46.

Infosys's allegations of direct evidence of monopoly power independently satisfy the first element of its monopolization claim at the pleading stage. *Cf. Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir. 1999) (evidence of "less service at greater cost . . . lends strong support to [the] contention that [a defendant] possesses monopoly power").[1]

## 2. Indirect Allegations of Cognizant's Monopoly Power.

Infosys also alleged monopoly power indirectly: (a) Infosys sufficiently pled relevant markets and (b) Cognizant, even by its own statements, has a dominant share in each market, protected by "entry barriers." *Microsoft*, 253 F.3d at 51.

### a. Payor Software and Related IT Services Are Relevant Product Markets.

A relevant market is the area of effective competition, comprising both a product/service and geographic component. *Illumina, Inc. v. F.T.C.*, 88 F.4th 1036, 1048 (5th Cir. 2023). Infosys plausibly pled two relevant markets, neither of which encompasses only a single brand or is limited in some other implausible way. *Cf., e.g.*, *Corrante v. Charles Schwab Corp.*, No. 22-470, 2023 WL 2244680, at *4 (E.D. Tex. Feb. 24, 2023) ("[C]ases in which dismissal on the pleadings is appropriate typically involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity or (2) failure even to attempt a plausible explanation as

---

[1] Because Infosys pled direct evidence of monopoly power, "a relevant market definition is not a necessary component of [its] monopolization claim." *Constr. Cost Data, LLC v. Gordian Grp., Inc.*, No. 16-114, 2017 WL 2266993, at *14 (S.D. Tex. Apr. 24, 2017) (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107–08 (2d Cir. 2002)), *R. & R. adopted*, 2017 WL 2271491 (S.D. Tex. May 22, 2017); *accord Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1197 (S.D. Tex. 2009). In any event, Infosys properly pled two relevant markets. *Infra* pp. 6-10.

to why a market should be limited in a particular way."[2]). The relevant markets here are straightforward and plausible: (1) software products for healthcare payors located in the United States ("Payor Software") and (2) IT services for healthcare Payor Software located in the United States ("IT Services"). CC ¶¶ 109-123.

Cognizant's attempt to challenge the product definitions of these markets, ECF No. 78 ("Mot.") at 6, is not ripe. "Relevant market is a question of fact," *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1348 (5th Cir. 1980), typically reserved for the jury, *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1244-45 (5th Cir. 1985). *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (concluding "proper market definition in th[e] case c[ould] be determined only after a factual inquiry into the 'commercial realities' faced by consumers); *Constr. Cost*, 2017 WL 2266993, at *14 ("[B]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant . . . market." (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001))). In any event, Infosys's definitions are fully consistent with the rule of reasonable interchangeability and cross-elasticity of demand. *See Broadcom*, 501 F.3d at 307, 315; *C.E. Servs.*, 759 F.2d at 1245-46. Moreover, they are consistent with Cognizant's own allegations and public industry statements about the relevant products and services. *See* Compl. ¶¶ 13-18; CC ¶¶ 5-6, 125; *see also Illumina*, 88 F.4th at 1049 (recognizing the role of "industry or public recognition of the [market] as a separate economic entity" in "determin[ing] the boundaries of the relevant product market").

---

[2] These narrow exceptions, which do not apply here, account for Cognizant's three cited cases. *See New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1039 (5th Cir. 2023) (two brands only); *PSKS, Inc. v. Leegin Creative Leather Prods. Inc.*, 615 F.3d 412, 416 (5th Cir. 2010) (one brand only); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 629 (5th Cir. 2002) (implausible exclusion based solely on ownership). *PSKS* is further "distinguishable in that the court granted the motion" to dismiss post-discovery. *Morice v. Hosp. Serv. Dist. #3*, 430 F. Supp. 3d 182, 210 (E.D. La. 2019).

Payor Software. The widely accepted "Hypothetical Monopolist Test" asks whether a hypothetical monopolist within a market could impose a small, but significant, non-transitory increase in price ("SSNIP") on consumers. *See, e.g.*, *U.S. v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51-52 (D.D.C. 2011). Applying that test, Infosys has properly pled the Payor Software market.

Healthcare payors use software to process insurance claims from their members. CC ¶¶ 2, 113-14, 119; Compl. ¶¶ 2, 12-13, 18. Cognizant's Facets and QNXT software perform this critical service, and Infosys is attempting to provide this service with its Infosys Helix software. CC ¶¶ 39-40. Payors do not view non-specialized types of claims processing software—e.g., for hospitals or general insurance—as substitutes for payor software like Facets, QNXT, and Infosys Helix. *Id.* ¶¶ 110, 112 (alleging "payors have many bespoke needs that non-specialized software is not equipped to address"); *see also* Compl. ¶¶ 2, 12-13, 18 (Cognizant alleging payor software "provide[s] solutions to the highly complex medical claims and payments processing problem in healthcare"). Payors also do not view building their own software as a viable substitute for commercial products because they typically lack sufficient scale, resources, and expertise. CC ¶¶ 44, 111, 115, 121, 143; *see also* Compl. ¶¶ 1, 12, 15-16 (alleging payor software costs millions of dollars to develop). Accordingly, "a hypothetical monopolist of healthcare payor software products could . . . impose a small, but significant, non-transitory increase in price on payors who purchase [Payer Software]," CC ¶ 112, which means "the proposed market is the relevant market," *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024).

Cognizant argues the product market for Payor Software is legally invalid because it does not include "proprietary software products built by large payors." Mot. at 7. But that is an improper fact dispute at this stage, and it ignores Infosys's well-pled factual allegations defining the contours

8

of the Payor Software market.[3] And even so, the few large payors with proprietary products do not (and would not) compete with Cognizant to sell propriety products to other payors because they are built for the large payors' "exclusive purpose." CC ¶ 109. Payors therefore do not view self-made products as substitutes for Payor Software. *Id.* ¶ 110.[4]

IT Services. The market for IT Services is also a properly defined product market. Payors need specialized IT services to use Payor Software effectively. CC ¶¶ 44, 119; *see also* Compl. ¶ 15 (Cognizant alleging IT support services are "needed" for healthcare payors "to seamlessly use the [software] products"). Cognizant and Infosys are among the few firms that offer specialized IT services that Payors view as substitutes. Payors have no substitutes for specialized IT services for Payor Software. Payors, for example, cannot use general IT providers for software because they lack sufficient subject matter expertise to meet client needs. CC ¶¶ 120, 122. And payors lack sufficient scale, resources, and expertise to provide their own IT services for the software. *Id.* ¶¶ 44, 111, 115, 121, 143; *see also* Compl. ¶¶ 15-16 (Cognizant alleging "implementation and customization" projects for healthcare payor software "are often complex" and "months-long"). Thus, here again, a "hypothetical monopolist of healthcare payor IT services could therefore impose a small but significant non-transitory increase in price on payors." CC ¶ 122.

In response, Cognizant offers a litany of factual questions about the specific nature of the goods and services at issue that will require discovery and expert testimony to answer. *See, e.g.,*

---

[3] The market properly excludes proprietary software built by large payors because these bespoke solutions, tailored to their exclusive needs, do not offer a substitute for other payors given the prohibitive scale, cost, and expertise necessary to build proprietary software. CC ¶¶ 109-12, 115.
[4] Cognizant's cases involving "self-supply," Mot. at 7, are factually and procedurally distinguishable; they involved fact disputes on a full evidentiary record about whether a firm operating at two levels of the supply chain would sell its "self-supply" to others. *See Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 277-78 (5th Cir. 1978); *H&R Block*, 833 F. Supp. 2d at 58 (distinguishing *U.S. v. Sungard Data Sys.*, 172 F. Supp. 172 (D.D.C. 2001)).

Mot. at 8. But given Infosys's sufficient allegations of the relevant service and explanation that payors do not view other services as substitutes, Cognizant's questions only reaffirm that the "[r]elevant market is a question of fact," *Associated Radio*, 624 F.2d at 1348. And Cognizant's effort to import a heightened pleading standard akin to pleading fraud under Rule 9(b) fails. "There are no heightened pleading requirements in an Antitrust case," and courts "will not look behind [the] allegations at the pleading stage . . . to explore facts concerning . . . market definition." *OGD Equip. Co. v. Overhead Door Corp.*, No. 17-898, 2019 WL 5390590, at *3 (E.D. Tex. Aug. 7, 2019), *R. & R. adopted*, 2019 WL 4253939 (E.D. Tex. Sept. 8, 2019).

### b.    Cognizant Has Durable Dominant Shares in Both Markets, Protected by Entry Barriers.

Courts may infer monopoly power from a firm's "predominant" share in the market. *Grinnell*, 384 U.S. at 571. "At the motion to dismiss stage, with discovery still to be completed, the plaintiff does not have to allege an exact, percentage-based market share." *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, No. 15-32, 2015 WL 6994438, at *11 (W.D. Tex. Oct. 15, 2015). It need only "plead facts that inferentially make a high market share . . . plausible." *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 635 (W.D. La. 2016). Infosys's pleading meets and exceeds this standard, plausibly alleging high shares in both relevant markets.

<u>Market Shares</u>. Contrary to Cognizant's contention, courts do not apply a bright-line share rule for pleading monopoly power. *See Associated Radio*, 624 F.2d at 1357 (rejecting defendant's post-trial contention that because its "market power did not rise to the level existing in some cases," it lacked monopoly power). In this Circuit, "absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984); *see, e.g.*, *Associated Radio*,

624 F.2d at 1363 (50-64% of market share); *Elec. Med. Tr. v. U.S. Anesthesia Partners, Inc.*, No.

23-4398, 2024 WL 5274650, at *8 (S.D. Tex. Sept. 27, 2024) (50-60% market share); *Stewart*

*Glass & Mirror Inc. v. U.S.A. Glass, Inc.*, 940 F. Supp. 1026, 1038 (E.D. Tex. 1996) ("over 50%");

*cf. Torrey v. Infectious Diseases Soc'y of Am.*, No. 17-190, 2021 WL 6773094, at *9 (E.D. Tex.

Sept. 1, 2021) (granting summary judgment where it was "implausible that Defendant controls

[50%] of the . . . market").[5]

Infosys pled sufficient facts to infer that Cognizant has monopoly power in both markets.

To begin, Infosys pled that Cognizant has a dominant share, exceeding 50% in both relevant

markets. CC ¶¶ 39, 124-131. These share estimates are plausible because they are based on

Cognizant's own statements about its market position in both markets and echoed by industry

observers. For example, Cognizant's CEO in 2024 stated "my TriZetto platform [QNXT and

Facets] is the largest platform in the United States for health care. 65% of the U.S. insured

population goes through that platform."[6] And Cognizant has publicly boasted that it provides IT

Services to 16 out of 20 of the largest payors in the US. CC ¶ 33. Statements by industry observers

reinforce Cognizant's own statements about its dominance, noting the TriZetto acquisition would

---

[5] The rarely cited *Exxon* case on which Cognizant relies is inapposite. *See* Mot. at 10. There, on a request for a stay pending appeal following an injunction hearing with witness testimony, the Fifth Circuit noted a 52% market share provided "an insufficient basis as a matter of law to conclude that Exxon violated the antitrust laws." *Exxon Corp. v. Berwick Bay Real Estate Partners*, 748 F.2d 937, 939-40 (5th Cir. 1984) (per curiam). Here, by contrast, the case is at the pleading stage, and Infosys offers extensive allegations of monopoly power and conduct, not relying on market share alone.

[6] CC ¶ 125 (quoting Cognizant Technology Solutions Corporation, NasdaqGS Company Conference Presentation, May 21, 2024; *see also* https://cognizant.q4cdn.com/123993165/ files/doc_financials/2024/q4/CTSH-Q4-2024-Earnings-Transcript.pdf (Cognizant CEO reporting TriZetto software "is used to process about two-thirds of US healthcare claims") (visited 3/29/2025); https://www.newindianexpress.com/business/2025/ Jan/10/cognizant-acted-with-anticompetitive-malice-alleges-infosys-in-counterclaim-filed-in-us-court (Cognizant asserting its "software products are widely used in the marketplace") (visited 3/29/2025).

"tak[e] it to a different league altogether," namely "the pole position among all Indian IT outsourcers in the healthcare software space." *Id.* ¶¶ 6, 36, 38. Infosys thus plausibly alleges that Cognizant's shares in the relevant markets are well over 50%. *See, e.g.*, *id.* ¶¶ 11-13, 33, 39, 129.

Cognizant contends Infosys's market share allegations are "conclusory," but then disputes the factual premises underlying Infosys's well-pleaded market share estimates. Mot. at 10-11. For example, Cognizant rejects its own CEO's statement that it has a 65% share of Payor Software, arguing "that is the wrong metric as a matter of law." *Id.* at 11. But the correct metric under the law to assess shares depends on the alleged facts and expert opinion. Given how Cognizant itself described its market share (65%), its argument raises a fact dispute at best. Cognizant also improperly disputes facts by questioning whether Infosys pled "Cognizant actually provides IT services to more than 50% of customers . . . or that Cognizant has 'control' over more than 50% by virtue of its license agreements." *Id.* at 12. Infosys squarely alleges that "Cognizant enjoys a high and stable market share of greater than 50% of the healthcare payor IT services market." CC ¶ 129. Cognizant attempts to manufacture ambiguity by questioning the reason this high and stable share exists—which is that Cognizant anticompetitively "controls who payors can work with." *Id.* Again, that is a factual dispute.

In sum, Infosys's market share allegations are more than sufficient at this stage, particularly as the precise details of Cognizant's dominance are currently within its possession. *See Universal Hosp.*, 2015 WL 6994438, at *7.

Entry barriers. The Counterclaim thoroughly alleged barriers to entering the Payor Software market.[7] *See* CC ¶¶ 77-78, 111-112, 115-117, 126. "[E]ntry into this market requires

---

[7] While Cognizant has not contested that there are barriers to entry in IT Services, the Counterclaim also alleged similar barriers to entry in that market. CC ¶¶ 120-22; *accord, e.g.*, Compl. ¶ 15.

substantial resources, a high degree of technical sophistication, subject-matter expertise, and a strong reputation with payors," CC ¶ 127, which are classic entry barriers. *See, e.g.*, *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 428 n.8 (5th Cir. 2008); *Broadcom*, 501 F.3d at 307. Cognizant's arguments to the contrary ignore not only these allegations but also its own Complaint, which alleged that building payor software takes years, costs millions of dollars, and requires specialized expertise. Compl. ¶¶ 2, 12, 15-16; CC ¶ 126. These too are well-recognized barriers to entry. *See, e.g.*, *Chi. Bridge*, 534 F.3d at 437-39; *U.S. v. Google LLC*, 747 F. Supp. 3d 1, 119-20 (D.D.C. 2024); *Universal Hosp.*, 2015 WL 6994438, at *15.

Cognizant suggests that Infosys's size and efforts to enter the Payor Software market render entry barriers low. Not so. Infosys alleged the durable dominance of QNXT and Facets for decades—despite the products being outdated, pricey, and incompatible with modern technology and consumer demand for innovation. CC ¶¶ 10, 110, 125-126. Infosys also alleged that it "is *uniquely* positioned" to enter and threaten Cognizant's dominance, reinforcing the point that Cognizant's exclusion of Infosys Helix harms competition. *Id.* ¶ 79 (emphasis added).[8]

### B.    Cognizant Has Engaged in a Course of Exclusionary Conduct.

The second element of a Section 2 claim requires "exclusionary" conduct. A firm violates Section 2 when it uses monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak*, 504 U.S. at 482-83. "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Conwood Co., v. U.S. Tobacco Co.*,

---

[8] Cognizant also misstates Infosys's allegations, claiming Infosys obtained 2,500 *customers* in its first four years developing Infosys Helix. Mot. at 11-12. The Counterclaim actually alleged that Infosys has entered "several" contracts and there were "2,500 customer *users*" (i.e., customer employees or contractors) of Infosys Helix as of May 2023. CC ¶¶ 116-17 (emphasis added). That is a sharp contrast to the far larger number of Facet and QNXT *customers*.

290 F.3d 768, 784 (6th Cir. 2002) (quoting *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)). Because "the means of illicit exclusion . . . are myriad," the range of potentially exclusionary or anti-competitive conduct is broad. *Microsoft*, 253 F.3d at 58; *see Retractable Techs., Inc. v. Becton, Dickinson & Co.*, No. 08-16, 2013 WL 4806905, at *3-4 (E.D. Tex. Sept. 9, 2013) (rejecting argument that "[n]o court" had previously found a particular act anticompetitive, and emphasizing "the fact-sensitive nature of the determination"). Ultimately, any "[c]onduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Broadcom*, 501 F.3d at 308.

Infosys properly pled the exclusionary conduct element. It alleged Cognizant uses its dominance in Payor Software and IT Services to engage in a course of conduct solely to foreclose and weaken competition from Infosys and others. Cognizant's attempt to reimagine its anticompetitive conduct as a unilateral "refusal to deal" is meritless. So too its attempt to defend its conduct at this stage as "procompetitive," "hard competition," or "protection of its IP."

### 1. Cognizant's Collective Actions Are Exclusionary.

Cognizant seeks to apply the wrong framework in analyzing Infosys's allegations of exclusionary conduct. It parses each act of alleged anticompetitive conduct, mischaracterizes Infosys's allegations, and then seeks to analyze each part of the scheme independently. But "[i]n a monopolization case conduct must always be analyzed 'as a whole.'" Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 310c7 (4th and 5th eds. 2024) ("Areeda"). Thus, "when a plaintiff alleges that a scheme or course of conduct was anticompetitive, the scheme or conduct must be considered as alleged, not in manufactured subcategories." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354-55 (4th Cir. 2024). Even if "no one of the instances of

14

improper conduct, standing alone, would lead to section 2 liability," a monopolization claim is stated where "[t]aken together . . . they show a pattern of exclusionary behavior." *Associated Radio*, 624 F.2d at 1356. "A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as de minimis or an error in judgment, but the pattern gives increased plausibility to the claim." *Duke*, 111 F.4th at 355; *see also Conwood*, 290 F.3d at 786-87.

Infosys alleged precisely that type of pattern of exclusionary behavior, CC ¶¶ 48-108, establishing the inference that Cognizant's "overall success was influenced by factors other than the superiority of its products and services." *Associated Radio*, 624 F.2d at 1356; *see also Universal Hosp.*, 2015 WL 6994438, at *6. In the instructive *Duke* case, NTE, a nascent competitor offering more efficient power, asserted that Duke's seemingly distinct acts were part of a unified plan to block it from competing for a key contract. 111 F.4th at 354. In reversing the district court's dismissal on summary judgment, the Fourth Circuit explained that a court errs in applying rigid, categorical tests to "a complex or atypical exclusionary campaign, the individual components of which do not fit neatly within pre-established categories." *Id.* at 354. It therefore evaluated Duke's actions as "part of a singular, coordinated anticompetitive effort." *Id.* at 356.

Here too, Infosys alleged that it is a more efficient competitor in IT Services than Cognizant and its new Infosys Helix product is superior to Cognizant's products. CC ¶¶ 40, 53, 140, 151, 161, 172, 183, 192, 204. Faced with this unique competitive threat, Cognizant engaged in a course of conduct with no legitimate purpose other than to stop that threat. *Id.* ¶¶ 8, 71, 134. While specific acts may differ, *Duke* demonstrates any conduct can be anticompetitive when it is aimed at excluding a more efficient rival. Cognizant offers pretextual justifications for its conduct. At best, these defenses present fact disputes given the well-pled allegations that Cognizant's conduct lacks

15

any legitimate purpose. *See, e.g.*, *Eastman Kodak*, 504 U.S. at 479; *Duke*, 111 F.4th at 362, 365;

*In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 351-52 (D.R.I. 2017).

2.  <strong>Cognizant's Acts Are Individually Exclusionary.</strong>

Even viewed in insolation, each component of Cognizant's scheme is exclusionary.

<u>"Most Favored Vendor" (MFV)</u>. Infosys plausibly pled that Cognizant's use of MFV

provisions is exclusionary conduct, consistent with courts' recognition that "most favored nation"

provisions may be exclusionary when imposed by firms, like Cognizant, with monopoly power.

*See, e.g.*, *U.S. v. Apple, Inc.*, 791 F.3d 290, 320 (2d Cir. 2015); *Dark Catt Studios Holdings, Inc.*

*v. Valve Corp.*, No. 21-872, 2022 WL 1443677, at *2 (W.D. Wash. May 6, 2022); *Aetna Inc. v.*

*Blue Cross Blue Shield of Mich.*, No. 11-15346, 2012 WL 2184568, at *3-4 (E.D. Mich. June 14,

2012). As alleged, Cognizant uses its power to impose these provisions in its license agreements

with payors against their wishes. CC ¶¶ 45-46. These provisions are exclusionary because they

enable Cognizant "to foreclose competition" by discouraging or preventing payors from hiring

Infosys or other Cognizant competitors in the IT Services market. *Id.* ¶¶ 46-47.

Cognizant's only response is to raise a defense that "[p]rotecting one's intellectual property

[IP] through contractual restrictions is procompetitive." Mot. at 19. Such procompetitive

justifications are improper on a motion to dismiss because they raise fact disputes. *See Viamedia,*

*Inc. v. Comcast Corp.*, 951 F.3d 429, 460 (7th Cir. 2020) ("balancing anticompetitive effects

against hypothesized justifications . . . is not amenable to resolution on the pleadings"). In any

event, *Microsoft* rejected the same type of IP defense raised by Cognizant, characterizing it as

"border[ing] upon frivolous." 253 F.3d at 63; *see also N.Y. v. Actavis PLC*, 787 F.3d 638, 660 (2d

Cir. 2015) (rejecting argument patent holder has an "absolute and unfettered right to use its

16

intellectual property as it wishes"); *accord F.T.C. v. Actavis*, 570 U.S. 136, 148-51 (2013). Moreover, Cognizant's IP defense hinges on factual dispute: whether it even *has* legitimate IP.

Unreasonably restrictive NDAAs. Infosys plausibly alleged that Cognizant uses its monopoly power to impose unreasonable restrictions in NDAAs with competitors designed to "foreclose competition" from Infosys and others in both markets. CC ¶¶ 50, 63, 132; *cf. U.S. v. Microsoft Corp.,* 56 F.3d 1448, 1451-52 (D.C. Cir. 1995) (approving consent decree barring anticompetitive licenses and unduly restrictive NDAs, among other exclusionary conduct).

Infosys does not claim that all NDAAs are anticompetitive. Before the Cognizant acquisition, TriZetto had an incentive to impose reasonable access and confidentiality terms as necessary. CC ¶¶ 48, 58. Only when Infosys began emerging as a unique competitive threat did Cognizant start using its power in the Payor Software market to impose overly restrictive NDAAs on Infosys and other competitors to obstruct competition in both the Payor Software and IT Services markets. *Id.* ¶¶ 49-77. These unreasonable provisions include non-competes, limitations on the scope of services, one-sided non-solicitation restrictions that asymmetrically entrench Cognizant's dominance, and excessive limits on employees allowed to work on a project. *Id.* Infosys alleged these provisions are unreasonable, and thus exclusionary, because they do not protect a legitimate business interest as evidenced by allegations that (i) the prior owners of Facets and QNXT did not impose these restrictions and (ii) Cognizant did not impose these restrictions in the initial years after it acquired TriZetto. *Id.* They instead have the purpose and effect of maintaining and enhancing Cognizant's dominance in both markets by imposing additional costs and burdens on competitors such as Infosys, degrading the quality of services competitors can provide, preventing healthy competition on the merits, and erecting additional barriers to enter the Payor Software market. *Id.*; *cf. Microsoft*, 253 F.3d at 54. Indeed, Cognizant has conceded as

17

much, contending that the purpose of its "strict" NDAAs is to prevent Infosys from "develop[ing] competing products." CC ¶ 135 (citing ECF No. 38 at 1, 25).

Cognizant defends its NDAA restrictions based on a purported "no duty to deal" reasonableness—a fact dispute—and purported lack of harm to Infosys. But Cognizant ignores that Infosys alleged harm to itself and competition from these unreasonable NDAA restrictions. *Id.* ¶¶ 137-38. Such harm is plausible. As the Counterclaim recounts, Cognizant's restrictions impose increased costs and other obstacles making it more difficult for Infosys to compete for IT Services contracts, perform contracts it can obtain, and enter the Payor Software market with an improved, modern product. *See id.* ¶¶ 55-71. And Cognizant is wrong that the conduct at issue must absolutely foreclose or eliminate its rivals to be anticompetitive. *See McWane, Inc. v. F.T.C.*, 783 F.3d 814, 832, 838 (11th Cir. 2015); *Microsoft*, 253 F.3d at 70-71. It is well established that conduct is anticompetitive if, as alleged here, it raises rivals' costs, degrades the quality of their services, or frustrates innovation. *Impax Labs., Inc. v. F.T.C.*, 994 F.3d 484, 492-93 (5th Cir. 2021); *McWane*, 783 F.3d at 832; *Microsoft*, 253 F.3d at 70-71. Infosys need not wait for the most extreme harm—that NDAA restrictions entirely foreclose its ability to compete—before seeking relief.

Withholding training on QNXT and Facets. Infosys alleged that Cognizant's decision to withhold training from significant rivals is irrational but for the exclusion of competition. *See Aspen*, 472 U.S. at 607-08. Prior owners of QNXT and Facets offered training to Infosys and other IT services vendors, which allowed them to provide higher quality consulting services, resulting in greater customer satisfaction with the QNXT and Facets platforms. CC ¶¶ 73-74. Cognizant has a similar program, but it restricts access to small market players (i.e., less efficient and capable rivals), while excluding Infosys. *Id.* ¶ 75. There is no legitimate business purpose for Cognizant's

18

change in policy other than to harm rivals by raising their costs and foreclosing healthy competition that would benefit payors and their customers. *Id.* ¶¶ 72, 75-77; *cf. Aspen*, 472 U.S. at 610-11; *Viamedia*, 951 F.3d at 463. This conduct as alleged constitutes exclusionary conduct under *Aspen* and its progeny. *Duke*, 111 F. 4th at 364; *Aspen*, 472 U.S. at 610-11; *Viamedia*, 951 F.3d at 463.

<u>Inducing disloyal behavior from key Infosys Helix employees</u>. After Infosys began to emerge as a potential competitor in the Payor Software market, Cognizant lured away the executive sponsors of Infosys Helix, inducing them to frustrate the development of Infosys Helix *while they remained at Infosys*. *Id.* ¶¶ 78-108, 138. As alleged, Cognizant did so expressly to sabotage Infosys Helix to protect Cognizant's dominance in the Payor Software and IT Services markets and, through a clearly alleged causal chain, succeeded in delaying Infosys Helix's entry to market. *Id.* Thus, Cognizant's cited cases involving "mere hiring away" are inapposite. *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 480 (5th Cir. 2000). As the Fifth Circuit has recognized, predatory hiring "for purposes of . . . denying [talent] to a competitor" and "induc[ing] disloyal performance by a rival's employee" are forms of exclusionary conduct. *Id.* (quoting Areeda, ¶ 782e); *see also Associated Radio*, 624 F.2d at 1354-55.

### 3. Cognizant's "No Duty to Deal" Defense Is Misplaced.

Cognizant's primary defense for its exclusionary conduct is that the antitrust laws impose no duty to deal with Infosys on its preferred terms unless the *Aspen* exception applies. Mot at 14. Cognizant tries to distort the dispute into the type of unilateral refusal to deal at issue in *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), and *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009). *See* Mot. at 14-15, 18. Cognizant's effort fails.

19

*First*, a "no duty to deal" defense applies only when the case involves *solely* a unilateral refusal to deal. *Duke*, 111 F.4th at 366; *Viamedia*, 951 F.3d at 472; *U.S. v. Live Nation Ent., Inc.*, No. 24-3973, 2025 WL 835961, at *2 (S.D.N.Y. Mar. 14, 2025). That is because courts must view exclusionary conduct as "part of a larger scheme," not as individual acts "in isolation." *Duke*, 111 F.4th at 366. Here, Infosys properly alleged affirmative exclusionary conduct, and Cognizant does not even try to characterize *all* that conduct as unilateral refusals to deal. Instead, it argues that its unreasonable NDAA restrictions and selective withholding of training constitute unilateral refusals to deal. Because Cognizant effectively concedes that at least some of its conduct is not a unilateral refusal to deal, this defense cannot apply.

*Second*, Cognizant's NDAAs are not properly characterized as a unilateral refusal to deal. *LinkLine*, 555 U.S. 438, demonstrates the point. There, the Supreme Court concluded a vertically integrated defendant had no duty to supply an input to plaintiffs at their preferred price. *Id.* at 449-51. The Supreme Court characterized the conduct as a unilateral refusal to deal because plaintiffs sought forced sharing of the defendant's lawful competitive advantage, namely a lower input cost from self-supply. *Id.* But unlike *linkLine* and other duty to deal cases, Infosys does not seek forced sharing of an input it needs to compete with Cognizant in a market. Instead, Infosys seeks to avoid unreasonable restrictions, imposed by Cognizant after a payor selected Infosys for an IT services contract, that restrict Infosys's ability to compete in the future. That conduct is classic exclusionary behavior and nothing like the simple refusals to share homegrown essential inputs with free-riding competitors at issue in *Trinko* and other duty to deal cases. *See, e.g.*, *Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 547 (E.D. Tex. 2004) ("The Court declines to read *Trinko* so as to lessen antitrust liability in contexts other than those addressed in that opinion.").

*Third*, even if the exclusionary conduct were hypothetically a unilateral refusal to deal, Infosys's allegations would easily satisfy the *Aspen* exception. Infosys plausibly alleged that Cognizant's conduct lacked any legitimate justification—i.e., was irrational but for the exclusion of a competitor. *Aspen*, 472 U.S. at 609-11. Moreover, the dismissals on the pleadings in *Trinko* and *linkLine* are readily distinguishable. Both cases involved *a regulated industry* where the value of antitrust enforcement was low. *See linkLine*, 555 U.S. at 443; *Duke*, 111 F.4th at 362-63 (discussing *Trinko*, 540 U.S. at 412). In contrast, the refusal to deal in *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1066 (10th Cir. 2013), which did not involve a regulated industry, was decided "based on an eight-week trial," *Viamedia*, 951 F.3d at 460. Refusal to deal claims often involve a fact dispute about the monopolist's justification, so dismissals on the pleadings are rare. *See Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, No. 22-1648, 2024 WL 2785142, at *15 (N.D. Ill. May 30, 2024); *see also Duke*, 111 F.4th 364-65 (refusal to deal presented a jury question).

### C.  Infosys Properly Pled Attempted Monopolization.

Attempted monopolization requires (1) exclusionary conduct, (2) with a specific intent to monopolize, and (3) a dangerous probability of success. *Spectrum*, 506 U.S. at 455-56. The first element is satisfied for the reasons discussed above. *Supra* pp. 13-19. Cognizant does not dispute the third element—a dangerous probability of achieving monopoly power. *See* Mot. at 20-21. This leaves the second element, intent, which "may be inferred from evidence of anticompetitive conduct." *Universal Hosp.*, 2015 WL 6994438, at *7 (citing *Aspen*, 472 U.S. at 603); *E.I. du Pont Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 453 (4th Cir. 2011) (plaintiff "sufficiently pled specific intent to monopolize" by pleading defendant engaged in anticompetitive practices). Here, Infosys plausibly pled exclusionary conduct, so "it is entitled to the inference of" Cognizant's "specific intent." *Universal Hosp.*, 2015 WL 6994438, at *7; *In re Pool Prods. Dist.*

*Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 391 (E.D. La. 2013) (intent element satisfied "because plaintiffs have plausibly alleged anticompetitive agreements").

Cognizant argues this element is lacking because "Infosys includes only one specific factual allegation to demonstrate that TriZetto intended to monopolize the alleged markets" and that allegation is subject to Cognizant's (faulty) IP defense. Mot. at 21. That argument effectively concedes Infosys adequately pled this element, and the defense raises a fact dispute. In any event, Cognizant ignores numerous factual allegations of its intent to monopolize the relevant markets, including (1) its then-president's announcement that acquiring QNXT and Facets would "give [Cognizant] a dominant position in the US healthcare market," (2) its payment of an above-market price in furtherance of its strategy, and (3) its CEO's 2024 statement that it intended to "double down" on its 65% market share. CC ¶¶ 5, 39, 125. "[T]hese types of public statements are sufficient to give rise to an inference of intent." *Universal Hosp.*, 2015 WL 6994438, at *7; *see Tops Mkts. Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 101-02 (2d Cir. 1998).

## II.    Infosys Properly Pled a Section 1 Violation for Unreasonable Restraint of Trade.

Section 1 of the Sherman Act requires (1) one or more agreements (2) that unreasonably restrain trade. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 884-85 (2007). Infosys alleged Cognizant's market-wide contracting practices involve unreasonable restraints on competition in both relevant markets. Cognizant disputes only the second element.

Vertical agreements, such as those alleged here, are analyzed under the "rule of reason," meaning "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin*, 551 U.S. at 885; *see also Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 977 (5th Cir. 1977) (emphasizing a court must look beyond the language of contract provisions "at the

circumstances surrounding the[ir] use"). A plaintiff may plead a restrictive practice as unreasonable with direct or indirect evidence of anticompetitive effects. Indirect evidence is proof of market power plus "some" tendency that the practice harms competition. *Impax*, 994 F.3d at 492-93. Courts typically require a share greater than 30% to constitute market power under Section 1. *Hardy v. City Optical Inc.*, 39 F.3d 765, 767 (7th Cir. 1994); *Pool Prods.*, 940 F. Supp. 2d at 397 (allegations of 33% market share sufficient).

Infosys plausibly pled indirect evidence that Cognizant's license agreements and NDAAs unreasonably restrain competition in both markets. Cognizant has substantial—indeed, dominant—market power in the relevant markets. *Supra* pp. 10-12. And the challenged restrictive practices weaken competition in both markets without any efficiency-enhancing benefits. For example, Infosys alleged the MFV provisions in Cognizant's license agreements have the purpose and effect of excluding competition in the IT Services market. CC ¶¶ 46-47, 133, 169, 201. Similarly, Infosys alleged the NDAA restrictions are unreasonable because they raise rivals' costs, erect artificial entry barriers, and degrade the quality of competitors' services and products in both markets. *Id.* These allegations of market power and likely anticompetitive effects in both markets satisfy the pleading burden under Section 1 in both markets. *See Dexon Comput., Inc. v. Cisco Sys., Inc.*, No. 22-53, 2023 WL 2941414, at *20-21 (E.D. Tex. Feb. 7, 2023).

In opposition, Cognizant restates its prior objections to the product markets while silently conceding it has market power in both pled markets. But Infosys pled plausible relevant markets. *Supra* pp. 6-10. Cognizant also wrongly insists the reasonableness of each agreement must be "considered individually." Mot. at 24. Where, as here, several vertical agreements are pled as part of a single scheme, they must be viewed "as the parts of a single plan." *Swift & Co. v. U.S.*, 196 U.S. 375, 396 (1905); *see also Frame-Wilson v. Amazon.com, Inc.*, 664 F. Supp. 3d 1198, 1210-

211 (W.D. Wash. 2023) (denying dismissal of Sections 1 and 2 claims because "the overall effects of [defendant's] conduct in the market are sustainable on their face" even though challenged conduct involved a series of individual agreements between defendant and third-party sellers).[9]

Even if considered separately, though, Cognizant has sufficient power in the markets for each agreement to unreasonably harm competition without justification. CC ¶¶ 9, 35, 50, 54, 63, 76, 130-31, 168-173; *see Pool Prods.*, 940 F. Supp. 2d at 398-99 (vertical agreements unreasonably restrained trade because they excluded rivals on a basis other than efficiency).

## III.    Infosys Properly Pled an Antitrust Injury.

Standing to pursue an antitrust suit requires (1) injury-in-fact, (2) antitrust injury, and (3) status as a proper plaintiff. *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 494 (5th Cir. 2023). Cognizant disputes only the second element, which requires an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Walker v. U-Haul of Miss.*, 747 F.2d 1011, 1014 (5th Cir. 1984) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)). To evaluate antitrust injury, the Court "must assume" Cognizant's conduct violates the antitrust laws. *Pulse*, 30 F.4th at 491, 494; *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015).

Cognizant wrongly suggests competitors cannot plead antitrust injury. Mot. at 28. But "antitrust cases . . . by an allegedly excluded competitor" are a "'classical' antitrust case." *Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.,* 123 F.3d 301, 305-06 (5th Cir. 1997). That is because conduct "aim[ed at] the elimination of competition . . . harms both competitors *and* competition."

---

[9] *Dickson* and *Pool Products* do not say otherwise. Mot. at 24. Both cases involved allegations of "*separate* vertical conspiracies." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 204, 211 (4th Cir. 2002) (emphasis added); *Pool Prods.*, 940 F. Supp. 2d at 396. Here, by contrast, Infosys challenges a unified contracting practice, which requires the Court to evaluate the practice *as a whole*. *See, e.g.*, *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 118 (1986). Cognizant's antitrust-injury argument ignores the "Injury to Competition" paragraphs detailing how Infosys's injury flows from an injury to competition. CC ¶¶ 139-143. Through the exclusionary conduct described above, Cognizant is "exploit[ing] its dominance" to "squeeze[]"a more efficient and superior rival—Infosys—"out of the market," which is a "textbook antitrust injury." *Pulse*, 30 F.4th at 491; *supra* pp. 13-19. Infosys also alleged *market-wide* effects, meaning Cognizant excludes other competitors as well, CC ¶¶ 19, 46-47, 70, 75, 130-35, and causes harm to payors and their members. Payors are stuck with (a) antiquated software for which they are paying supra-competitive prices because they lack viable alternatives, and (b) lower quality IT services for that software (at premium prices) than if Infosys and others could compete on the merits. *Id.* ¶¶ 139-43. Higher costs for payors pass on to the American public in the form of higher premiums, copays, deductibles, and other out-of-pocket costs associated with health insurance, *id.*, which "plausibly establish[es]" the conduct "harm[s] consumer welfare" and competition. *Drs. Hosp. of Laredo v. Cigarroa*, No. 21-1068, 2022 WL 3567353, at *9 (W.D. Tex. Aug. 17, 2022).

## IV.    Infosys Properly Pled Violations of Texas Antitrust Laws.

Texas antitrust laws are "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes." Tex. Bus. & Com. Code § 15.04. Because Infosys properly pled claims under Sections 1 and 2 of the Sherman Act, its Texas law claims are equally well pled. *See Dexon*, 2023 WL 2941414, at *15, *40; *Universal Hosp.*, 2015 WL 6994438, at *17.

## <u>CONCLUSION</u>

Cognizant's Motion to Dismiss should be denied in its entirety. If the Court grants any aspect of the Motion, Infosys respectfully requests leave to amend. *See Griggs v. Hinds Junior Col.*, 563 F.2d 179, 180 (5th Cir. 1977).

Dated: March 31, 2025

Respectfully submitted,

JENNER & BLOCK LLP

By: */s/ Douglas E. Litvack*

Brent Caslin (*pro hac vice*)
Nick Saros (*pro hac vice*)
Kelly M. Morrison (*pro hac vice*)
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071
Tel.: (213) 239-5100
BCaslin@jenner.com
NSaros@jenner.com
KMorrison@jenner.com

Shoba Pillay (*pro hac vice*)
Laura E. Pelanek (*pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
SPillay@jenner.com
LPelanek@jenner.com

Douglas E. Litvack (*pro hac vice*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
DLitvack@jenner.com

LYNN PINKER HURST &
SCHWEGMANN, LLP

Christopher J. Schwegmann
State Bar No. 24051315
cschwegmann@lynnllp.com
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Tel: (214) 981-3835
Fax: (214) 981-3839

*Attorneys for Defendant and Counterclaim
Plaintiff Infosys Limited*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of March, 2025, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the Northern District of Texas, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

/s/ *Douglas E. Litvack*
Douglas E. Litvack (*pro hac vice*)
