# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| COGNIZANT TRIZETTO SOFTWARE GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> INFOSYS LIMITED, <br><br> Defendant. | **Case No. 3:24-cv-2158-X** <br><br> **FIRST AMENDED COUNTERCLAIM** <br><br> **DEMAND FOR JURY TRIAL** |
| INFOSYS LIMITED, <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> COGNIZANT TECHNOLOGY SOLUTIONS CORP. and COGNIZANT TRIZETTO SOFTWARE GROUP, INC., <br><br> Counterclaim Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

THE PARTIES........................................................................................................8

JURISDICTION, VENUE, AND COMMERCE ...................................................9

BACKGROUND ...................................................................................................10

    A.    Other Companies, Including Infosys, Developed QNXT and Facets Prior to CTS's Acquisition of TriZetto. ............................................................10

    B.    CTS's Acquisition of TriZetto in 2014. .....................................................11

COGNIZANT'S COURSE OF  ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT ..........................................................................................................14

    A.    Cognizant Imposes Anticompetitive Contractual Restrictions and Prohibitions to Exclude Competition in the Core Administration Software and Core Administration IT Services Markets. ....................................14

        1.    Cognizant Imposes Anticompetitive Most Favored Vendor Provisions.............................................................................................16

        2.    Cognizant Imposes NDAAs With Anticompetitive Restrictions and Prohibitions. ..............................................................................17

        3.    Cognizant Imposes NDAAs with Anticompetitive Limitations on Project Staffing. ........................................................................21

        4.    Cognizant Imposes NDAAs with Anticompetitive One-Sided Non-Solicitation Provisions. ...............................................................23

        5.    Cognizant Imposes NDAAs with Anticompetitive Non-Compete Provisions.............................................................................................25

        6.    Cognizant Imposes Its Anticompetitive Contractual Provisions Broadly, Harming Competition Across the Core Administration Software and Core Administration IT Services Markets Without Any Legitimate Purpose. ........................................................27

    B.    Cognizant Excludes Competitors from Training for its Core Administration Software.................................................................................29

    C.    Cognizant Engaged in Predatory Hiring of Infosys Helix's Executive Sponsors.......................................................................................................31

D.    Cognizant's Anticompetitive Conduct Has Delayed Infosys Helix and
Threatened its Viability.......................................................................39

THE RELEVANT MARKETS...................................................................................40

A.    The Core Administration Software Market ...........................................42

1.    Core Administration Software in the United States is a Relevant
Market. ......................................................................................42

B.    The Core Administration IT Services Market and Submarkets............49

1.    Core Administration IT Services in the United States is a Relevant
Market. ......................................................................................49

2.    Core Administration Integration in the United States is a Relevant
Market. ......................................................................................55

3.    Core Administration Testing in the United States is a Relevant
Market. ......................................................................................58

4.    Core Administration Migration in the United States is a Relevant
Market. ......................................................................................61

COGNIZANT'S MONOPOLY POWER IN EACH OF THE RELEVANT MARKETS............65

A.    Cognizant Has Monopoly Power in the Core Administration Software
Market. ................................................................................................65

B.    Cognizant Has Monopoly Power in the Core Administration IT Services
Market and Submarkets. ......................................................................70

COGNIZANT'S SPECIFIC INTENT TO  MONOPOLIZE EACH OF THE RELEVANT
MARKETS .........................................................................................................75

COGNIZANT'S WILLFUL ACQUISITION AND MAINTENANCE OF MONOPOLY
POWER IN EACH OF THE RELEVANT MARKETS .................................................77

COGNIZANT'S ANTICOMPETITIVE AND  EXCLUSIONARY CONDUCT LACKS
ANY VALID JUSTIFICATION .................................................................................81

ANTICOMPETITIVE EFFECTS AND INJURY TO COMPETITION .....................................82

INFOSYS'S ANTITRUST INJURY ...................................................................................84

CONTINUING VIOLATIONS ...........................................................................................86

VIOLATIONS ALLEGED...................................................................................................86

A.     Count I: Claim for Relief for Monopolization of Core Administration
       Software Market in Violation of Section 2 of the Sherman Act,
       15 U.S.C. § 2 ..................................................................................................86

C.     Count II: Claim for Relief for Monopolization of the Core Administration
       IT Services Market and Submarkets in Violation of Section 2 of the
       Sherman Act, 15 U.S.C. § 2 .........................................................................88

D.     Count III: Claim for Relief, in the Alternative, for Attempted
       Monopolization of the Core Administration Software Market in Violation
       of Section 2 of the Sherman Act, 15 U.S.C. § 2 ......................................89

E.     Count IV: Claim for Relief, in the Alternative, for Attempted
       Monopolization of the Core Administration IT Services Market and
       Submarkets in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ...........91

F.     Count V: Claim for Relief for Unreasonable Restraint of Trade in the Core
       Administration Software Market in Violation of Section 1 of the Sherman
       Act, 15 U.S.C. § 1 ..........................................................................................94

G.     Count VI: Claim for Relief for Unreasonable Restraint of Trade in the
       Core Administration IT Services Market and Submarkets in Violation of
       Section 1 of the Sherman Act, 15 U.S.C. § 1.........................................95

H.     Count VII: Claim for Relief for Violations of the Texas Free Enterprise
       and Antitrust Act (TFEAA), Tex. Bus. & Com. Code § 15.05(a) and (b).............96

PRAYER FOR RELIEF ...........................................................................................98

JURY DEMAND .....................................................................................................100

Counterclaim Plaintiff Infosys Limited ("Infosys") alleges the following against Counterclaim Defendants Cognizant Technology Solutions Corp. ("CTS") and Cognizant TriZetto Software Group, Inc. ("Cognizant TriZetto") (collectively "Cognizant").

## INTRODUCTION

1.      This is an antitrust case about Cognizant's anticompetitive schemes to achieve, maintain, and enhance its monopolistic dominance over specialized software and IT services that managed health insurance organizations in the United States ("Health Plans") depend on to provide Americans with healthcare coverage. Cognizant is the self-professed "number one player in healthcare in the United States." Its CEO, Ravi Kumar S, publicly boasts about Cognizant's healthcare dominance, declaring "we are very deep, very big," and "the strongest in the market." Bragging that "it's very hard to beat Cognizant," Kumar has openly declared Cognizant's intent to "double down" on its "pole position in health care." In defiance of the antitrust laws, Cognizant uses its admittedly "extraordinary strength" to stifle competition from more innovative and efficient rivals. Cognizant's far-reaching anticompetitive conduct deprives Health Plans of the benefits of competition on the merits: reduced prices, increased options, heightened innovation, and improved quality for software and services in the U.S. healthcare system. The damage to competition from Cognizant's conduct reverberates across the U.S. healthcare system, harming not only the competitive process and Cognizant's competitors like Infosys but also Health Plans, U.S. healthcare providers, and ultimately Americans who pay more for their healthcare. Through its anticompetitive conduct, Cognizant has violated and continues to violate the Sherman Act and the Texas Free Enterprise Antitrust Act. Infosys, as one of Cognizant's most innovative and efficient competitors, brings this Counterclaim to stop Cognizant's ongoing antitrust violations and recover appropriate damages.

1

2.     Health Plans (also known as health insurers, healthcare payors, or simply payors) require "Core Administration Software" to perform their most critical, core functions: managing their members, processing claims, and managing their provider networks. Core Administration Software, also known as payor software or core administration platform software, is essential and highly specialized. If it does not perform effectively, Health Plans cannot perform their core functions. Thus, Health Plans depend on "Core Administration IT Services"—a set of highly specialized information technology ("IT") services including Core Administration Testing, Core Administration Integration, and Core Administration Migration—to ensure that their Core Administration Software performs effectively.

3.     Cognizant monopolizes multiple relevant markets related to Core Administration Software and Core Administration IT Services, as defined in the Relevant Markets section of this Counterclaim. Using its monopoly power in the defined relevant markets, Cognizant allocates the markets and imposes contractual restrictions and prohibitions that harm Health Plans and the competitive process: raising prices, reducing output, and excluding competition, including from Infosys. Cognizant's contractual restrictions and prohibitions are well-established forms of exclusionary conduct that violate antitrust statutes prohibiting monopolization, but certain aspects are so damaging to competition that they also violate separate antitrust statutes prohibiting unreasonable restraints of trade. Cognizant also bars more innovative and efficient rivals, including Infosys, from participating in training programs traditionally offered while continuing to make training available to others. Cognizant's monopolistic conduct is intended to, and does, damage Infosys's ability to compete against Cognizant in the defined relevant markets. At the same time, Cognizant has acted unlawfully to obstruct and delay Infosys's ability to develop competing Core Administration Software. Because of Cognizant's anticompetitive schemes, Health Plans continue

2

to use—and overpay for—Cognizant's Core Administration Software and Core Administration IT Services.

4.      Two of the oldest and most commonly used Core Administration Software products are Facets and QNXT. Erisco Managed Care Technologies ("Erisco") developed Facets over 30 years ago. Quality Care Solutions, Inc. ("QCSI") began developing and then reengineered QNXT, with support from Infosys, over 20 years ago.

5.      In the early 2000s, software company TriZetto Group, Inc. ("TriZetto"), acquired both Erisco (2000) and QCSI (2007), and with them Facets and QNXT. In 2008, Apax Partners ("Apax"), a private equity firm, acquired TriZetto. Before, during, and after the TriZetto and Apax acquisitions, Infosys and Cognizant competed to provide Core Administration IT Services to Health Plans, including those using Facets and QNXT.

6.      In August 2014, Apax put TriZetto up for sale. At the time, with $13 billion in revenue in 2013, CTS was the dominant "Core Administration IT Services Provider"—a company providing Core Administration IT Services. But rivals, like Infosys, were starting to take business from CTS, resulting in three successive quarters of declining healthcare revenue in 2014.[1] CTS's stock price fell 17%.[2]

7.      CTS announced plans to acquire TriZetto in September 2014, "creating a fully-integrated healthcare technology and operations leader."[3] CTS touted that its acquisition of TriZetto would "accelerate significantly its market position" by allowing it to offer "integrated

---

[1] "Cognizant to Acquire TriZetto for $2.7 Billion," Sept. 15, 2014, available at: https://martinwolf.com/cognizant-to-acquire-trizetto-for-2-7-billion/.

[2] *Id.*

[3] "Cognizant to Acquire TriZetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader," Sept. 15, 2014, available at: https://news.cognizant.com/2014-09-15-Cognizant-to-Acquire-TriZetto-Creating-a-Fully-Integrated-Healthcare-Technology-and-Operations-Leader.

engagement opportunities" (i.e., both licensing and servicing Facets and QNXT). CTS's then-President boasted that the transaction would "give [CTS] a dominant position in the US healthcare market" because it would now control markets for both Core Administration Software and Core Administration IT Services.[4]

8.     At the time, CTS was already providing Core Administration IT Services to "16 of the top 20 health plans in the U.S."[5] Industry observers therefore remarked that CTS "is ideally placed in healthcare with few like-sized competitors" and that the acquisition "has the potential of taking it to a different league altogether."[6] Industry observers also warned that the acquisition could have an adverse effect on competition, noting that many competitors also had "a steady revenue stream . . . implementing TriZetto solutions,"[7] but the acquisition would "make it tougher" for them to compete "in the US healthcare market."[8]

9.     The industry analysts were prescient. CTS's healthcare revenues more than doubled post-acquisition, from about $2.25 billion in 2013 to $4.67 billion in 2018. Before its acquisition of TriZetto, CTS competed with Infosys and other Core Administration IT Services Providers on the merits of their respective offerings (e.g., integration, testing, and migration) to users of Facets, QNXT, and other Core Administration Software. But that competitive dynamic changed after CTS

---

[4] "Cognizant to buy TriZetto for $2.7 billion to expand healthcare business," Sept. 16, 2014, available at: https://www.livemint.com/Companies/v2CbKKfxSBHJj4PhhTjPAJ/Cognizant-to-buy-IT-services-provider-Trizetto-for-27-bill.html.

[5] "Cognizant Completes Acquisition of TriZetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader," Nov. 20, 2014, available at: https://news.cognizant.com/2014-11-20-Cognizant-Completes-Acquisition-of-TriZetto-Creating-a-Fully-Integrated-Healthcare-Technology-and-Operations-Leader.

[6] "Cognizant Acquires TriZetto: The New 'Big Blue' of Healthcare IT? Sherpas in Blue Shirts," Sept. 15, 2014, available at: https://everestgrp.com/2014-09-cognizant-acquires-trizetto-the-new-big-blue-of-healthcare-it-sherpas-in-blue-shirts-15544.html.

[7] *Id.*

[8] "Cognizant to buy TriZetto for $2.7 billion to expand healthcare business," Sept. 16, 2014, *supra* n.4.

4

acquired TriZetto (and with it, Facets and QNXT). Cognizant began weaponizing the newfound power it gained through its acquisition of TriZetto—its monopoly power over Core Administration Software—to harm competition not only in the Core Administration Software relevant market but also the Core Administration IT Services relevant markets.

10.     Cognizant engages in anticompetitive conduct to stifle competition from more efficient rivals, including Infosys. Notably, Cognizant uses its power to impose contractual restrictions and prohibitions on its customers and competitors that have no legitimate purpose and serve only to foreclose competition in the relevant markets and prevents entry to those markets. These anticompetitive restrictions take various forms, including (1) imposing most favored vendor or first right of refusal provisions in Cognizant's agreements with Health Plans, which effectively grant Cognizant the right to prevent its software clients from awarding Core Administration IT Services work to its competitors like Infosys, (2) limiting product training so competitors have diminished ability to train personnel to perform Core Administration IT Services, and (3) requiring competitors like Infosys to enter into contracts directly with Cognizant that impose (a) limitations on the scope of work they can perform for Health Plan clients, (b) restrictions on which of their employees can service customer accounts, (c) prohibitions on developing complementary products that could interface with Cognizant's software, and (d) one-way non-solicitation provisions that protect Cognizant's employees from poaching while allowing Cognizant to weaken its rivals' ability to compete (by hiring away talented software support engineers from rivals, like Infosys, while rivals are precluded from doing the same).

11.     Through its control of Facets and QNXT, Cognizant has the power to impose these exclusionary contractual provisions on its Health Plan clients and on its Core Administration IT Services Provider competitors because Health Plans have few if any real alternatives to

5

Cognizant's Core Administration Software. It also takes significant time, money, and disruption for a Health Plan to switch Core Administration Software, and Cognizant engages in anticompetitive conduct to block Health Plans' efforts to do so. Health Plans therefore lack the ability to discipline Cognizant's behavior.

12.     The TriZetto acquisition also gave Cognizant the ability and incentive to protect its dominance in the Core Administration Software Market from any competitive threat. For over a decade, Facets and QNXT have dominated their Core Administration Software Market with limited competition, protected by significant barriers to entry. Cognizant thus had little need to innovate or reduce prices, despite the rapid advancement of software and technology in other industries. As a result, Cognizant's decades-old products continue to dominate, ensnaring Health Plans in antiquated products that cost more than they should.

13.     Infosys is uniquely positioned to challenge Cognizant's stranglehold over the Core Administration Software Market because of its strong reputation with Health Plans and expertise developing highly specialized software products.

14.     In 2019, Infosys decided to challenge Cognizant's dominance over the Core Administration Software Market. It began developing Infosys Helix, a Core Administration Software, in response to Health Plan client demand for customizable, cloud-native Core Administration Software capable of leveraging artificial intelligence to help Health Plans perform their core functions. Infosys Helix is built using modern technology and—as Cognizant's aggressively anticompetitive response confirms—presents a legitimate threat to Cognizant's dominance in the relevant markets. To date, Infosys has devoted tens of millions of dollars to develop Infosys Helix.

6

15.     Determined to protect its monopolies in the Core Administration Software and the Core Administration IT Services relevant markets, Cognizant unleashed a systematic course of conduct to exclude competitors, including Infosys, from these relevant markets. This course of conduct includes market allocation and anticompetitive contractual restrictions and prohibitions imposed on Health Plans and competitors, including Infosys. As further detailed in this Counterclaim, these contractual restrictions and prohibitions are unlawful not only as part of Cognizant's monopolistic course of conduct but also as independently unreasonable restraints of trade and commerce. Cognizant's monopolistic course of conduct also includes a predatory hiring scheme to undermine the development of Infosys Helix. And it includes the imposition of artificial hurdles to prevent Health Plans who use Cognizant's Core Administration Software from replacing it or making it interoperable with Infosys Helix or other Core Administration Software. Cognizant does so against Health Plans' wishes.

16.     Cognizant's anticompetitive conduct is causing significant financial harm to Infosys. It is also harming Health Plans—i.e., the direct purchasers of Core Administration Software and Core Administration IT Services—by depriving them of the benefits of unfettered competition from Infosys and other more efficient rivals that would result in higher quality software and services at lower cost.

17.     Cognizant's conduct is also stifling innovation by substantially delaying Infosys from bringing its disruptive cloud-native, AI-leveraging Infosys Helix Core Administration Software to market despite strong demand from Health Plans. Cognizant's Core Administration Software is not cloud native. It is built on outdated technology that is decades old.

18.     Rather than compete on the merits, Cognizant has used and is using its dominant positions in the Core Administration Software and the Core Administration IT Services relevant

7

markets to exclude competition, enabling it to charge supra-competitive prices for lower-quality Core Administration Software and Core Administration IT Services compared to what competitors like Infosys offer. These higher costs imposed on Health Plans ultimately raise the price of Americans' healthcare through higher premiums, copays, deductibles, and other out-of-pocket costs associated with health insurance.

19.     Infosys seeks equitable relief to stop Cognizant's anticompetitive practices and restore competition. Infosys also seeks monetary damages for its injuries from Cognizant's violations of federal and state antitrust laws.

## THE PARTIES

20.     Infosys Limited is a company headquartered in Bengaluru, India. Infosys and its subsidiaries have several locations in the United States, with its principal U.S. office located in Richardson, Texas. Infosys provides next-generation IT services and consulting, including Core Administration IT Services. Infosys is also using its decades of experience working with Health Plans to create an innovative new Core Administration Software, Infosys Helix, to meet Health Plans' needs for a better alternative to Cognizant's Core Administration Software.

21.     Cognizant Technology Solutions Corporation is a company incorporated in Delaware with its principal place of business in Teaneck, New Jersey. CTS is an IT services firm and consulting firm, including in the Core Administration IT Services relevant markets. Though Cognizant is incorporated in Delaware, over 70% of its workforce is in India. CTS acquired Core Administration Software QNXT and Facets in 2014 through its acquisition of TriZetto.

22.     Cognizant TriZetto Software Group, Inc., is a wholly owned subsidiary of CTS incorporated in Delaware, with its principal place of business in Englewood, Colorado. Cognizant TriZetto was formed in 2014 in connection with the TriZetto acquisition and is the named party in the Non-Disclosure and Access Agreements ("NDAAs") discussed in this Counterclaim.

## JURISDICTION, VENUE, AND COMMERCE

23.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332(a), and 1337(a). This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Infosys's federal law claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has diversity and supplemental jurisdiction under 28 U.S.C. §§ 1332(a) and 1367(a) over Infosys's state law claims because (1) there is complete diversity between the parties and the amount in controversy exceeds $75,000 and (2) the federal and state law claims derive from a common nucleus of operative facts.

24.    This Court has personal jurisdiction over CTS because CTS has sufficient minimum personal contacts with the Northern District of Texas ("this District"), transacts business in this District, and in any event has consented to jurisdiction in this District for purposes of this case.

25.    Venue in this Court is proper because CTS transacts business in this District, is subject to personal jurisdiction in this District, and in any event has consented to venue in this District for purposes of this case.

26.    This Court has personal jurisdiction over Cognizant TriZetto because Cognizant TriZetto has sufficient minimum personal contacts with this District, transacts business in this District, and in any event has consented to jurisdiction in this District for purposes of this case.

27.    Venue in this District is proper because Cognizant TriZetto transacts business in this District, is subject to personal jurisdiction in this District, and in any event consented to venue in this District for purposes of this case.

28.    CTS and Cognizant TriZetto engage in, and their activities substantially affect, interstate trade and commerce and trade and commerce within the State of Texas. CTS and Cognizant TriZetto market, offer, provide, sell, license, contract for, and distribute the products and services at issue in this Counterclaim throughout the United States, within the State of Texas,

9

and across state lines. CTS and Cognizant TriZetto's conduct at issue in this Counterclaim had and continues to have substantial effects on interstate trade and commerce, as well as trade and commerce partially or wholly within the State of Texas.

## BACKGROUND

### A.    Other Companies, Including Infosys, Developed QNXT and Facets Prior to CTS's Acquisition of TriZetto.

29.    Cognizant TriZetto describes QNXT and Facets as "next-generation software systems"[9] but it has been a full generation—more than two decades—since the development of these products. The products are last-generation, not next-generation. Further, Cognizant did not develop either platform; rather, Cognizant acquired them inorganically in 2014 when it purchased TriZetto.

30.    Facets was originally developed by Erisco over 30 years ago. TriZetto acquired Erisco and the Facets product in 2000.

31.    QNXT was originally developed by QCSI over 20 years ago. Beginning in 2003, QCSI engaged Infosys to assist with porting the programming language of QNXT from Visual Basic to a .Net application. Infosys continued to work on the reengineering of QNXT after TriZetto acquired QCSI, and with it the QNXT product, in 2007. At the time of TriZetto's acquisition, the majority of QCSI's customers were second- or third-tier Health Plans. QCSI was just starting to enter the top-tier market by licensing QNXT to larger customers, including, for example, Plan 1.

32.    By the end of 2007, TriZetto had acquired Facets and QNXT and positioned them as the leading Core Administration Software products for Health Plans—commercial health insurers and other managed health plans as detailed in this Counterclaim. For example, more than

---

[9] Complaint ¶ 14, ECF 1.

20 of the 38 Blue Cross Blue Shield organizations in the United States use Facets as their Core Administration Software. In August 2008, private equity firm Apax acquired TriZetto.

**B.      CTS's Acquisition of TriZetto in 2014.**

33.      In August 2014, Apax decided to sell TriZetto. At that time, approximately 90% of CTS's healthcare segment revenue came from providing Core Administration IT Services related to Facets and QNXT. That revenue represented a quarter of CTS's overall revenue. As of September 2014, it was reported that with "approximately $2.5 billion in annualized revenue, Cognizant's healthcare practice is consistently ranked among the top 10 on the Healthcare Informatics Top 100," and "Cognizant serves . . . 16 of the top 20 health plans in the U.S."[10] However, despite that ranking, CTS in 2014 had reported three successive quarters of declining revenue in its healthcare business.[11] CTS saw that it could use the market power it would acquire through purchasing the Core Administration Software associated with the majority of its Core Administration IT Services work to turn its poor performance around—and that doing so would be well worthwhile even if it meant paying a premium over TriZetto's true market value.

34.      While there were multiple strategic bidders for TriZetto, including Infosys, CTS was the prevailing bidder because it was willing to pay a monopoly premium for TriZetto. At the time, CTS valued TriZetto at nearly four times its 2013 annual revenue of around $700m. Industry observers opined that CTS overpaid "for an asset which isn't growing nearly as fast as Cognizant."[12] CTS did so because it could leverage the power it gained in the Core Administration

---

[10] "Cognizant Completes Acquisition of TriZetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader," Nov. 20, 2014, *supra* n.5.

[11] "Cognizant to Acquire TriZetto for $2.7 Billion," Sept. 15, 2014, *supra* n.1.

[12] James Crabtree, "Cognizant Rejects Claims it Overpaid for TriZetto," New York Institute of Finance, Sept. 15, 2014, available at: https://www.nyif.com/articles/cognizant-rejects-claim-it-overpaid-for-trizetto.

Software Market with its existing power in the Core Administration IT Services relevant markets to enhance and maintain monopoly power in all of these markets.

35.     CTS paid $2.7 billion for TriZetto, with the transaction closing in November 2014. CTS understood TriZetto brought "to Cognizant significant and complementary new market opportunities,"[13] as well as "[e]nhanced competitiveness in integrated engagement opportunities."[14] CTS asserted that the acquisition "represents a great opportunity to integrate services across our three horizons—traditional IT services; high-growth businesses such as management consulting, business process services and IT infrastructure services; and emerging delivery models."[15] A key rationale for the acquisition was thus to enhance and maintain monopoly power across the Core Administration Software Market and the Core Administration IT Services relevant markets. The pattern of exclusionary conduct described below would not have been possible without the leverage CTS gained over customers and rivals by acquiring TriZetto and its Core Administration Software.

36.     CTS touted the deal in an announcement on September 15, 2014. CTS reported the acquisition would "accelerate significantly its market position and strategy."[16] CTS asserted the acquisition would broaden CTS's "solutions offerings and creates an opportunity for us to cross-sell our business process, infrastructure management and consulting services to the TriZetto clients where we currently do not have relationships"[17] and provide a "greater longer term opportunity . . . for us to combine TriZetto's platforms with our services and program management capabilities

---

[13] "Cognizant to Acquire TriZetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader," Sept. 15, 2014, *supra* n.3.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] Cognizant 2014 Annual Report, at 1, available at:
https://cognizant.q4cdn.com/123993165/files/Annual/2014/Cognizant_2014AnnualReport.pdf.

to create end-to-end integrated platform-based solutions that bring together infrastructure, applications, the cloud and business process services."[18]

37.    As Gordon Coburn, then-president of CTS, said, the acquisition "will give us a dominant position in the US healthcare market. . . . TriZetto, when closed, will take [CTS's] healthcare services revenue to approximately 30% of company revenue."[19] Industry analysts agreed, stating that TriZetto would "significantly enhance" Cognizant's "competitive position in the health care vertical."[20]

38.    Industry analysts also noted the damaging impact the acquisition would have on competition. As one opined:

> The deal will . . . have myriad implications for the overall healthcare IT services competitive landscape. Most competitors of Cognizant already have a steady revenue stream (large or small) implementing TriZetto solutions, most importantly Facets™, which is used by most payors in the U.S. How this impacts its engagements and partnerships will be tricky. Whether Cognizant will want to (and if so, how) assume a dichotomous role of a partner and competitor will be another interesting area to watch. . . . Two things that are definitely salient here–one, Cognizant is going all out to bet big on healthcare; and two, this acquisition has the potential of taking it to a different league altogether! . . . . The deal definitely has characteristics of a long-term strategic bet than a tactical maneuver.[21]

When it announced the deal, CTS anticipated approximately $1.5 billion of cumulative potential revenue synergies over the following five years—through the ability to provide Core Administration IT Services to the TriZetto clients who became Cognizant clients through the

---

[18] *Id.* at 45.

[19] "Cognizant to buy TriZetto for $2.7 billion to expand healthcare business," Sept. 16, 2014, *supra* n.4.

[20] "Cognizant to Buy TriZetto for $2.7 Billion for Health Unit," Bloomberg, Sept. 15, 2024, available at: https://www.bloomberg.com/news/articles/2014-09-15/cognizant-to-buy-trizetto-for-2-7-billion-in-health-care-growth.

[21] Cognizant Acquires TriZetto: The New 'Big Blue' of Healthcare IT? Sherpas in Blue Shirts, Sept. 15, 2014, *supra* n.6.

acquisition.[22] Surya Gummadi, Cognizant's current "President – Americas" and former "Vice President and market head for [its] Health Plans business," "led Cognizant's acquisition of TriZetto . . . and its commercial integration."

**COGNIZANT'S COURSE OF**
**ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT**

A.    **Cognizant Imposes Anticompetitive Contractual Restrictions and Prohibitions to Exclude Competition in the Core Administration Software and Core Administration IT Services Markets.**

39.    Before it was acquired by CTS, TriZetto did not have an incentive to impose onerous provisions on third parties providing Core Administration IT Services to Health Plans using QNXT or Facets. TriZetto did not provide Core Administration IT Services for its products and typically partnered with third-party Core Administration IT Services Providers, like Infosys, for such services. It therefore had an incentive to impose reasonable access and confidentiality terms. For example, a May 2013 Third Party Access Agreement between TriZetto and Syntel Inc. contained only two paragraphs on a single page, neither of which prevented Syntel from developing competing products or offering competing services.

40.    After CTS's acquisition of TriZetto in 2014, Infosys continued to provide Core Administration IT Services to Health Plans that used QNXT or Facets without an NDAA. For example, Infosys has provided Core Administration IT Services related to a large Health Plan's use of Facets since July 2015 under a long-term contract without a Cognizant NDAA. Similarly, Infosys has provided Core Administration IT Services related to QNXT for a different Health Plan since 2011 without a Cognizant NDAA. But when Infosys emerged as a stronger competitive threat to Cognizant in 2018 for Core Administration IT Services, and then Core Administration Software

---

[22] "Cognizant to Acquire TriZetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader," Sept. 15, 2014, *supra* n.3.

in 2020, Cognizant began imposing progressively more restrictive and prohibitive terms in its NDAAs.

41.    Starting in 2018, Infosys began to win significant Core Administration IT Services work, including at least 11 accounts valued at hundreds of millions of dollars, away from Cognizant. Infosys enjoyed these successes because it was providing higher quality services at more competitive prices than Cognizant. In response, Cognizant began using its monopoly power in the Core Administration Software Market to implement illegitimate NDAAs on Infosys, as one part of a monopolistic course of conduct intended to foreclose competition in the Core Administration IT Services relevant markets and protect the dominant market position Cognizant had overpaid so dearly to acquire and expand.

42.    Cognizant's anticompetitive use of illegitimate contractual restrictions and prohibitions in the Core Administration Software Market and the Core Administration IT Services relevant markets is not unique to Infosys. Cognizant systematically imposes them to exclude competition it views as a threat to its dominance, foreclosing competitors from large portions of these markets. Indeed, Cognizant systematically allocates the Core Administration IT Services relevant markets through its unlawful restraints and prohibitions, excluding larger competitors while allowing small competitors to handle small Core Administration IT Services projects, representing a sliver of the markets, in exchange for agreeing to accept Cognizant's monopolistic dominance of the markets. These small competitors have agreed with Cognizant to limit competition through Cognizant's "TriZetto Consulting Partner Network." For example, at one large Health Plan, Cognizant █████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████. Cognizant's unlawful market allocations have no effective end date because Cognizant

███████████████████████████████████████████████, and Health Plans

are stuck with Cognizant's Core Administration Software indefinitely because of Cognizant's

monopolization of the Core Administration Software Market. Thus, Cognizant's restraints and

prohibitions harm competition and the competitive process across the Core Administration

Software Market and the Core Administration IT Services relevant markets.

### 1.    Cognizant Imposes Anticompetitive Most Favored Vendor Provisions.

43.    Cognizant imposes contractual restrictions on Health Plans who use its Core

Administration Software that restrict their access to Core Administration IT Services. Cognizant's

Core Administration Software license agreements typically include a most favored vendor

("MFV") provision, which either identifies a list of Core Administration IT Services Providers that

Cognizant permits the Health Plan client to use (notably Cognizant itself) or provides Cognizant

with a first right of refusal provision concerning Core Administration IT Services projects. These

provisions either directly exclude Cognizant competitors, such as Infosys, from providing Core

Administration IT Services to Health Plans or effectively exclude them by giving Cognizant the

right to refuse consent for Health Plans to engage them to provide Core Administration IT Services.

44.    These types of provisions have no legitimate purpose, harm Health Plans, and serve

only to exclude competition by directly restricting Health Plans' access to Cognizant's most

significant competitors, including Infosys, for their Core Administration IT Services projects.

These types of provisions prevent Core Administration IT Services Providers, including Infosys,

from competing for a substantial share of the Core Administration IT Services relevant markets

and also exclude them from entering the Core Administration Software Market by adding high and

durable barriers to entry.

16

45.     These types of provisions cause Cognizant competitors, including Infosys, to lose valuable Core Administration IT Services contracts despite their ability to provide the services to Health Plans more efficiently than Cognizant, excluding them from the markets. These types of provisions are a stark demonstration of Cognizant's monopoly power because Cognizant imposes them on its Health Plan customers against their wishes and they substantially foreclose competition in the Core Administration Software Market and the Core Administration IT Services relevant markets.

**2.      Cognizant Imposes NDAAs With Anticompetitive Restrictions and Prohibitions.**

46.     Infosys has a longstanding relationship with a large Health Plan, identified here as Plan 1. Plan 1 uses QNXT. In August 2018, Plan 1 issued a Request for Proposal ("RFP") for a significant new contract, valued at hundreds of millions of dollars, for end-to-end Core Administration IT Services projects, including integration, testing, migration, and application development for QNXT. The projects included consolidating more than 13 different instances of QNXT, making upgrades where maintenance was years behind schedule and creating project teams focused on upgrades for QNXT and applications used to support it.

47.     Infosys and Cognizant submitted competing RFP responses to Plan 1 for this business opportunity. Cognizant failed to make even the short list for consideration for the contract. Instead, in October 2018, Plan 1 selected Infosys and another Core Administration IT Services Provider for the short list.

48.     Ultimately, Plan 1 selected Infosys for the project. This was the first time since the TriZetto acquisition that Infosys had outcompeted Cognizant for a significant Core Administration IT Services contract for a Health Plan using Cognizant's QNXT platform. Infosys prevailed by offering competitive pricing and superior quality.

17

49.     Following the loss, Cognizant schemed to use its monopoly power over Plan 1 to sabotage Infosys's ability to fulfill the contract. Cognizant first demanded that Infosys enter into a Confidentiality Agreement that included a non-compete term prohibiting Infosys employees providing Core Administration IT Services to Plan 1 with access to broadly defined QNXT confidential information from working on—or even providing training for—competing software for as long as they provided services to Plan 1 plus an additional year, regardless of whether access to QNXT was relevant to the employees' work—which it was not. A few months later, Cognizant demanded that Infosys enter into a separate NDAA (the "Plan 1 NDAA") for its Plan 1 work involving QNXT. To accomplish its contracted Core Administration Software IT Servies projects for Plan 1, Infosys had no choice but to enter into the Confidentiality Agreement and NDAA with Cognizant TriZetto.

50.     The executed Plan 1 NDAA, effective November 19, 2018, was anything but a conventional NDAA carefully crafted to promote the parties' working relationship while protecting confidential information. Instead, Cognizant imposed numerous provisions that lacked any legitimate purpose other than to limit Infosys's ability to meet Plan 1's needs, such as a provision restricting which Infosys personnel could service the Plan 1 account. For example, these provisions did not have any legitimate purpose to protect intellectual property because they applied indiscriminately rather than being tied to the protection of any of Cognizant's supposed intellectual property.

51.     In addition, the Plan 1 NDAA expressly limited the scope of Core Administration IT Services that Infosys could provide to Plan 1 by defining a finite set of such services for which Infosys was allowed to use broadly defined Confidential Information. Infosys sought to make the list of services only exemplary—"including but not limited to"—so it could still appropriately

perform the Core Administration IT Services that Plan 1 had hired Infosys to provide. But Cognizant rejected that change despite its harm to Plan 1 and Infosys, who had no choice but to accede in the face of Cognizant's vast monopoly power and defiance of the antitrust laws. The executed Plan 1 NDAA contains a specifically enumerated list of what Cognizant allows Infosys to do for Plan 1.

52.    This type of provision has no legitimate purpose and serves only to exclude competition by restricting the type and volume of Core Administration Software Services that a Cognizant competitor, including Infosys, can perform for a Health Plan using Cognizant's Core Administration Software. This type of provision therefore prevents Core Administration IT Services Providers, including Infosys, from competing for a substantial share of the Core Administration IT Services relevant markets and also excludes them from entering the Core Administration Software Market by adding high and durable barriers to entry. For instance, if a Health Plan hires Infosys because it is encountering a major problem with Facets that it needs to resolve, and Cognizant imposes this provision, Infosys would be unable to help the Health Plan with other issues it encounters with Facets unless Cognizant grants it permission to address them, which Cognizant is unwilling to do. This provision also weakens Infosys's ability to compete for future Core Administration IT Services work against Cognizant by preventing Infosys from satisfying the client's full need for Core Administration IT Services projects. That excludes Infosys as an option when—as is often the case—a Health Plan wants a single vendor for all its Core Administration IT Services—even though Infosys, but for Cognizant's restrictions, would be able to serve as the Health Plan's single Core Administration IT Services vendor at a better price and with higher quality than Cognizant. Similarly, this type of provision prevents competitors, including Infosys, from offering the mutual client an alternative to Cognizant's Core

19

Administration Software. Indeed, Cognizant has the power to impose this type of provision because Health Plans, including Plan 1, do not have a meaningful alternative to Cognizant's Core Administration Software. And Cognizant's imposition of this type of provision sends a clear message to Health Plans that using a vendor other than Cognizant for Core Administration IT Services will result in challenges, including the need to negotiate NDAAs and accept illegitimate restrictions and prohibitions on the services that the non-Cognizant vendor can accomplish for the customer.

53.    This type of provision is especially restrictive because of the overbroad definition of "Confidential Information" that Cognizant TriZetto imposes in its NDAAs, which includes "Cognizant software, third-party software provided by Cognizant, or related user documentation," among other items. This expansive definition ensures that competitors, including Infosys, cannot provide *any* Core Administration IT Services not expressly authorized in the NDAA to Health Plans relating to Cognizant software without Cognizant's blessing—even when, as is often the case, Infosys and other competitors would be able to perform the particular Core Administration IT Services project the customer needs without access to any of Cognizant's supposedly confidential information, much less any of its supposed intellectual property.

54.    This type of provision causes Cognizant competitors, including Infosys, to lose valuable Core Administration IT Services contracts despite their ability to provide the services to Health Plans more efficiently than Cognizant, excluding them from the markets. And even when Cognizant competitors, including Infosys, manage to win a Core Administration IT Services contract, this type of provision causes Health Plans and Cognizant competitors, including Infosys, to spend additional time and money than they would in the absence of this provision. This type of provision has the purpose and effect of raising costs for competitors, including Infosys, and

20

degrading the quality of their Core Administration IT Services, as well pressuring Health Plans to select Cognizant for their Core Administration IT Services projects. This type of provision is a stark demonstration of Cognizant's monopoly power because it is imposed on Cognizant competitors against the wishes of Cognizant's Core Administration Software customers and substantially forecloses competition in the Core Administration Software Market and the Core Administration IT Services relevant markets.

### 3.    Cognizant Imposes NDAAs with Anticompetitive Limitations on Project Staffing.

55.    In 2020, Infosys won new work from a Health Plan, identified here as Plan 2, to provide Core Administration IT Services, including some related to Plan 2's use of Facets. In response, Cognizant imposed an NDAA (the "Plan 2 NDAA") containing the same types of anticompetitive provisions as the Plan 1 NDAA (e.g., a finite list of services Infosys was allowed to provide to Plan 2) while adding even more restrictive provisions. Specifically, the Plan 2 NDAA imposed an inadequate cap on the number of Infosys employees permitted to perform Core Administration IT Services for Plan 2 and required Infosys to identify them specifically to Cognizant. Cognizant imposed these limits despite the harm to Plan 2 and Infosys, who had no choice but to accede in the face of Cognizant's vast monopoly power and defiance of the antitrust laws.

56.    The Plan 2 NDAA specifically identifies "Authorized Recipients" by name, location, and title, and limits the total number of Authorized Recipients to 50, despite Infosys's estimation that 250 was the appropriate number of staff members needed for the engagement. To add a new staff member to the Plan 2 account—due to increased needs on the client account or other changes in Infosys's staffing—the Plan 2 NDAA required notice to Cognizant within ten days, including the Authorized Recipient's name, title, and domicile. Cognizant had no duty or

incentive to authorize any addition, however. The Plan 2 NDAA also precludes Infosys employees that work on non-Cognizant Core Administration Software like Infosys Helix from working on the Plan 2 account for an indefinite time period, further exacerbating the harm to Plan 2 and Infosys by further limiting adequate staffing.

57.    This type of provision has no legitimate purpose and only serves to exclude competition by restricting the type and volume of Core Administration Software Services that a Cognizant competitor, including Infosys, can perform for a Health Plan using Cognizant's Core Administration Software. The provision therefore prevents Core Administration IT Services Providers, including Infosys, from competing for a substantial share of the Core Administration IT Services Market and Submarkets and also excludes them from entering the Core Administration Software Market. Capping and requiring specific identification of Authorized Recipients hinders the ability of Cognizant competitors, including Infosys, to provide Core Administration IT Services to Health Plans because they result in insufficient manpower to perform certain Core Administration IT Services projects while delaying and reducing excellent performance for others. Such provisions also require additional governance and oversight by competitors, including Infosys, that can be difficult to manage and raise costs. Cognizant also treats lists of competitor employees with highly specialized Core Administration IT Services as a solicitation target list that it uses hire away competitors' employees to further weaken their ability to compete with Cognizant in the Core Administration IT Services relevant markets.

58.    This type of provision causes Cognizant competitors, including Infosys, to lose valuable Core Administration IT Services contracts despite their ability to provide the services to Health Plans more efficiently than Cognizant, excluding them from the markets. And even when Cognizant competitors, including Infosys, manage to win a Core Administration IT Services

contract, this type of provision causes Health Plans and Cognizant competitors, including Infosys, to spend additional time and money than they would in the absence of this provision. This type of provision has the purpose and effect of raising costs for competitors, including Infosys, and degrading the quality of their Core Administration IT Services, as well as pressuring Health Plans to select Cognizant for their Core Administration IT Services projects. This type of provision is a stark demonstration of Cognizant's monopoly power because it is imposed on Cognizant competitors against the wishes of Cognizant's Core Administration Software customers and substantially forecloses competition in the Core Administration Software Market and the Core Administration IT Services relevant markets.

**4.    Cognizant Imposes NDAAs with Anticompetitive One-Sided Non-Solicitation Provisions.**

59.    The Plan 2 NDAA also includes a one-sided non-solicitation provision that prohibits Infosys from soliciting Cognizant's employees while allowing Cognizant to solicit Infosys employees: "**Non-Solicitation of Cognizant Employees**. During the period You are providing Services and for one (1) year after the Services end, You must not solicit for employment or hire any Cognizant employees with whom Your employees performing Services are directly communicating in connection with the Services. General advertisements shall not be considered solicitations." Infosys sought to make this provision mutual during NDAA negotiations so that it would function as a legitimate mutual agreement to promote a collaborative working relationship to collectively service Plan 2, but Cognizant refused. It instead used its monopoly power to impose a one-way non-solicitation provision that lacked any legitimate purpose and served only to restrict Cognizant's employees from getting better jobs and to harm competition in the Core Administration Software Market and the Core Administration IT Services relevant markets.

23

Cognizant imposed this provision despite the harm to Plan 2 and Infosys, who had no choice but to accede in the face of Cognizant's vast monopoly power and defiance of the antitrust laws.

60.     This type of provision has no legitimate purpose and serves to exclude competition by restricting the type and volume of Core Administration Software Services that a Cognizant competitor, including Infosys, can perform for a Health Plan using Cognizant's Core Administration Software. The provision therefore prevents Core Administration IT Services Providers, including Infosys, from competing for a substantial share of the Core Administration IT Services relevant markets and also excludes them from entering the Core Administration Software Market. Courts have recognized that mutual non-solicitation provisions in certain agreements can serve a legitimate purpose by allowing the parties to such agreements to fulfill a common objective without fear that doing so will compromise their workforces. The one-way provision Cognizant imposes, however, has no such legitimate purpose. It is designed to facilitate Cognizant's ability to interfere with the performance by competitors, including Infosys, of contracted Core Administration IT Services projects by giving Cognizant the ability to pick off key competitor employees to disrupt those projects. It is also designed to prevent Cognizant employees from having the opportunity to get better jobs with Cognizant competitors, thus reducing their compensation and denying talent to competitors, including Infosys. The problem is exacerbated by Cognizant's requirement that competitors, including Infosys, disclose the lists of employees working on the mutual customer account, i.e., its employees with valuable experience and highly specialized skills delivering Core Administration IT Services.

61.     This type of provision causes Cognizant competitors, including Infosys, to lose valuable Core Administration IT Services contracts despite their ability to provide the services to Health Plans more efficiently than Cognizant, excluding them from the markets. This type of

provision has the purpose and effect of raising the costs for competitors, including Infosys, and degrading the quality of their Core Administration IT Services. This type of provision is a stark demonstration of Cognizant's monopoly power because it is imposed on Cognizant competitors against the wishes of Cognizant's Core Administration Software customers and substantially forecloses competition in the Core Administration Software Market and the Core Administration IT Services relevant markets.

### 5.    Cognizant Imposes NDAAs with Anticompetitive Non-Compete Provisions.

62.    Cognizant also imposed sweeping non-compete provisions in the Plan 2 NDAA. The definition of Authorized Recipient in the Plan 2 NDAA includes similar language to that in the Plan 1 NDAA (i.e., "are not involved in specifying, designing, developing, managing, marketing, testing, or selling Your commercial software products or providing training for them to the extent such products are directly competitive with any Proprietary Software"). But Cognizant added an additional non-compete provision into the definition itself: an Authorized Recipient cannot "directly or indirectly use Source Material or Proprietary Software to create or enhance any non-Cognizant products that provides related functionality." Proprietary Software is defined broadly to be "Cognizant software, third-party software provided by Cognizant, Cognizant content products that describe or implement the configuration of Cognizant software products, and related user documentation." This non-compete provision, particularly its inclusion of indirect use in combination with the broad definition of Proprietary Software, has the purpose and effect of preventing Cognizant competitors, including Infosys, from developing Core Administration Software and from performing a swath of Core Administration IT Services that interfaces with Cognizant's Core Administration Software even when neither task relies on *any* protectable Cognizant information. Indeed, under Cognizant's sweeping non-compete provision, a competitor's employee who merely sees the user interface of any Cognizant Core Administration

Software (i.e., what anyone using the software sees on the screen), as is often necessary in the case of certain testing projects, would be prohibited from later helping develop Core Administration Software or deliver certain Core Administration IT Services (e.g., application development).

63.    Cognizant also uses non-compete provisions to impose an effective extension of the NDAA restrictions. The applicable term for the Plan 2 NDAA provision was extended from the three year term on the face of the Plan 2 NDAA to "a minimum period of five (5) years after the date You receive the Cognizant Confidential Information," with Confidential Information broadly defined to include "Cognizant software, third-party software provided by Cognizant," and "related documentation."

64.    This type of provision has no legitimate purpose and serves only to exclude competition by restricting the type and volume of Core Administration Software Services that a Cognizant competitor, including Infosys, can perform for a Health Plan using Cognizant's Core Administration Software. This type of provision therefore prevents Core Administration IT Services Providers, including Infosys, from competing for a substantial share of the Core Administration IT Services Market and Submarkets and also excludes them from entering the Core Administration Software Market. By adding this type of provision, Cognizant is eliminating competition from new or higher-quality Core Administration Software and Core Administration IT Services Providers, including Infosys, and improved integration services.

65.    This type of provision causes Cognizant competitors, including Infosys, to lose Core Administration IT Services contracts despite their ability to provide the services to Health Plans more efficiently than Cognizant, excluding them from the markets. This type of provision has the purpose and effect of raising the costs for competitors, including Infosys, and degrading the quality of their Core Administration IT Services, as well pressuring Health Plans to select

26

Cognizant for their Core Administration IT Services projects. This type of provision is a stark demonstration of Cognizant's monopoly power because it is imposed on Cognizant competitors against the wishes of Cognizant's Core Administration Software customers and substantially forecloses competition in the Core Administration Software Market and the Core Administration IT Services relevant markets.

### 6. Cognizant Imposes Its Anticompetitive Contractual Provisions Broadly, Harming Competition Across the Core Administration Software and Core Administration IT Services Markets Without Any Legitimate Purpose.

66.     Cognizant's NDAAs are "form agreements," meaning Cognizant broadly imposes the exclusionary provisions described above on Health Plans and IT Services Providers. Cognizant has added additional exclusionary provisions to its form NDAAs over time, as described above, which Cognizant then uses as it imposes new NDAAs or renews older NDAAs. Thus, while particularly damaged by Cognizant's unlawful conduct, Infosys is not unique in that Cognizant's injury to competition spans across the Core Administration Software Market and the Core Administration IT Services relevant markets.

67.     Cognizant imposed the exclusionary provisions described above on Infosys in April 2022 in connection with a Core Administration IT Services project for a Health Plan, identified here as Plan 3. The NDAA contains a non-compete provision in the definition of Authorized Recipient, a one-sided non-solicitation provision, a limited list of allowed services, a requirement that Authorized Recipients be specifically identified, and an expanded non-compete provision.

68.     Cognizant also imposed the exclusionary provisions described above on Infosys in December 2022 in connection with a Core Administration IT Services project for a Health Plan, identified here as Plan 4. Again, the NDAA a non-compete provision in the definition of Authorized Recipient, a one-sided non-solicitation provision, a limited list of allowed services, a

27

requirement that Authorized Recipients be specifically identified, and an expanded non-compete provision.

69.    These exclusionary provisions harm not just Infosys but competition across the relevant markets. Cognizant ███████████████████████████████████████ ███████████████████████████████████████████████████ █████. Cognizant also █████████████████████████████████████ ███████████████████████████████. For example, ███████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████ There are many other examples, including █████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████

70.    Confirming that Cognizant's exclusionary NDAA provisions have no legitimate purpose and do not serve to protect intellectual property or trade secrets, Cognizant tells Health

Plans that ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████. Cognizant effectively admits that the true purpose of its form NDAAs is to prevent Health Plans from using Cognizant's competitors for Core Administration IT Services and prevent Cognizant's competitors from developing Core Administration Software.

71.    The anticompetitive and exclusionary nature of Cognizant's form NDAAs is further confirmed by Cognizant's extended delays in approving and executing NDAAs. Even though they are form NDAAs and Cognizant uses its vast monopoly power to reject any reasonable alterations, Cognizant delays approval and execution of NDAAs for months. These systematic delays further prevent Health Plans from selecting Cognizant competitors for their Core Administration IT Services projects—even when the competitors are better priced and higher quality. Because Cognizant's anticompetitive and exclusionary NDAA restrictions and prohibitions have lengthy terms of five years or more and apply to Core Administration IT Services performed for a dominant share of Health Plans who are locked into Cognizant's Core Administration Software, Cognizant's NDAAs foreclose competition in a substantial share of the Core Administration Software Market and the Core Administration IT Services relevant markets.

## B.    Cognizant Excludes Competitors from Training for its Core Administration Software.

72.    Cognizant also improperly protects its dominant position in the Core Administration IT Services relevant markets by refusing to allow training on its Core Administration Software for competing Core Administration IT Services vendors, including Infosys. Cognizant's decision to withhold training lacks any efficiency or other procompetitive

rationale. It serves only to harm Cognizant's rivals by raising their costs and substantially foreclose competition that would benefit Health Plans.

73.     When QCSI owned QNXT, QCSI offered a certified service partners program to provide comprehensive training on the QNXT platform for Core Administration IT Services vendors. Infosys was a "Certified Service Partner" for QCSI. It was in QCSI's economic interest to provide a robust training program to service partners, like Infosys, because QCSI would profit from encouraging training of qualified service providers as training provides a higher quality of services to clients and results in greater overall satisfaction with the Core Administration Software, which encourages adoption and retention of their software. Training also benefited Infosys because Infosys had a cost-efficient way to train personnel about the software and updates to more efficiently provide Core Administration IT Services to clients who used QNXT.

74.     For the same reasons, TriZetto also offered vendors an ability to be a certified vendor for QNXT and Facets, meaning that the vendor and its staffed employees could participate in a certification program for the then-current version of the product. This training covered configuration, providing sample business use cases that offered configuration solutions for all software modules.

75.     A few years ago, Cognizant rolled out a comprehensive certified service partner program but, unlike the prior owners of the software, Cognizant limited access to the program to small market players (i.e., less efficient and capable rivals), excluding Cognizant's most significant competitors (like Infosys) from participation. Cognizant selects participants at its discretion. Cognizant's decision to limit access to its certified service partner program does not make economic sense because the cost to Cognizant of extending the program to all service providers

30

would be minimal while Cognizant could charge additional fees to the larger service providers, thus profiting more by providing greater access to the certified service partner program.

76.    Cognizant intentionally foregoes substantial profits from training on its Core Administration Software in order to maintain and enhance its dominance of the Core Administration IT Services relevant markets. Through its monopolistic dominance of those markets, Cognizant more than recoups lost training profits in the form of supracompetitive pricing for Core Administration IT Services.

77.    Despite Cognizant's anticompetitive prohibition on training access, Infosys has been able to perform some Core Administration IT Services projects related to Cognizant's Core Administration Software over the past decade because of both Infosys's historic knowledge of the software and Cognizant's lack of innovation in its Core Administration Software, which have not changed significantly in at least a decade. But the availability of training would allow Infosys to perform more Core Administration IT Services projects—and to perform them more efficiently, to the benefit of Health Plans. The same is true for other Core Administration IT Services Providers excluded from training. Thus, Cognizant's training prohibitions harm competition across the Core Administration IT Services relevant markets. These unreasonable restrictions enable Cognizant to degrade the quality of competitors' (including Infosys's) Core Administration IT Service offerings, as well as maintain higher prices for such services.

## C.    Cognizant Engaged in Predatory Hiring of Infosys Helix's Executive Sponsors.

78.    Cognizant's Core Administration Software products have existed for decades, and Cognizant has entrenched its dominance to ensure they faced little competition. Cognizant therefore lacked any meaningful incentive to respond to client demand for innovation or lower its prices. Infosys recognized the client demand for new and innovative Core Administration Software

31

and began developing Infosys Helix—a cloud-native, AI-powered Core Administration Software based on modern programming language.

79.     Infosys is uniquely positioned to challenge Cognizant's dominance over the Core Administration Software Market with Infosys Helix. Infosys has the requisite subject matter expertise in the healthcare industry and technical know-how to build better Core Administration Software for Health Plans than Cognizant's antiquated Core Administration Software. Infosys also has a sufficiently strong track record and reputation in the healthcare industry for some Health Plans to take the leap of trusting its new Core Administration Software to perform their business-critical core functions.

80.     In 2019, Infosys decided to begin an effort to enter the Core Administration Software Market. That same year, Plan 1 selected Infosys for a contract valued at hundreds of millions of dollars for end-to-end Core Administration IT Services projects involving integration, testing, migration, and application development.

81.     In late May 2020, Infosys offered Infosys Helix to Plan 1 as a potential solution to certain problems Plan 1 faced with proprietary software developed years earlier by Plan 1 to handle its member enrollment. Plan 1's proprietary software was limited to member enrollment and could not handle the rest of its core functions. Plan 1 used QNXT as its Core Administration Software for the rest of its core functions.

82.     Infosys is using an anchor client model for its development of Infosys Helix. This means that the development of various functionalities of Infosys Helix is prioritized by the needs of the anchor clients, which helps support the high development costs entailed in creating new Core Administration Software. As discussions proceeded between Infosys and Plan 1, Plan 1

ultimately became one of the first Infosys Helix anchor clients in 2021. As a result, the first functionalities Infosys developed for Infosys Helix coincide with Plan 1's needs.

83.    As a new Infosys product, Infosys Helix required significant internal support to advance, including critical executive-level support. For Infosys Helix, the primary executive sponsor was then-President Ravi Kumar S. He controlled the Infosys Helix development budget. In addition, Kumar led Infosys's global delivery organization, independent validation services, engineering services, emerging technology solutions, business intelligence and analytics, cloud and infrastructure, and enterprise package applications service lines.

84.    In the fall of 2020, Kumar was made aware of the early stages of the negotiations with Plan 1 for a potentially significant customer deal involving Infosys Helix.

85.    Infosys submitted a proposal to Plan 1 in December 2020 to replace Plan 1's proprietary member enrollment software with Infosys Helix and integrate it with QNXT, which handled the rest of Plan 1's core functions. Kumar was informed of and updated on the proposal that was submitted to the customer.

86.    As negotiations with Plan 1 continued during the first months of 2021, Kumar was approached for support on staffing issues to move forward with the potential Plan 1 deal, including the financial benefit of the deal to Infosys, as well as Infosys Helix development approvals. As part of those requests, Infosys provided competitively sensitive business and strategy information to Kumar, including the existing pipeline and revenue projections for Infosys Helix. At that time (February 2021), Infosys's confidential internal projections included clients representing several possible deals projected to bring in substantial revenue to Infosys in 2022 and 2023.

87.    Over the next few months, Kumar regularly received confidential updates on progress securing clients and revenue related to Infosys Helix. As Infosys Helix appeared to gain

traction with potential customers, Kumar appointed Shveta Arora, Senior Vice President, Global Head of Consulting, as a co-executive sponsor for Infosys Helix to help orchestrate development across service lines. Arora shared Kumar's optimism about the new product, remarking "[w]ith whatever I have heard so far on Infosys Helix, I am very excited about the effort and look forward to partnering on this to help realize the vision." Kumar also relied heavily on Ravi Kiran Kuchibhotla, Senior Vice President and Head of Strategy, who actively supported Infosys Helix, coordinating service lines and staffing to accelerate its build to help close client deals in 2021.

88.     Infosys closed its Infosys Helix deal with Plan 1 in Spring 2021. The value of the contract was significant. Both Kumar and Arora lauded it as a critical step to bringing much needed competition to Cognizant's Core Administration Software. Kumar asserted that Infosys Helix was "a challenger to the traditional platforms and I'm quite sure if we persist, we can pull through market momentum around Infosys Helix," while Arora predicted that "Infosys Helix has the potential to catapult Infosys positioning in the overall Healthcare market."

89.     Kumar, Arora, and Kuchibhotla continued to receive confidential updates about the Infosys Helix business plan and product pipeline through 2021. As of September 2021, Infosys had a handful of signed contracts for Infosys Helix and substantial momentum to generate significant growth and revenue, with a promising pipeline of potential revenue from Infosys Helix.

90.     Kumar, Arora, and Kuchibhotla maintained their support for Infosys Helix through the remainder of 2021. Kumar even recorded an Infosys Helix promotional video for upcoming industry conventions that Kumar suggested be "amplif[ied]" as part of the company's campaign to advance Infosys Helix.

91.     Kumar, Arora, and Kuchibhotla knew that one of Infosys's strategies to "displace" and aggressively compete against Cognizant was to promote Infosys Helix's superiority in the

Core Administration Software Market because there was "CTS fatigue in key large accounts" and Infosys could meet Health Plan demand for an alternative to Cognizant's long-dominant—and long outdated—Core Administration Software.

92.    Unbeknownst to Infosys, Kumar entered serious discussions with Cognizant about leaving Infosys and joining Cognizant in 2022.

93.    Despite Infosys Helix's promising success in obtaining contracts in 2021 with Kumar's full support, Kumar pulled back his support in 2022 as his secret discussions with Cognizant progressed. For months, he refused to authorize additional staffing support that Infosys Helix needed to meet its go-live date for Plan 1. In March 2022, for example, Kumar was asked for additional engineering support for Infosys Helix, with the request noting that due to a lack of appropriate staffing (caused by Kumar), Infosys had pushed back its planned go-live date for Infosys Helix with Plan 1 and had lost an additional substantial opportunity with Plan 1 because of the delay. Infosys also lost an opportunity to sell Infosys Helix to another Health Plan because that Health Plan wanted to test the product and Infosys had not yet staffed the necessary resources to develop it in a manner that would allow appropriate testing, again because of Kumar's delays.

94.    Despite being presented with these lost opportunities and related challenges, Kumar continued to push back on requests for resources to support the development of Infosys Helix and instead proposed that Infosys Helix "slow down," suggesting Infosys should not "invest so much engg $ [engineering money]" on Infosys Helix.

95.    Kumar continued to ignore requests for additional engineering support for Infosys Helix in the Spring of 2022, with the assistance of Arora and Kuchibhotla, canceling meetings to discuss the issue, even though the lack of staffing had resulted in "a situation now [where the]

client is shaming us on the delays" and a fear within Infosys that the client would cancel the contract due to Infosys's delay in providing necessary engineering support.

96.    In late July 2022, requests for staffing approval by Kumar were escalated with urgency by the Global Head of the Healthcare vertical, as the Infosys Helix functionality was on "a critical path" by that point with "a serious go-live risk that can potentially result in the entire seven figure SOW termination by the client due to repeated go-live delays." The request included a revenue versus cost analysis that reflected a potential substantial net realization benefiting Infosys. Kumar did not respond by email to the request.

97.    A few days later, Kumar received another request for staffing support noting that Infosys was at a crucial juncture with Infosys Helix and was struggling to deliver on sold business to Plan 1 and another anchor client. Kumar again did not respond.

98.    On August 16, 2022, Kumar was included on an email describing the importance of Plan 1 to the success of Infosys Helix, describing Infosys Helix as "critical" to Infosys's growth future and reiterating that Plan 1 was an anchor client for Infosys Helix. Kumar finally approved the necessary engineering staffing for the Plan 1 deadlines. But he caveated his approval: the staffing must be to billable work aimed at concrete needs from Infosys clients. In other words, Kumar approved staffing for already-contracted work but prohibited staffing for further development of Infosys Helix as an alternative to Cognizant's Core Administration Software for more Health Plans.

99.    A few days later, on August 22, 2022, Kumar met with Cognizant's Chief of Staff to the Chief Executive Officer.

100.    Shortly after that meeting, Kumar agreed to leave Infosys and join Cognizant. The agreement was memorialized in a letter agreement dated September 6, 2022, for Kumar to join

Cognizant as Executive Vice President and President – Americas. Cognizant used its power in the Core Administration Software Market and the Core Administration IT Services relevant markets to lure away Kumar, incentivizing disloyal behavior that delayed and degraded the launch of Infosys Helix, harming Infosys and preserving Cognizant's dominance of the relevant markets.

101.    Kumar continued receiving competitively sensitive details concerning Infosys Helix's business plan and strategy. In late August, Kumar received a confidential document for the Infosys Helix steering committee with detailed information about the product, functionality, business pipeline, potential clients, and other opportunities related to Infosys Helix. Kumar received additional confidential updates regarding business plans and marketing strategy for Infosys Helix through September, such as an email about a possible collaboration with another major company to deliver Infosys Helix to Health Plan clients.

102.    Kumar left Infosys on October 11, 2022, and on October 17, 2022, Cognizant announced that he would be joining Cognizant as "President, Cognizant Americas" on January 16, 2023. On January 12, 2023, however, Cognizant suddenly announced Kumar as its CEO, replacing Brian Humphries.

103.    Because of Kumar's decisions while he was a leader at Infosys, Infosys did not allocate new programmer talent to Infosys Helix, hire new personnel for the product, or backfill product support positions for attrition. Infosys Helix was slowed down materially by Kumar. His decisions effectively meant that, at the time, Infosys "cannot do any new development" for Infosys Helix.

104.    After Kumar's departure, Arora continued in her role as executive sponsor for Infosys Helix. Arora was regularly updated on the development needs and business plan for Infosys

Helix. Arora was aware, for example, that despite the setbacks Kumar caused before his departure, Infosys Helix secured new client opportunities in 2023 and was projected to be profitable by 2025.

105.    However, despite Health Plan demand and the need to advance Infosys Helix to compete with Cognizant, Arora continued the pattern of delay established by Kumar. For example, despite Kumar's approval of additional engineering staffing for Infosys Helix billable client work in August 2022, Arora did not get these essential roles staffed until nearly a year later. The pattern of inaction continued to delay Infosys's Helix development and tarnish its reputation with anchor clients. Kuchibhotla followed Arora's lead, similarly lacking urgency in coordinating staffing and delaying the provision of other necessary resources in support of Infosys Helix.

106.    Arora gave notice to Infosys in October 2023 and joined Cognizant in December 2023 as Senior Vice President and Global Head of Consulting. Kuchibhotla gave notice to Infosys in March 2024 and joined Cognizant with the title of Chief Strategy Officer in July 2024—just a month before Cognizant filed this case against Infosys. Cognizant did not publicly announce Kuchibhotla's arrival, and to this day Cognizant has not added Kuchibhotla to its website. Cognizant proudly lists its C-Suite "Leadership Team" on its website, including CEO Ravi Kumar S, Chief Financial Officer Jatin Dalal, and Chief People Officer Kathryn (Kathy) Diaz, along with its Chief Legal Officer, Chief Marketing Officer, and Chief AI Officer. Yet Kuchibhotla, Cognizant's titular Chief Strategy Officer, is conspicuously absent. On a separate part of its website, Cognizant touts its "experts," "visionary leaders," and "trailblazers," including Arora and other executives below the C-Suite level. Again, Cognizant's titular Chief Strategy Officer Kuchibhotla is conspicuously absent.

107.    In general, simply hiring talent is not exclusionary conduct. But when a dominant firm like Cognizant hires talent not to use it but to deny it to a competitor, such predatory hiring

constitutes exclusionary conduct under the antitrust laws. Unlawful predatory hiring also occurs when a dominant firm like Cognizant combines hiring from competitors with efforts to induce disloyal performance by its hires, such as disclosure of the competitor's trade secrets or other confidential information, steering business while still in the competitor's employ or in circumvention of non-compete agreements, sabotage of the competitor, or intentionally lax performance before leaving the competitor's employ. Thus, whether Kumar, Arora, and Kuchibhotla's conduct toward Infosys Helix while scheming with Cognizant to leave Infosys involved outright sabotage or simply intentionally lax performance of their duties, their hiring by Cognizant was unlawfully predatory. As to Kuchibhotla, moreover, Cognizant's decision not to acknowledge him publicly—despite the lofty nature of his titular role even as Cognizant publicly touts its other executives with similar and lower roles—indicates that Cognizant hired him solely to harm Infosys. Despite being ordered to do so as to Kumar and agreeing to do so as to Arora and Kuchibhotla, Cognizant has yet to produce Kumar's, Arora's, and Kuchibhotla's relevant files in this case. Those files may show whether Kumar, Arora, and Kuchibhotla disclosed Infosys's trade secrets or other confidential information, especially in connection with this case, which Cognizant filed a month after the last of them joined Cognizant.

**D.    Cognizant's Anticompetitive Conduct Has Delayed Infosys Helix and Threatened its Viability.**

108.    To date, Infosys has invested tens of millions of dollars and thousands of hours from hundreds of highly skilled and specialized employees to develop Infosys Helix as a superior competitor to Cognizant's outdated Core Administration Software. Because of the superiority of Infosys Helix and Infosys's tenacity, Cognizant's anticompetitive, exclusionary conduct has not yet managed to destroy Infosys Helix. Despite Cognizant's unlawful conduct, Infosys has succeeded in launching initial functionalities for Infosys Helix and convincing a few Health Plans

to adopt Infosys Helix. By May 2023, across several Health Plans, Infosys Helix had 2,500 individual users (i.e., employees or contractors of the Health Plans using Infosys Helix). Infosys's contracts for Infosys Helix thus far have a total contract value over $10 million spread over multiple years.

109.    Despite these hard-fought successes, Cognizant's anticompetitive, exclusionary conduct has harmed Infosys Helix, continues to harm it, and threatens its viability. Cognizant's Core Administration Software has hundreds more Health Plan customers with thousands more individual users than Infosys Helix. Similarly, Infosys Helix's total contract value over multiple years represents a fractional sliver of Cognizant's Core Administration Software annual contract values, let alone their multiyear contract values. Cognizant's unlawful conduct, as detailed in the preceding sections of this Counterclaim, has delayed Infosys's Helix's development, growth, sales, and revenue trajectory by at least eighteen months, resulting in substantial lost income and increased costs to Infosys. Cognizant's unlawful conduct has also prevented—and continues to prevent—Health Plans from selecting Infosys Helix as their Core Administration Software. Thus, through its unlawful conduct, Infosys has successfully excluded a disruptive new entrant to the Core Administration Software Market.

## THE RELEVANT MARKETS

110.    Relevant markets help measure a defendant's ability to impact competition and the defendant's historical impact on competition. A relevant market is an area of effective competition where a defendant operates and customers can practically obtain the product or service that they seek to obtain. A relevant market consists of a product market and a geographic market. While antitrust law uses the term "product market," product markets are not limited to physical products but may consist of intangible goods like software or services. A product market includes all products that the customers can reasonably substitute for what they seek to obtain. A geographic

market should include an appreciable segment of the product market, which may encompass the entire United States or an area as small as a municipality depending on economic practicalities.

111.    Within a relevant market, there are often submarkets that are themselves distinct relevant markets. One common reason relevant markets may exist as submarkets within an overall relevant market is that there are identifiable types of customers who are distinct from other types of customers within the overall market. One type of customer composing a relevant submarket may be distinctly susceptible to anticompetitive conduct by a monopolist such that the anticompetitive effects of the monopolist's conduct may be distinctly felt in that relevant submarket. Another common reason relevant markets may exist as submarkets within an overall relevant market is that there are identifiable types or variations of the product with characteristics or uses that are distinct from other types or variations of the product within the overall market. One type of product composing a relevant submarket may be distinctly susceptible to anticompetitive conduct by a monopolist, such that the anticompetitive effects of the monopolist's conduct may be magnified in that relevant submarket. Recognition within the industry—especially by defendants themselves—of distinctions within the overall relevant market reinforces the existence of submarkets that are themselves relevant markets.

112.    Cognizant has burrowed into the middle of the United States healthcare system, entrenching itself through anticompetitive conduct as an extortionate toll collector on the healthcare provided to over 200 million Americans. As a result, the damage to competition from Cognizant's conduct reverberates across the United States healthcare system, harming not only Cognizant's competitors like Infosys but also Health Plans, providers, and patients across the United States. These harms to competition are felt most acutely in five relevant markets:

      a.      The Core Administration Software Market; and

b.    The Core Administration IT Services Market and at least three submarkets within it, each of which is a distinct relevant market: Core Administration Integration Market, Core Administration Testing Market, and Core Administration Migration Market.

113.    These relevant markets are based on practical indicia in the healthcare industry, the structure of the healthcare industry, and the ordinary course documents and behavior of key participants in the healthcare industry. Cognizant's own public statements and internal documents and records confirm these relevant markets.

## A.    The Core Administration Software Market

114.    The Core Administration Software Market, as defined below, is a relevant antitrust market spanning the United States and consisting of highly specialized software that managed health insurance organizations in the United States ("Health Plans") need to perform their core functions.

### 1.    Core Administration Software in the United States is a Relevant Market.

115.    Core administration software for Health Plans ("Core Administration Software") in the United States is a relevant market, comprising a relevant product market—core administration software for Health Plans—and a relevant geographic market—the United States ("Core Administration Software Market").

116.    Health Plans are managed health insurance organizations in the United States that collect premiums and, in exchange, accept the financial responsibility of paying for eligible healthcare services provided by authorized providers to covered individuals ("members"). Plan sponsors or members may pay the premiums. Plan sponsors may be employers or government funders. When premiums are paid directly by government funders, as in the case of managed Medicare plans (e.g., Medicare Advantage) and managed Medicaid plans, the premiums are known

as "capitated fees" because they are fixed per-member fees paid by the government funder (e.g., Medicare). Thus, Health Plans may receive government funding but are not themselves government entities. Health Plans consist of health insurance organizations, whether for-profit or non-profit, that offer managed Medicare plans, managed Medicaid plans, or private health insurance plans.

117.    Because Health Plans bear and manage the risk associated with their members' needs for healthcare services, they are distinct from "benefits administrators"—self-funded plans and third-party administrators—which do not. Self-funded plans involve healthcare coverage provided by an employer or union without paying premiums or transferring risk to a health insurance organization. In other words, rather than paying a Health Plan a monthly premium to cover their insured members' eligible healthcare expenses, self-funded plans pay for their employees' or union members' healthcare expenses. Self-funded plans use third-party administrators to process claims. As Cognizant has explained, "managing self-funded plans" involves "unique challenges." Because self-funded plans and third-party administrators do not sell insurance or manage care, they function differently from Health Plans and have different software needs. For example, self-funded plans and third-party administrators typically do not create and manage their own networks (which involves negotiating and managing contracts with providers, robust provider quality monitoring, and operating provider recognition and integrated care programs). Instead, they almost always contract to "piggyback" on networks created and managed by Health Plans. As examples of the differences, Health Plans must perform and manage at least three major tasks that self-funded plans and third-party administrators do not: (a) premium billing and collection (as part of member management); (b) underwriting and utilization management (as part of claims processing); and (c) complex insurance network management, benefit design, and

provider quality monitoring (as part of provider management). Health Plans require their Core Administration Software to help them manage these major tasks, which are part of Health Plans' core functions.

118.    Cognizant recognizes that Health Plans are a discrete set of distinct customers for Core Administration Software. As Cognizant and TriZetto have long recognized, there are separate "health plan and benefits administrator markets" for their software and IT services. Cognizant categorizes the customers for its various software offerings into three distinct types: "health insurance plans, third party benefit administrators and healthcare providers." Even pre-acquisition, TriZetto identified "health plans (payers)" and "benefits administrators" as separate "healthcare markets." Announcing the acquisition, Cognizant touted that TriZetto would be part of Cognizant's healthcare business serving "more than 200 clients, including 16 of the top 20 U.S. health plans." Today, Cognizant markets and provides its QNXT and Facets Core Administration Software specifically to Health Plans. As Cognizant CEO Ravi Kumar S publicly acknowledged just last week, Cognizant's Core Administration Software "support[s] health plans." Cognizant markets a different software called QicLink to benefits administrators (i.e., self-funded plans and third-party administrators). Cognizant recognizes that self-funded plans and third-party administrators have different needs and functions from Health Plans and, in turn, need different software. Cognizant "developed QicLink specifically for TPAs [third-party administrators] and to address the unique challenges of managing self-funded plans." According to Cognizant, QicLink "is specifically designed to support third party administration of today's complex self-funded plans." Similarly, TriZetto described Facets and QNXT as "the leading administrative systems for managed health plans in the country," distinguishing them from QicLink as "the leading automated claims-processing system for benefits administrators."

119.    Health Plans have three core functions that are unique to Health Plans: (1) member management, (2) claims processing, and (3) provider management.

120.    The member management function administers all aspects of membership: members' identification information, coverage dates, premiums, enrollment (i.e., when members become eligible for coverage, such as by being hired by an employer), disenrollment (i.e., when members become ineligible for coverage, such as by leaving their employer), confirmation of enrollment and plan eligibility, and continuation of benefits (i.e., when a member leaves an employer but elects to continue coverage through Continuation of Health Coverage (COBRA)).

121.    The claims processing function receives and process prior authorizations and claims for payment from healthcare providers, determining whether the claims are entitled to coverage (e.g., whether the claims are for a member entitled to coverage as of the date of the healthcare service being provided and whether the particular service provided is eligible for coverage), determining how much to pay if the claim is covered (which requires taking into account deductibles, co-pays or co-insurance, negotiated rates, and whether the healthcare provider is in-network or not), issuing claim responses and payments to providers, generating explanations of benefits for members, and tracking claims utilization over time.

122.    The provider management function administers provider-facing details of insurance products and provider networks—which may be a single network for certain Health Plans or multiple networks and benefit designs for Health Plans with multiple plans—by tracking in-network providers' information, enrollment (i.e., when a provider joins the network), disenrollment (i.e., when a provider leaves the network), generating accurate lists of in-network providers for the Health Plan to provide its members (e.g., through an online provider directory), and credentialing and quality provider programs.

123.    Health Plans and their core functions are unique compared to (1) other businesses (including other insurance businesses) in the United States and the rest of the world and (2) non-U.S. health insurers because the United States has a healthcare financing system that differs from other countries, many of which have fully government-funded healthcare. Health Plans must comply with unique legal and regulatory requirements imposed by federal and state laws on health insurance in the United States, such as Health Insurance Portability and Accountability Act (HIPAA) standards for protected health information.

124.    Health Plans need Core Administration Software to perform their unique core functions.

125.    The Core Administration Software Market comprises all Core Administration Software that performs the core functions of Health Plans, regardless of whether it is supplied by a software provider or a Health Plan itself.[23] Health Plans usually license one Core Administration Software from a single company that provides Core Administration Software ("Core Administration Software Provider") to handle all their core functions in an end-to-end fashion.

126.    Some Health Plans have built Core Administration Software for their own proprietary use. Such self-built Core Administration Software is not commercially available because it is proprietary. It is available only to the Health Plan that built it, not to other Health Plans. Most Health Plans do not desire, and are unable, to build their own proprietary Core

---

[23] In the alternative, pursuant to Federal Rule of Civil Procedure 8(d)(2), the Core Administration Software Market excludes Health Plans' own proprietary software that is not commercially available to other Health Plans. Health Plans cannot substitute to proprietary software to defeat a small but significant non-transitory increase in price by a hypothetical monopolist of commercially sold Core Administration Software because proprietary software is not available for purchase and Health Plans cannot practically develop their own proprietary software because of the enormous cost of doing so (even for the most capable) and because they lack the expertise, scale, resources, willingness, and risk tolerance necessary to do so.

Administration Software because of the enormous cost of doing so (even for the most capable) and because they lack the expertise, scale, resources, willingness, and risk tolerance necessary to do so. Moreover, even Health Plans who previously succeeded in building proprietary Core Administration Software increasingly lack the desire and ability to improve and upgrade that software to keep up with modern technology needs (e.g., cloud processing and artificial intelligence) because they lack the expertise, scale, resources, willingness, and risk tolerance necessary to do so. Indeed, Health Plans using proprietary Core Administration Software are largely replacing that software with Core Administration Software licensed from a Core Administration Software Provider.

127.    Cognizant licenses its Core Administration Software on an all-or-nothing basis, meaning it does not sell individual functionality to perform Health Plans' core functions separately. In other words, Cognizant does not offer the member management, claims processing, or provider management functionalities of QNXT or Facets as separate products. If a Health Plan seeks to use a different Core Administration Software in addition to QNXT or Facets, it must still pay Cognizant for the full cost of QNXT and Facets—regardless of which functionality it is using. Thus, except in instances where a Health Plan is in the process of integrating its acquisition of another Health Plan that used different Core Administration Software, few Health Plans use more than one Core Administration Software.

128.    Core Administration Software is unique. There is no substitute for Core Administration Software because Health Plans rely on it to perform their core functions—member management, claims processing, and provider management—and each of these core functions is uniquely essential to Health Plans. Without accurate, timely member management, Health Plans could not perform their central function—paying for members' eligible healthcare received from

authorized providers—because they would not have a system capable of determining whose healthcare to pay for. Without accurate, timely claims processing, Health Plans could not perform their central function because they would not have a system capable of determining which healthcare expenses are eligible for payment. Without accurate, timely provider management, Health Plans could not perform their central function because they would not have a system capable of determining a provider's authorization to receive payment (i.e., whether the provider is an in-network or out-of-network medical provider as of the date of the claim). Because Health Plans' core functions are complex, highly specialized, and entirely specific to Health Plans within the United States healthcare system, there is no software other than Core Administration Software that Health Plans would be able to use—or consider using—to perform their core functions and there are no customers for Core Administration Software other than Health Plans. For example, Health Plans would not be able to use—and would not consider using—QicLink or any other benefits administrator software instead of QNXT, Facets, or Infosys Helix because QicLink and other benefits administrator software is specialized for benefits administrators (i.e., self-funded plans and third-party administrators) and lacks the core administration functionalities that Health Plans require. Thus, Core Administration Software is not interchangeable with other types of software available in the United States or with software available in any other country.

129.    For these reasons, a hypothetical monopolist in the Core Administration Software Market could impose a small but significant non-transitory increase in price on U.S. Health Plans who license Core Administration Software. This hypothetical monopolist could also maintain prices above competitive levels and maintain quality below the level that would prevail in a competitive market.

**B.      The Core Administration IT Services Market and Submarkets**

130.    The Core Administration IT Services Market, as defined below, is a relevant antitrust market spanning the United States and consisting of IT services that Health Plans (i.e., health insurance organizations in the United States) need to ensure the functioning of their core processing software (i.e., Core Administration Software).

131.    Within the Core Administration IT Services Market, there are submarkets composed of the following types of services (i.e., antitrust product markets) that have distinct competitive conditions from other types of services in the overall market and thus are relevant markets in and of themselves:

a.       Integrating Core Administration Software with Health Plans' other software and data systems ("Core Administration Integration");

b.       Testing of Core Administration Software to ensure it performs correctly for Health Plans' needs ("Core Administration Testing"); and

c.       Migrating Health Plans' Core Administration Software from one infrastructure to another, either from a non-cloud infrastructure onto a cloud infrastructure or between different cloud infrastructures ("Core Administration Migration").

**1.      Core Administration IT Services in the United States is a Relevant Market.**

132.    The provision of IT services that Health Plans need to ensure their Core Administration Software performs effectively ("Core Administration IT Services") in the United States is a relevant market, comprising a relevant product market—the provision of Core Administration IT Services—and a relevant geographic market—the United States ("Core Administration IT Services Market").

49

133.    Because Health Plans depend on Core Administration Software to perform their core functions, Health Plans have a critical need to ensure that their Core Administration Software performs effectively on an ongoing basis. To do so, Health Plans rely on Core Administration IT Services, which are complex IT projects that require various specializations depending on the specific project, involve a high volume of work, and thus require large teams of technicians with multiple skillsets and expertise. There is a range of Core Administration IT Services: Core Administration Integration, Core Administration Testing, and Core Administration Migration, as well as implementing Core Administration Software; developing and maintaining applications related to Core Administration Software; deploying artificial intelligence tools related to Core Administration Software; and generating automations enabling Core Administration Software to perform Health Plans' core functions effectively.

134.    Health Plans do not need the full range of Core Administration IT Services on an indefinite basis. Rather, they need Core Administration IT Services for defined projects at various times, for various periods, and for various reasons. Their needs depend on factors including how their Core Administration Software is performing, what other systems they use that interconnect with their Core Administration Software, what upgrades and functionalities they require to make their Core Administration Software perform effectively, what business and regulatory changes necessitate reconfiguration and integration of their Core Administration Software, and what errors they encounter related to their Core Administration Software.

135.    When a Health Plan needs Core Administration IT Services, it generally requests bids or proposals from providers of Core Administration IT Services ("Core Administration IT Services Providers") to perform the project in accordance with detailed specifications. The Health Plan selects a winning Core Administration IT Services Provider for the project and enters into a

contractual agreement regarding the project. The Health Plan will enter into, or may already have, an overall contract, known as a Master Services Agreement ("MSA"), with the winning Core Administration IT Services Provider. This MSA governs the overall relationship between the Health Plan and the Core Administration IT Services Provider, but it may not guarantee that the Core Administration IT Services Provider will receive projects under the MSA or specify the terms of particular projects. For each project, the Health Plan and winning Core Administration IT Services Provider generally enter into a subsidiary agreement, known as a Statement of Work ("SOW"), detailing the nature of the project, the specific Core Administration IT Services to be performed (e.g., all Core Administration IT Services or specified Core Administration Integration, Core Administration Testing, or Core Administration Migration), the price and payment terms for the project, and any other terms the parties may negotiate specific to the project.

136.    Some Health Plans seek to engage a single Core Administration IT Services Provider to provide a complete package of Core Administration IT Services projects in an end-to-end fashion for a specified time period (e.g., a statement of work covering all necessary Core Administration IT Services projects for several years, including Core Administration Testing, Integration, and Migration). This approach avoids the additional coordination, oversight, and procurement processes required to engage, administer, and manage multiple Core Administration IT Services Providers performing various individual projects. Other Health Plans seek to engage Core Administration IT Services Providers on a project-by-project basis (e.g., a statement of work covering one Core Administration Testing project). This approach involves additional coordination, oversight, and procurement processes required to engage, administer, and manage multiple Core Administration IT Services Providers performing various individual projects.

137.    The Core Administration IT Services Market comprises all Core Administration IT Services provided to Health Plans, whether by a Core Administration IT Services Provider or supplied by Health Plans themselves. But most Health Plans do not desire, and are unable, to supply themselves (much less any other Health Plan) with Core Administration IT Services because they lack sufficient scale, willingness to invest, risk tolerance, resources, expertise, training programs, and practical ability to do so. Because, as explained above, Core Administration IT Services involves various projects at various times for various reasons, all complex and requiring various specializations, it is not practical for Health Plans to employ or independently contract the large numbers of variously specialized technicians who would be required for them to provide their own Core Administration IT Services. For example, even if a Health Plan managed to individually hire one hundred highly skilled IT specialists to perform a particular Core Administration Integration project, it would be unlikely that once those specialists completed that project the Health Plan would have another Core Administration IT Services project those same specialists would be suited to perform given the varying timing and specializations involved, leading to layoffs or inefficiently high labor costs for the Health Plan. Thus, attempting to self-supply would create significant frictions and costs for Health Plans (i.e., routinely hiring and then laying off large numbers of IT specialists), and the jobs would not be attractive to the highly skilled and specialized technicians Health Plans would need. Moreover, Cognizant uses its monopoly power to erect additional barriers that foreclose self-supply by Health Plans.

138.    Core Administration IT Services Providers include any organization, whether based in the United States or anywhere else in the world, providing Core Administration IT Services to Health Plans in the United States. Some minor Core Administration IT Services Providers may provide only one type of Core Administration Software IT Service, but the primary providers

(accounting for nearly the entire market) are capable of providing the full range of Core Administration IT Services. Thus, Core Administration IT Services Providers are reasonably interchangeable with each other across various Core Administration IT Services projects. Unlike a Health Plan attempting to self-supply, Core Administration IT Services Providers have the scale, willingness to invest, risk tolerance, resources, expertise, training programs, and practical ability to perform the full range of Core Administration IT Services projects. Notably, because Core Administration IT Services Providers are performing many projects for different Health Plans over time, they can redeploy their technicians from one project to another based on expertise and rotate technicians through necessary training. And because they have a deep bench of technicians with a range of expertise, Core Administration IT Services Providers are able to assemble and deploy teams with the right mix of skills, experience, expertise, and specialization for particular projects requested by Health Plans. Individual technicians themselves are reasonably interchangeable with each other across some but not all types of projects because they have varying skills, experience, expertise, and specializations. For example, experienced technicians specializing in Core Administration Testing are reasonably interchangeable with each other but not with technicians (of any experience level) specializing in Core Administration Migration. But individual technicians are not reasonably interchangeable with Core Administration IT Services Providers because Core Administration IT Services projects require large teams of specialists with multiple experience levels. Core Administration IT Services Providers employ a variety of technicians with the full range of skills, experience, expertise, and specializations needed to assemble these large teams to deliver the projects, such that the Providers are reasonably interchangeable with each other.

139.    Core Administration IT Services are unique. There is no substitute for Core Administration IT Services because Health Plans depend on those services to ensure their Core Administration Software performs appropriately—which is critical because Health Plans rely on it to perform their core functions. Health Plans would not and could not substitute other IT services for Core Administration IT Services because those other services would not ensure their Core Administration Software performs appropriately, jeopardizing their core functions. Health Plans could not substitute non-specialized IT services (i.e., computer repair, technology support, routine software installation assistance, laptop and server configuration, or any other general IT service) because those services, and the technicians performing them, would not accomplish what Health Plans need to ensure the performance of their Core Administration Software. For example, a user password reset service (and the technicians providing it) would not integrate, test, or migrate Core Administration Software. Health Plans could not substitute IT services specialized for other types of businesses (whether inside or outside the healthcare and insurance industries) because those services also would not accomplish what Health Plans need to ensure the performance of their Core Administration Software. For example, various IT services specialized for self-funded plans and third-party administrators, healthcare providers, life insurers, or banks would not integrate, test, or migrate Core Administration Software. There are no customers for Core Administration IT Services other than Health Plans because those services are specific to Health Plans and their use of Core Administration Software to perform their core functions. Thus, Core Administration IT Services are not interchangeable with other types of IT services available to Health Plans in the United States.

140.    For these reasons, a hypothetical monopolist in the Core Administration IT Services Market could impose a small but significant non-transitory increase in price on U.S. Health Plans

obtaining Core Administration IT Services. This hypothetical monopolist could also maintain prices above competitive levels and maintain quality below the level that would prevail in a competitive market.

**2.    Core Administration Integration in the United States is a Relevant Market.**

141.    The provision of Core Administration Integration to Health Plans in the United States is a relevant market, comprising a relevant product market—provision of Core Administration Integration to Health Plans—and a relevant geographic market—the United States ("Core Administration Integration Market").

142.    Health Plans have a critical need to ensure that their Core Administration Software performs effectively because they depend on their Core Administration Software to perform their core functions. As Cognizant acknowledges, "systems integration is a necessary fact of life" for Health Plans. To meet this critical need, Health Plans need Core Administration Integration. Core Administration Integration is the complex and specialized service of integrating Core Administration Software with the Health Plan's other systems, notably databases, networks, and other software, and with third-party systems, notably data sources, networks, and software used by the Health Plan's plan sponsors, providers, and other third-parties with which Health Plans must interact (e.g., state Medicaid agencies in the case of Medicaid managed care plans). To function appropriately and perform the Health Plan's core functions, Core Administration Software must be able to ingest the data it needs (e.g., a new member's information, a new claim, a new provider) and then output data (e.g., adding a new provider to the appropriate database), generate materials (e.g., an explanation of benefits), and issue outputs or other instructions (e.g., instruct banking software to issue an electronic funds transfer or a check to pay a claim the Core Administration Software has approved). Core Administration Integration is the work of making the external connections Core Administration Software depends on. In other words, Core Administration

Integration consists of developing and connecting the "plumbing" for Core Administration Software.

143.    Health Plans do not need Core Administration Integration on an indefinite basis. Rather, they need specific Core Administration Integration services for defined projects at various times, for various periods, and for various reasons. Their needs depend primarily on what other systems they use that interconnect with their Core Administration Software and what upgrades or changes occur in those other systems (including because of business and regulatory changes that necessitate integration changes), but they may also be driven by errors encountered in the Core Administration Software caused by integration problems.

144.    When a Health Plan needs Core Administration Integration, it generally requests bids or proposals from Core Administration IT Services Providers to perform the project in accordance with detailed specifications. The Health Plan selects a winning Core Administration IT Services Provider for the project and enters into a contractual agreement regarding the project. The Health Plan will enter into, or may already have, an MSA with the winning Core Administration IT Services Provider. It will also enter into an SOW detailing the nature of the Core Administration Integration project, the price and payment terms for the project, and any other terms the parties may negotiate specific to the project.

145.    The Core Administration Integration Market comprises all Core Administration Integration provided to Health Plans, whether by a Core Administration IT Services Provider or supplied by Health Plans themselves. But most Health Plans do not desire, and are unable, to supply themselves (much less any other Health Plan) with Core Administration Integration because they lack sufficient scale, willingness to invest, risk tolerance, resources, expertise, training programs, and practical ability to do so. As explained above, it is not practical for Health Plans to

employ or independently contract the large numbers of highly specialized technicians who would be required for them to provide their own Core Administration IT Services, and the same reasons apply to Core Administration Integration. Moreover, Cognizant's use of its monopoly power to erect additional barriers that foreclose self-supply by Health Plans extends to Core Administration Integration.

146.    Core Administration IT Services Providers that provide Core Administration Integration are reasonably interchangeable with each other, but not with any IT services providers that do not provide Core Administration Integration. Experienced individual technicians specializing in Core Administration Integration are interchangeable with each other but not with individual technicians (of any experience level) specializing in other types of Core Administration IT Services (e.g., Core Administration Testing). Individual technicians specializing in Core Administration Integration are not reasonably interchangeable with Core Administration IT Services Providers because Core Administration Integration projects require large teams of Core Administration Integration specialists with multiple experience levels. Core Administration IT Services Providers employ a variety of Core Administration Integration technicians with the full range of experience needed to assemble these large teams to deliver the projects, such that the Providers are reasonably interchangeable with each other.

147.    Core Administration Integration is unique. There is no substitute for Core Administration Integration because Health Plans depend on it for the "plumbing" relied upon by their Core Administration Software, without which their Core Administration Software would be unable to perform the Health Plan's critical core functions. Health Plans would not and could not substitute Core Administration Integration with other types of Core Administration IT Services, or other IT services more broadly, because those other services would not develop or connect the

57

essential "plumbing" Health Plans need to ensure their Core Administration Software is able to perform their core functions. There are no customers for Core Administration Integration other than Health Plans because the service is specific to Health Plans and their use of Core Administration Software to perform their core functions. Thus, Core Administration Integration is not interchangeable with other types of Core Administration IT Services or other IT services available to Health Plans in the United States.

148.    For these reasons, a hypothetical monopolist in the Core Administration Integration Market could impose a small but significant non-transitory increase in price on U.S. Health Plans obtaining Core Administration Integration. This hypothetical monopolist could also maintain prices above competitive levels and maintain quality below the level that would prevail in a competitive market.

### 3.    Core Administration Testing in the United States is a Relevant Market.

149.    The provision of Core Administration Testing to Health Plans in the United States is a relevant market, comprising a relevant product market—provision of Core Administration Testing to Health Plans—and a relevant geographic market—the United States ("Core Administration Testing Market").

150.    Health Plans have a critical need to ensure that their Core Administration Software performs effectively because they depend on their Core Administration Software to perform their core functions. To meet this critical need, Health Plans often rely on Core Administration Testing. Core Administration Testing is the complex and specialized service of conducting quality assurance testing and validation to ensure that Core Administration Software is performing the Health Plan's core functions correctly—and, when it is not performing correctly, figure out where the problem lies. Given the specialization of not only the Core Administration Software itself but also the "plumbing" it needs to function, Health Plans need Core Administration Testing when

there are changes contemplated anywhere in the "plumbing," such as upgrades, software changes, or new data sources. Given the critical nature of Core Administration Software to their core functions, Health Plans typically insist on thorough quality assurance testing and validation before any changes go into "production" (i.e., are implemented in the live version of their Core Administration Software and "plumbing").

151.    Health Plans do not need Core Administration Testing on an indefinite basis. Rather, they need specific Core Administration Testing services for defined projects at various times, for various periods, and for various reasons. Their needs depend primarily on what upgrades, modifications, or additions they are making to their Core Administration Software and the "plumbing" it depends on, but they may also be driven by errors encountered in the Core Administration Software that require systematic testing to diagnose the root cause and then, after correction (which may require the provision of a different type of Core Administration IT Services or, if the problem lies in the Core Administration Software itself, patching of the software by the Core Administration Software Provider), quality assurance and validation testing to ensure the correction fixed the errors.

152.    When a Health Plan needs Core Administration Testing, it generally requests bids or proposals from Core Administration IT Services Providers to perform the project in accordance with detailed specifications. The Health Plan selects a winning Core Administration IT Services Provider for the project and enters into a contractual agreement regarding the project. The Health Plan will enter into, or may already have, an MSA with the winning Core Administration IT Services Provider. It will also enter into an SOW detailing the nature of the Core Administration Testing project, the price and payment terms for the project, and any other terms the parties may negotiate specific to the project.

59

153.    The Core Administration Testing Market comprises all Core Administration Testing provided to Health Plans, whether by a Core Administration IT Services Provider or supplied by Health Plans themselves. But most Health Plans do not desire, and are unable, to supply themselves (much less any other Health Plan) with Core Administration Testing because they lack sufficient scale, willingness to invest, risk tolerance, resources, expertise, training programs, and practical ability to do so. As explained above, it is not practical for Health Plans to employ or independently contract the large numbers of highly specialized technicians who would be required for them to provide their own Core Administration IT Services, and the same reasons apply to Core Administration Testing. Moreover, Cognizant's use of its monopoly power to erect additional barriers that foreclose self-supply by Health Plans extends to Core Administration Testing.

154.    Core Administration IT Services Providers that provide Core Administration Testing are reasonably interchangeable with each other, but not with IT services providers that do not provide Core Administration Testing. Experienced individual technicians specializing in Core Administration Testing are interchangeable with each other but not with individual technicians (of any experience level) specializing in other types of Core Administration IT Services (e.g., Core Administration Migration). Individual technicians specializing in Core Administration Testing are not reasonably interchangeable with Core Administration IT Services Providers because Core Administration Testing projects require large teams of Core Administration Testing specialists with multiple experience levels. Core Administration IT Services Providers employ a variety of Core Administration Testing technicians with the full range of experience needed to assemble these large teams to deliver the projects, such that the Providers are reasonably interchangeable with each other.

155.     Core Administration Testing is unique. There is no substitute for Core Administration Testing because Health Plans depend on it to validate that their Core Administration Software and its "plumbing" are functioning correctly, without which their Core Administration Software could fail to perform the Health Plan's critical core functions. Health Plans would not and could not substitute Core Administration Testing with other types of Core Administration IT Services, or other IT services more broadly, because those other services would not provide the quality assurance testing, validation, and error testing Health Plans need to ensure their Core Administration Software is able to perform their core functions correctly. There are no customers for Core Administration Testing other than Health Plans because the service is specific to Health Plans and their use of Core Administration Software to perform their core functions. Thus, Core Administration Testing is not interchangeable with other types of Core Administration IT Services or other IT services available to Health Plans in the United States.

156.     For these reasons, a hypothetical monopolist in the Core Administration Testing Market could impose a small but significant non-transitory increase in price on U.S. Health Plans obtaining Core Administration Testing. This hypothetical monopolist could also maintain prices above competitive levels and maintain quality below the level that would prevail in a competitive market.

### 4.     Core Administration Migration in the United States is a Relevant Market.

157.     The provision of Core Administration Migration to Health Plans in the United States is a relevant market, comprising a relevant product market—provision of Core Administration Software migration—and a relevant geographic market—the United States ("Core Administration Migration Market").

158.     Health Plans have a critical need to ensure that their Core Administration Software performs effectively because they depend on their Core Administration Software to perform their

core functions. To meet this critical need, Health Plans often rely on Core Administration Migration. Core Administration Migration is the complex and specialized service of migrating Core Administration Software (and the information stored within it) between different infrastructures for a Health Plan while ensuring it remains connected to the surrounding "plumbing." Before the advent of cloud infrastructures, Core Administration Software necessarily operated on local infrastructure owned or leased by the Health Plan (i.e., servers or data centers) and required periodic migration from one local infrastructure to another. Increasingly, Health Plans also seek to migrate their Core Administration Software from their legacy physical infrastructures to cloud infrastructures. And Health Plans that have already migrated to cloud infrastructures may, for various reasons, wish to migrate from one cloud infrastructure (e.g., AWS) to another (e.g., Azure). Given the critical nature of Core Administration Software to their core functions, Health Plans need such migrations to happen with minimal downtime and risk to the connections between the Core Administration Software and the "plumbing" on which it relies.

159.    Health Plans do not need Core Administration Migration on an indefinite basis. Rather, they need specific Core Administration Migration services for defined projects at various times, for various periods, and for various reasons. Their needs depend primarily on the nature of their current infrastructure, their strategies for modernizing their infrastructure, and their desires to reduce infrastructure expenses, but they may also be driven by performance issues with existing infrastructure (e.g., legacy infrastructure nearing its end-of-life) that require cloud migration to ensure their Core Administration Software continues to operate effectively.

160.    When a Health Plan needs Core Administration Migration, it generally requests bids or proposals from Core Administration IT Services Providers to perform the project in accordance with detailed specifications. The Health Plan selects a winning Core Administration

IT Services Provider for the project and enters into a contractual agreement regarding the project. The Health Plan will enter into, or may already have, an MSA with the winning Core Administration IT Services Provider. It will also enter into an SOW detailing the nature of the Core Administration Migration project, the price and payment terms for the project, and any other terms the parties may negotiate specific to the project.

161.    The Core Administration Migration Market comprises all Core Administration Migration provided to Health Plans, whether by a Core Administration IT Services Provider or supplied by Health Plans themselves. But most Health Plans do not desire, and are unable, to supply themselves (much less any other Health Plan) with Core Administration Migration because they lack sufficient scale, willingness to invest, risk tolerance, resources, expertise, training programs, and practical ability to do so. As explained above, it is not practical for Health Plans to employ or independently contract the large numbers of highly specialized technicians who would be required for them to provide their own Core Administration IT Services, and the same reasons apply to Core Administration Migration. Moreover, Cognizant's use of its monopoly power to erect additional barriers that foreclose self-supply by Health Plans extends to Core Administration Migration.

162.    Core Administration IT Services Providers that provide Core Administration Migration are reasonably interchangeable with each other, but not with Core Administration IT Services Providers that do not provide Core Administration Migration. Experienced individual technicians specializing in Core Administration Migration are interchangeable with each other but not with individual technicians (of any experience level) specializing in other types of Core Administration IT Services (e.g., Core Administration Integration). Individual technicians specializing in Core Administration Migration are not reasonably interchangeable with Core

Administration IT Services Providers because Core Administration Migration projects require large teams of Core Administration Migration specialists with multiple experience levels. Core Administration IT Services Providers employ a variety of Core Administration Migration technicians with the full range of experience needed to assemble these large teams to deliver the projects, such that the Providers are reasonably interchangeable with each other.

163.    Core Administration Migration is unique. There is no substitute for Core Administration Migration because Health Plans depend on it to move their Core Administration Software between infrastructures while maintaining the connections to the "plumbing" their Core Administration Software requires, and any failures in the process would prevent Health Plans from performing their core functions. Health Plans would not and could not substitute Core Administration Migration with other types of Core Administration IT Services, or other IT services more broadly, because those other services would not provide the infrastructure migration Health Plans need to ensure their Core Administration Software is able to continue performing their core functions. There are no customers for Core Administration Migration other than Health Plans because the service is specific to Health Plans and their use of Core Administration Software to perform their core functions. Thus, Core Administration Migration is not interchangeable with other types of Core Administration IT Services or other IT services available to Health Plans in the United States.

164.    For these reasons, a hypothetical monopolist in the Core Administration Migration Market could impose a small but significant non-transitory increase in price on U.S. Health Plans obtaining Core Administration Migration. This hypothetical monopolist could also maintain prices above competitive levels and maintain quality below the level that would prevail in a competitive market.

64

**COGNIZANT'S MONOPOLY POWER IN EACH OF THE RELEVANT MARKETS**

165.    Cognizant is a monopolist in the Core Administration Software Market, Core Administration IT Services Market, Core Administration Testing Market, Core Administration Integration Market, and Core Administration Migration Market. Its monopoly power in these relevant markets is not hypothetical. Cognizant's dominance has persisted for many years because of its anticompetitive conduct rather than any superior product or service or historical accident.

**A.    Cognizant Has Monopoly Power in the Core Administration Software Market.**

166.    Cognizant has durable monopoly power in the Core Administration Software Market.

167.    Cognizant is a Core Administration Software Provider offering two Core Administration Software products: Facets and QNXT. Their software performs all three core Health Plan functions: (1) member management, (2) claims processing, and (3) provider management. Cognizant describes QNXT as an "enterprise-wide core administration platform." And Cognizant describes Facets as a "next-generation solution that integrates consumer, care, claims and revenue management in a flexible platform."

168.    Cognizant has dominated the Core Administration Software Market since at least 2014 when CTS acquired TriZetto. Cognizant recognizes that it has few competitors in the Core Administration Software Market. In its January 2023 Executive Employment and Non-Disclosure, Non-Competition, and Invention Assignment Agreement with its CEO Ravi Kumar, Cognizant identified just eight "Direct Competitors." The only competitor on the list that provides Core Administration Software is Infosys. The rest compete with Cognizant only as to other products or services provided by Cognizant, largely outside the U.S. healthcare industry.

169.    Cognizant's monopoly power in the Core Administration Software Market is directly demonstrated by its supracompetitive prices and output restrictions. Cognizant

overcharges Health Plans for its Core Administration Software, charging Health Plans ███████ ██████████████████ to use Cognizant's decades-old software. For example, Cognizant charged one single-state Health Plan approximately ███████████████████████████████████████ ███████████████████████. According to Cognizant's internal data, its combined total contract value for Core Administration Software over the last eight years is at least ███████ These charges for decades-old Core Administration Software are supracompetitive and ultimately increase the cost of insurance and healthcare for American individuals and families. The numbers confirm it: average premiums for Health Plans that use Cognizant for Core Administration Software are substantially higher than average premiums for the (relatively few) Health Plans that do not.

170.    In addition, Cognizant restricts output in the Core Administration Software Market. Because the product in the Core Administration Software Market is software, output is measured by the volume of software made available to customers in those markets. Cognizant restricts that output by underinvesting in its Core Administration Software, which reduces both quality and volume. Specifically, Health Plan customers desire expanded software capabilities and additional software functionalities from their Core Administration Software, and they would receive it in a competitive market. But they do not receive these expanded software capabilities and additional software functionalities—they receive less total software than they want—because Cognizant does not face competitive pressure to offer them and, thus, can continue to underinvest while still keeping prices high, generating monopoly profits. Despite widespread dissatisfaction with the degrading quality of Cognizant's Core Administration Software, Cognizant has not suffered any loss in its dominance, as would occur absent monopoly power and its exclusionary conduct. Increasing the injury to competition, Cognizant imposes anticompetitive contractual restrictions to

prevent Health Plan customers from obtaining the missing software capabilities and functionalities from other sources (i.e., Cognizant' competitors), further restricting overall output in the Core Administration Software Market.

171.    Cognizant's monopoly power is also demonstrated by its durably dominant market share in the Core Administration Software Market of at least ▉%. Based on Cognizant's internal data, its share of the Core Administration Software Market is approximately ▉%. Cognizant has maintained a share of at least ▉% since at least ▉▉.

172.    Cognizant publicly admits its dominance of the Core Administration Software Market. Cognizant touts that it supports "200+ leading health plans" and "20 of the top 25 healthcare plans" (i.e., 80% of the top 25 Health Plans) are its clients. Just last week, Cognizant's CEO, Ravi Kumar S publicly boasted Cognizant is "probably the number one player in healthcare in the United States." In 2024, Kumar admitted Cognizant's "concentration is very high in Healthcare." He also said Cognizant has "the largest platform in the United States for health care" and "65% of the U.S. insured population goes through" Cognizant's Core Administration Software. Similarly, Cognizant currently touts that its Core Administration Software in the United States serves "200+ million members." Even those high numbers understate Cognizant's share of the Core Administration Software Market because they reflect the number of members with claims processed through Cognizant's Core Administration Software rather than the share of Health Plans in the Core Administration Software Market using Cognizant's Core Administration Software. That is why Cognizant's own data shows ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉. In 2023, Kumar also bragged that "[t]he health care ecosystem for Cognizant is the strongest in the market" and Cognizant is "on a pole position in health care," with

"extraordinary strength of platforms [i.e., Core Administration Software] plus services [i.e., Core Administration IT Services]."

173.    Cognizant's monopoly over the Core Administration Software Market is protected by significant barriers to entry. Cognizant's durably dominant market share over the past decade despite substantial demand from Health Plans for alternatives, particularly innovative cloud-native Core Administration Software that Cognizant does not offer, is evidence of the high barriers preventing new competitors from entering the market. For example, Cognizant has locked in "20 the top 25 health plans in the U.S." as its clients for at least a decade.

174.    Entry into the Core Administration Software Market requires a rare combination of characteristics, resources, and factors: substantial resources, the ability and willingness to invest heavily with a long time horizon before achieving profitability, access to scale, a high level of risk tolerance, a high degree of technical sophistication, subject-matter expertise, and a strong reputation with Health Plans, who are risk averse given the sensitive and highly regulated nature of their industry and thus weigh reputation as a significant factor in their Core Administration Software acquisition decisions.

175.    Cognizant acknowledged the existence of high entry barriers in its Complaint in this case, alleging that building Core Administration Software takes years, costs millions of dollars, and requires specialized expertise. ECF No. 1 ¶¶ 2, 12, 15-16.

176.    Cognizant has created, reinforced, or exacerbated these barriers to entry through its conduct, as described throughout this Counterclaim. Notably, Cognizant aggressively targets new competitors attempting to enter the Core Administration Software Market with anticompetitive contractual and training restrictions. Cognizant has also erected unlawful moats around its Health

Plan customers, trapping them with contractual restrictions, functionally locked-in data, and technological hurdles to integration and migration.

177.    Infosys has the rare combination of characteristics, resources, and factors to challenge Cognizant's monopoly, and it is entering the Core Administration Software Market with its innovative, natively cloud-based Infosys Helix Core Administration Software. As a result of Cognizant's anticompetitive conduct, however, Infosys has paid a heavy price for doing so.

178.    Demonstrating the significance of the barriers to entering the Core Administration Software Market, Infosys's entry required investing tens of millions of dollars into Helix's development and staffing hundreds of employees with high technical sophistication and subject-matter expertise.

179.    As a new entrant into the Core Administration Software Market, Infosys Helix competes with Cognizant's Core Administration Software. Infosys Helix already offers two of the three core Health Plan functions—member management and provider management—and will soon offer the third—claims processing. Infosys is actively developing Infosys Helix's claims processing function, which will make it an end-to-end Core Administration Software solution for Health Plans. Already, however, Infosys Helix provides Health Plans with better prices and higher quality (e.g., cloud native) functionality as to member management and provider management than Cognizant's increasingly outdated Core Administration Software.

180.    Nonetheless, despite Infosys Helix's better price and higher quality, Infosys's market share in the Core Administration Software Market remains minimal as a result of Cognizant's monopolization of those markets.

**B.      Cognizant Has Monopoly Power in the Core Administration IT Services Market and Submarkets.**

181.     Cognizant has durable monopoly power in each of the Core Administration IT Services, Core Administration Integration Market, Core Administration Testing Market, and Core Administration Migration Markets (collectively, the "Core Administration IT Services Market and Submarkets").

182.     Cognizant is a Core Administration IT Services Provider offering the full range of Core Administration IT Services, including Core Administration Integration, Core Administration Testing, and Core Administration Migration. Cognizant touts its "deep knowledge of healthcare systems, systems integration and testing." Cognizant claims its "experience in working with TriZetto Healthcare products" (i.e., QNXT and Facets) is "unmatched." Cognizant tells Health Plans that it "ha[s] the resources to quickly integrate your systems, along with deep expertise in virtually all major healthcare industry solutions." "Cognizant pioneered the concept of an independent Testing practice," which it "organized by areas of industry specialization - such as . . . healthcare." Recognizing that "[m]aintaining a reliable IT infrastructure is mission critical" and "[h]ealthcare organization are struggling to ensure that their IT infrastructure can keep up with current and emerging technology trends," Cognizant tells Health Plans that "[m]oving some or all operations to the cloud is the best way to improve efficiency, reliability, cost-effectiveness and scalability." Cognizant promotes its "optimized cloud operations" for Health Plans, offering them "migration to a variety of cloud models."

183.     Since acquiring TriZetto in 2014, Cognizant has leveraged its control over Core Administration Software to capture and maintain dominant shares in the Core Administration IT Services Market and Submarkets. Cognizant recognizes that it has few competitors in the Core Administration IT Services Market and Submarkets. In its January 2023 Executive Employment

and Non-Disclosure, Non-Competition, and Invention Assignment Agreement with its CEO Ravi Kumar, Cognizant identified just eight "Direct Competitors." Most of them compete with Cognizant only as to other products or types of IT services, not Core Administration IT Services, and even those who compete as to any Core Administration IT Services do not come close to Cognizant's dominant shares. Indeed, discovery in this case thus far indicates that only two of Cognizant's "Direct Competitors" other than Infosys perform any of the IT services that would constitute Core Administration IT Services, and their ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████.

184.     Cognizant's monopoly power in each of the Core Administration IT Services Market and Submarkets is directly demonstrated by its supracompetitive prices and output restrictions. Cognizant overcharges Health Plans for Core Administration IT Services, Core Administration Integration, Core Administration Testing, and Core Administration Migration, charging Health Plans ████████████████████████. According to Cognizant's internal data, its combined total contract value for Core Administration IT Services, Core Administration Integration, Core Administration Testing, and Core Administration Migration over the last eight years were at least ████████████████████████████████████ respectively. These charges for Core Administration IT Services are supracompetitive and ultimately increase the cost of insurance and healthcare for American individuals and families. The numbers confirm it: average premiums for Health Plans that use Cognizant for Core Administration IT Services are substantially higher than average premiums for the (comparatively few) Health Plans that do not.

185.     In addition, Cognizant restricts output in the Core Administration IT Services Market and Submarkets. Because the product in the Core Administration IT Services Market and

Submarkets is services, output is measured by the volume of services made available to customers in those markets. Cognizant restricts that output by imposing contractual restrictions that Health Plan customers and Core Administration IT Services Provider competitors, not limited to Infosys, have no choice but to accept because of Cognizant's power. These contractual restrictions reduce the volume of services available to Health Plans in the Core Administration IT Services Market and Submarkets. Health Plans are denied access to alternative Core Administration IT Services Providers and their services, which would be available in a competitive market. Despite widespread dissatisfaction with Cognizant's restrictions and the quality of its Core Administration IT Services, it has not suffered any loss in its dominance, as would occur absent monopoly power.

186.    Cognizant's ability to restrict Infosys's Core Administration IT Services, Core Administration Integration, Core Administration Testing, and Core Administration Migration for Plan 1, Plan 2, Plan 3, and Plan 4 through its contractual demands and restrictions is further direct evidence of Cognizant's power to exclude competition in the Core Administration IT Services Market and Submarkets. Infosys is not alone in being excluded. Cognizant also excludes other competitors through contractual restrictions it imposes on Health Plan customers and Core Administration IT Services Provider competitors. Cognizant even goes so far as to ███████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████. Cognizant's power over Health Plans is so great that it is able to ████████████████████████████████████████████████████████. Cognizant leverages its dominance of the Core Administration Software Market to bully its Health Plan customers into accepting undesirable terms. Cognizant is thus able to control which firms Health Plans are able to select for their needs within the Core Administration IT Services and Submarkets.

187.    Cognizant's monopoly power is also demonstrated by its durably dominant market share in the Core Administration IT Services Market of at least ██%. Based on Cognizant's internal data, its share of the Core Administration IT Services Market is approximately ██%. Cognizant has maintained a share of at least ██% since at least ████.

188.    Cognizant's durably high share in the Core Administration IT Services Market is confirmed by its internal data showing it wins more than ██% of all Core Administration IT Services projects it bids for. This high win rate confirms that Health Plan customers are unable to substitute away from Cognizant because of its monopoly power.

189.    Cognizant's durably dominant market shares in the Core Administration Integration, Core Administration Testing, and Core Administration Migration are again at least ██% because it possesses shares at least as high as its durably dominant market share in the overall Core Administration IT Services Market. Cognizant imposes contractual restrictions and prohibitions that vary based on the type of Core Administration IT Services being provided, and there are heightened restrictions or outright prohibitions that particularly limit Health Plans from using a Cognizant competitor for Core Administration Integration, Core Administration Testing, and Core Administration Migration projects. Thus, Cognizant monopoly power in each of those submarkets is at least as high as its monopoly power in the overall market. Indeed, based on Cognizant's internal data, its shares of the Core Administration Integration, Core Administration Testing, and Core Administration Migration Markets are approximately ██%, ██%, and ██% respectively. Cognizant has maintained shares of at least ██% since at least ████.

190.    Cognizant's durably high shares are confirmed by its internal data showing it wins more than ██%, ██%, and ██%, respectively, of all Core Administration Integration, Core Administration Testing, and Core Administration Migration Markets projects it bids for. These

73

high win rates confirm that Health Plan customers are unable to substitute away from Cognizant because of its monopoly power.

191.    Cognizant publicly admits its dominance of the Core Administration IT Services Market and Submarkets. Cognizant touts that "200+ leading health plans," including "20 of the top 25 healthcare plans" (i.e., 80%), are its clients. In 2024, Cognizant's CEO, Ravi Kumar S, publicly touted Cognizant's "strong position . . . [in] health care," bragging that "we are very deep, very big," and one could name any Health Plan and Cognizant would "have[] the #1, #2, or #3 wallet share" of their spending. Publicly confirming Cognizant's astonishingly high win rate data, he boasted that "it's very hard to beat Cognizant." In 2023, Kumar also bragged that "[t]he health care ecosystem for Cognizant is the strongest in the market" and Cognizant is "on a pole position in health care," with "extraordinary strength of platforms [i.e., Core Administration Software] *plus services* [i.e., Core Administration IT Services]." (Emphasis added).

192.    Cognizant's monopoly over the Core Administration IT Services Market and Submarkets is protected by significant barriers to entry. Cognizant's durably dominant market share despite substantial demand from Health Plans for alternatives is evidence of the high barriers preventing new competitors from entering the market. For example, Cognizant has locked in "20 the top 25 health plans in the U.S." as its clients for at least a decade.

193.    Entry into the Core Administration IT Services Market and Submarkets requires a rare combination of characteristics, resources, and factors: sufficient scale to win projects in these markets, which require large and highly specialized teams; willingness to invest in the hiring and training necessary to be able to compete for projects in these markets; tolerance for the significant risk of not winning any projects in these markets for a lengthy initial period; expertise in the varied and specialized areas required to win projects in these markets, including subject matter expertise

in healthcare and Core Administration Software; access to training programs and resources to support expensive employee training; and a strong reputation with Health Plans, who are risk averse given the sensitive and highly regulated nature of their industry and thus weigh reputation as a significant factor in their Core Administration IT Services acquisition decisions.

194.    Cognizant has created, reinforced, or exacerbated these barriers to entry through its conduct, as described throughout this Counterclaim. Notably, Cognizant aggressively targets competitors in the Core Administration IT Services Market and Submarkets, including but not limited to Infosys, with anticompetitive contractual and training restrictions. Cognizant has also erected unlawful moats around its Health Plan customers, trapping them with contractual restrictions and prohibitions, functionally locked-in data, and technological hurdles to integration, testing, and migration.

195.    Infosys has the rare combination of characteristics, resources, and factors to challenge Cognizant's monopolies in the Core Administration IT Services Market and Submarkets, and it is able to provide the full range of Core Administration IT Services, Core Administration Integration, Core Administration Testing, and Core Administration Migration more innovatively and at better prices, higher quality, and greater volume than Cognizant. Because of Cognizant's dominance in each of the Core Administration IT Services Market and Submarkets, however, Infosys's market share in each of those markets remains substantially lower than it would be absent Cognizant's distortions of competition.

### COGNIZANT'S SPECIFIC INTENT TO MONOPOLIZE EACH OF THE RELEVANT MARKETS

196.    Even if Cognizant's power in any of the Core Administration Software Market or Core Administration IT Services Market and Submarkets fell short of monopoly power, which it

does not, Cognizant would still have a dangerous probability of acquiring monopoly power in each market because of its high market shares, all ██% or higher as explained above.

197.    Cognizant's words and stated goals show that it specifically intends to monopolize each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets. Cognizant's CEO, Ravi Kumar S has openly admitted Cognizant's intent to do exactly what this counterclaim alleges—leverage its high Core Administration Software shares to increase its dominance in Core Administration IT Services. In 2023, he said Cognizant's Core Administration Software was "the fulcrum and the nucleus of our health care ecosystem" and Cognizant intended to "double down on it."

198.    In 2024, Cognizant's CEO, Ravi Kumar, said that Cognizant has an "entire health care ecosystem that is built on a thesis of platforms in the middle and creating a multiplier of services underneath it." Referring to Cognizant's dominance in healthcare, he reiterated Cognizant's intent to "double down."

199.    Through statements in this case, Cognizant also revealed its specific intent to monopolize the Core Administration Software Market and Core Administration IT Services Market and Submarkets. In court submissions, Cognizant admitted its specific intent to exclude competition from Infosys through its "strict" NDAAs that are aimed at preventing Infosys from "develop[ing] competing products." *See* Cognizant's Brief in Opposition to Infosys's Motion to Dismiss, ECF 38, at 1, 25; *see also id.* at 6, 17 (admitting that Cognizant seeks to prevent Infosys from helping Health Plans that wish to migrate away from Cognizant's Core Administration Software).

200.    Cognizant's actions also demonstrate its specific intent to monopolize each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets.

Cognizant has engaged, and continues to engage, in a course of exclusionary conduct that stifles competition, as described in this Counterclaim.

### COGNIZANT'S WILLFUL ACQUISITION AND MAINTENANCE OF MONOPOLY POWER IN EACH OF THE RELEVANT MARKETS

201. Cognizant has engaged in all the anticompetitive and exclusionary conduct described in this Counterclaim to acquire and maintain its monopoly power in each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets. Thus, Cognizant has engaged in the willful acquisition and maintenance of its monopoly power in each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets.

202. Cognizant's willful acquisition and maintenance of its monopoly power in each of the Core Administration Software Market and Core Administration IT Services Market and Submarkets through its ongoing course of anticompetitive and exclusionary conduct includes each of the following (summarized below but described in full throughout this Counterclaim):

a. Allocating the Core Administration IT Services Market and Submarkets by agreeing to allow small competitors to handle minor projects, representing a sliver of the markets, in exchange for accepting Cognizant's monopolistic dominance of the markets;

b. Imposing "most favored vendor" provisions that (1) prohibit Cognizant's Core Administration Software customers (i.e., Health Plans) from receiving Core Administration IT Services from Cognizant competitors, including Infosys, and (2) give Cognizant the unilateral right to refuse consent for Cognizant's Core Administration Software customers (i.e., Health Plans) to receive Core Administration IT Services from Cognizant competitors, including Infosys;

77

c.      Imposing lengthy non-compete provisions that apply indiscriminately, without regard to any supposed intellectual property, and prevent competitors, including Infosys, from providing Core Administration Software and Core Administration IT Services to Health Plans;

d.      Imposing limits on the Core Administration IT Services that competitors, including Infosys, seek to provide Health Plans by defining finite lists of such services that Cognizant decides to permit and by prohibiting services not on the list;

e.      Imposing overbroad definitions of Cognizant's supposedly "Confidential Information" that limit only Core Administration Software and Core Administration IT Services provided by competitors, including Infosys, while acknowledging that the information is not truly confidential;

f.      Imposing insufficient caps on staffing by competitors, including Infosys, and requiring specific lists of staff members from competitors, including Infosys, to reduce the volume and qualify of Core Administration IT Services that competitors, including Infosys, can perform for Health Plans and to increase their costs and administrative hurdles;

g.      Imposing lengthy one-sided non-solicitation provisions that allow Cognizant to interfere with the performance by competitors, including Infosys, of contracted Core Administration IT Services and to prevent Cognizant's employees from finding better jobs at higher pay while denying their talents to competitors, including Infosys;

h.      Imposing non-compete provisions that use sweeping definitions of "Confidential Information" to effectively extend already lengthy restrictions preventing

78

competitors, including Infosys, from providing Core Administration Software and Core Administration IT Services to Health Plans;

      i.     Excluding competitors who challenge Cognizant's dominance, including Infosys, from previously offered training, foregoing substantial training profits but more than recouping the lost profits through supracompetitive pricing for Core Administration IT Services; and

      j.     Engaging in predatory hiring.

203.    Cognizant's anticompetitive and exclusionary conduct, individually and as a course of conduct, forecloses competitors from each of the Core Administration Software Market and Core Administration IT Services Market and Submarkets and forecloses competition for a substantial share of each of relevant market. Cognizant's anticompetitive and exclusionary conduct protects, enhances, and forecloses its dominant shares of each of the Core Administration Software Market and Core Administration IT Services Market and Submarkets. Moreover, Cognizant's market allocation also protects and forecloses the additional slivers of market share it grants to small Core Administration IT Services Providers who agree to accept its dominance in the Core Administration Software Market and Core Administration IT Services Market and Submarkets. This substantial foreclosure has no end date as its "TriZetto Consulting Partner Network" allocation scheme is long term and indefinite. Similarly, the various anticompetitive and exclusionary contractual restrictions Cognizant imposes preserve, enhance, and foreclose its dominant shares of each of the Core Administration Software Market and Core Administration IT Services Market and Submarkets because Cognizant imposes them through its licenses and contracts with the vast majority of Health Plans that are locked into its Core Administration

Software. This substantial foreclosure is long term as the licenses at issue typically ██████████

and the contracts often ████████████████████████████████████████

204.    The exclusionary effects of each form of Cognizant's anticompetitive and exclusionary conduct extend to each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets because Cognizant acts in each relevant market (i.e., the Core Administration Software Market and Core Administration IT Services Market and Submarkets) to protect and enhance its monopoly power in all the relevant markets. For example, Cognizant's market allocation of the Core Administration IT Services Market and Submarkets excludes competition not only from those markets but also the Core Administration Software Market because the small competitors must accept Cognizant's dominance across all the relevant markets. Indeed, the small competitors cannot attempt to enter the Core Administration Software Market because Cognizant bars them from doing so, granting them minor Core Administration IT Services projects to ensure they cannot challenge Cognizant's dominance in any of the relevant markets.

205.    Cognizant's course of anticompetitive and exclusionary is unlawful and, analyzed as a whole, shows a pattern of exclusionary behavior and practices establishing that Cognizant has engaged in the willful acquisition and maintenance of its monopoly power in each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets.

206.    Each form of Cognizant's anticompetitive and exclusionary conduct is unlawful and, analyzed collectively or individually, establishes Cognizant has engaged in the willful acquisition and maintenance of its monopoly power in each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets.

## COGNIZANT'S ANTICOMPETITIVE AND
## EXCLUSIONARY CONDUCT LACKS ANY VALID JUSTIFICATION

207.    There is no valid procompetitive benefit from Cognizant's anticompetitive exclusionary conduct, whether analyzed individually or collectively, that could outweigh its competitive harm. Cognizant's anticompetitive and exclusionary conduct has not resulted in lower prices, higher output, increased innovation, or better quality. To the contrary, as described throughout this Counterclaim, Cognizant's anticompetitive and exclusionary conduct has resulted in higher—indeed supracompetitive—prices, lower output, reduced innovation, and worse quality in each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets.

208.    Cognizant exclusionary conduct does not protect any genuine intellectual property, trade secrets, or confidential information. Any such justifications Cognizant has stated to competitors are pretextual. Cognizant targets potential and actual competitors, including Infosys, with the various restrictions and prohibitions described in this Counterclaim only if they represent a threat to Cognizant's dominance. Cognizant does not impose those restrictions and prohibitions on potential and actual competitors who accept its dominance, even though they are accessing the same Core Administration Software, training, information, and documentation as potential and actual competitors who represent a threat to Cognizant's dominance. For example, Cognizant did not begin imposing its exclusionary NDAAs on Infosys until Infosys started winning Core Administration IT Services projects from Cognizant. Similarly, Cognizant did not target Infosys with other anticompetitive and exclusionary conduct until Infosys began its multiyear effort to develop a new and much-improved Core Administration Software, Infosys Helix, as an alternative to Cognizant's Core Administration Software. If Cognizant's NDAAs were essential to safeguard its confidential information, it would not have permitted Infosys to provide Core Administration

IT Services without an executed NDAA for a large health plan's use of Facets since July 2015 or for a large managed care company's use of QNXT since 2011. Cognizant's conduct defies standard industry practice for software developers to require only a licensing agreement with their clients, rather than any sort of confidentiality or non-disclosure agreement with clients' third-party service providers with whom the developer has no direct business relationship.

## ANTICOMPETITIVE EFFECTS AND INJURY TO COMPETITION

209.    Cognizant's individual anticompetitive and exclusionary acts have harmed and continue to harm competition in each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets. Those individual acts have also worked together as a course of conduct in a mutually reinforcing manner to suffocate competition across each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets. Cognizant's anticompetitive and exclusionary conduct has imposed and continues to impose substantial costs across the U.S. healthcare system on Health Plans, providers, patients, competitors, and the competitive process more broadly.

210.    Whether analyzed individually or collectively, Cognizant's conduct described in this Counterclaim has distorted the competitive process in each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets. Cognizant's distortions increase costs, obstruct innovation, foreclose actual and potential competitors, and enhance and maintain Cognizant's dominance and monopoly power. The anticompetitive effects of Cognizant's distortions harm every entity and individual within those markets—except Cognizant itself, which extracts supra-competitive profits at the expense of everyone else in those markets.

211.    Cognizant's intentional and systematic distortion of the competitive process in each of the Core Administration Software Market or Core Administration IT Services Market and

Submarkets has resulted and continues to result in reduced competition in each of those markets across many dimensions, particularly prices, contractual terms, output, quality, and innovation.

212.    Because of Cognizant's conduct described in this Counterclaim, the direct purchasers in each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets have paid and continue to pay higher prices, receive lower quality software and services, and receive less output. In other words, Health Plans pay higher prices for lower quality—and a lower volume of—Core Administration Software, Core Administration IT Services, Core Administration Integration, Core Administration Testing, and Core Administration Migration. But for Cognizant's conduct described in this Counterclaim, Health Plans would pay lower prices, receive higher quality software and services, and receive more output in each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets.

213.    Cognizant's conduct described in this Counterclaim also directly harms potential and actual competitors, including Infosys, in each of the Core Administration Software Market or Core Administration IT Services Market and Submarkets. Cognizant's distortions of the competitive process foreclose competition on the merits by erecting and strengthening entry barriers that would not exist absent Cognizant's conduct, preventing competitors from offering better, lower-priced, higher volume Core Administration Software, Core Administration IT Services, Core Administration Integration, Core Administration Testing, and Core Administration Migration. Cognizant's distortions of the competitive process also remove the competitive pressures that would otherwise exist for Cognizant to lower its prices, increase its output, innovate, and improve its software and services.

214.    Cognizant's conduct described in this Counterclaim also harms American healthcare providers, patients, and families and individuals who need healthcare coverage. The

costs of Cognizant's anticompetitive and exclusionary conduct are passed along in the form of lower reimbursement rates to providers and higher premiums, deductibles, co-pays, co-insurance, and out of pocket costs to Americans who have or need healthcare coverage.

215.     Because Core Administration Software, Core Administration IT Services, Core Administration Integration, Core Administration Testing, and Core Administration Migration are a major expense for Health Plans, Cognizant's anticompetitive and exclusionary conduct has significantly contributed to the persistently high and growing healthcare costs across the United States. Spending on Core Administration IT Services alone typically costs between 3% and 4.5% of total revenues for Health Plans, which can translate to hundreds of millions of dollars for large Health Plans.[24] Americans purchasing healthcare coverage are ultimately left to pick up this tab.

## INFOSYS'S ANTITRUST INJURY

216.     Infosys is uniquely positioned to deliver innovative, high-quality, high-volume, and competitively priced Core Administration Software, Core Administration IT Services, Core Administration Integration, Core Administration Testing, and Core Administration Migration to Health Plans. That is because Infosys is one of the few firms with the rare combination of characteristics, resources, and factors necessary to do so. Specifically, as to the Core Administration Software Market, Infosys has the necessary substantial resources, ability and willingness to invest heavily with a long time horizon before achieving profitability, access to scale, high level of risk tolerance, high degree of technical sophistication, subject-matter expertise, and strong reputation with Health Plans. As to the Core Administration IT Services Market and Submarkets, Infosys has the necessary scale to win projects in these markets, which require large and highly specialized teams; willingness to invest in the hiring and training necessary to be able

---

[24] "How Much Should You Spend on Healthcare IT? As a % of Revenue," accessed Jan. 9, 2025, available at: https://peaketechnology.com/healthcare-it-budgeting-101/.

to compete for projects in these markets; tolerance for the significant risk of not winning any projects in these markets; expertise in the varied and specialized areas required to win projects in these markets, including subject matter expertise in Healthcare Core Administration Software; access to training programs and resources to support expensive employee training; and a strong reputation with Health Plans.

217.    As a direct and proximate result of Cognizant's unlawful conduct described in this Counterclaim, Infosys has suffered and continues to suffer injury to its business and property, of the type the antitrust laws are intended to punish and prevent, in each of the Core Administration Software Market and Core Administration IT Services Market and Submarkets, including hundreds of millions of dollars in lost sales and increased costs.

218.    As a direct and proximate result of Cognizant's unlawful conduct described in this Counterclaim, Infosys has lost and continues to lose contracts for Core Administration Software because Cognizant has unlawfully foreclosed substantial shares of the Core Administration Software Market from Infosys Helix, erected and increased the barriers to entry Infosys Helix has faced, delayed Infosys's Helix development and launch, and increased Infosys Helix's costs of development. Indeed, but for Cognizant's unlawful conduct, Infosys would have obtained and would be obtaining significantly higher revenue and profits from selling Infosys Helix because more Health Plans would select Infosys Helix and also because Infosys would be further along in its development, thus further increasing sales.

219.    As a direct and proximate result of Cognizant's unlawful conduct described in this Counterclaim, Infosys has lost and continues to lose contracts for Core Administration IT Services, Core Administration Integration, Core Administration Testing, and Core Administration Migration projects because Cognizant has unlawfully foreclosed substantial shares of the Core

Administration IT Services Market and Submarkets from Infosys; excluded Infosys from training needed to perform more projects in these markets and perform them more efficiently; deprived Infosys of sufficient staffing to perform projects in these markets at higher speed, efficiency, and quality; interfered with Infosys's performance of projects in these markets; and increased Infosys's costs of performing projects in these markets.

## CONTINUING VIOLATIONS

220.    From at least four years prior to the filing of Infosys's original Counterclaim and continuing to the present day, Cognizant has engaged in the unlawful conduct described in this Counterclaim, causing the injuries, harms, and damages described in this Counterclaim—to Health Plans, competitors including Infosys, healthcare providers, patients, families and individuals needing healthcare coverage, and to competition and the competitive process in Core Administration Software Market and Core Administration IT Services Market and Submarkets.

## VIOLATIONS ALLEGED

**A.    Count I: Claim for Relief for Monopolization of Core Administration Software Market in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

221.    Infosys incorporates and realleges in full the allegations of paragraphs 1 through 220.

222.    The Core Administration Software Market constitutes a relevant antitrust market.

223.    Cognizant has monopolized the Core Administration Software Market.

224.    Cognizant has monopoly power in the Core Administration Software Market.

225.    Cognizant has willfully acquired and maintained its monopoly power in the Core Administration Software Market through the anticompetitive and exclusionary course of conduct described above in this Counterclaim.

86

226.    Cognizant's anticompetitive and exclusionary course of conduct has harmed competition and the competitive process in the Core Administration Software Market.

227.    Cognizant has willfully acquired and maintained its monopoly power in the Core Administration Software Market through each individual act of its anticompetitive and exclusionary course of conduct.

228.    Each individual act of Cognizant's anticompetitive and exclusionary course of conduct has harmed competition and the competitive process in the Core Administration Software Market.

229.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, has foreclosed a substantial share of the Core Administration Software Market.

230.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, lacks any non-pretextual procompetitive justification that could offset the harms caused by the conduct.

231.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, has harmed and continues to harm Infosys.

232.    For all these reasons, Cognizant has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

233.    As a direct and proximate result of Cognizant's violations of Section 2 of the Sherman Act, Infosys has suffered and continues to suffer injury to its business and property, and Infosys is threatened with further injury to its business and property if Cognizant's actions are not enjoined.

234.    Infosys is entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under the Clayton Act, 15 U.S.C. § 15; and

equitable relief to cure Cognizant's unlawful conduct and restore competition in the Core Administration Software Market.

C.    **Count II: Claim for Relief for Monopolization of the Core Administration IT Services Market and Submarkets in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

235.    Infosys incorporates and realleges in full the allegations of paragraphs 1 through 220.

236.    Each of the Core Administration IT Services Market and Submarkets constitutes a relevant antitrust market.

237.    Cognizant has monopolized each of the Core Administration IT Services Market and Submarkets.

238.    Cognizant has monopoly power in each of the Core Administration IT Services Market and Submarkets.

239.    Cognizant has willfully acquired and maintained its monopoly power in each of the Core Administration IT Services Market and Submarkets through the anticompetitive and exclusionary course of conduct described above in this Counterclaim.

240.    Cognizant's anticompetitive and exclusionary course of conduct has harmed competition and the competitive process in each of the Core Administration IT Services Market and Submarkets.

241.    Cognizant has willfully acquired and maintained its monopoly power in each of the Core Administration IT Services Market and Submarkets through each individual act of its anticompetitive and exclusionary course of conduct.

242.    Each individual act of Cognizant's anticompetitive and exclusionary course of conduct has harmed competition and the competitive process in each of the Core Administration IT Services Market and Submarkets.

243.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, has foreclosed a substantial share of each of the Core Administration IT Services Market and Submarkets.

244.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, lacks any non-pretextual procompetitive justification that could offset the harms caused by the conduct.

245.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, has harmed and continues to harm Infosys.

246.    For all these reasons, Cognizant has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

247.    As a direct and proximate result of Cognizant's violations of Section 2 of the Sherman Act, Infosys has suffered and continues to suffer injury to its business and property, and Infosys is threatened with further injury to its business and property if Cognizant's actions are not enjoined.

248.    Infosys is entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under the Clayton Act, 15 U.S.C. § 15; and equitable relief to cure Cognizant's unlawful conduct and restore competition in the Core Administration IT Services Market and Submarkets.

**D.    Count III: Claim for Relief, in the Alternative, for Attempted Monopolization of the Core Administration Software Market in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

249.    Infosys incorporates and realleges in full the allegations of paragraphs 1 through 220.

250.    The Core Administration Software Market constitutes a relevant antitrust market.

251.    Cognizant has attempted to monopolize the Core Administration Software Market.

252.    Cognizant has monopoly power or, at a minimum, a dangerous probability of acquiring monopoly power in the Core Administration Software Market.

253.    Cognizant has, with specific intent to monopolize, attempted to acquire and maintain monopoly power in the Core Administration Software Market through the anticompetitive and exclusionary course of conduct described above in this Counterclaim.

254.    Cognizant's anticompetitive and exclusionary course of conduct has harmed, or at a minimum was capable if fully successful of harming, competition and the competitive process in the Core Administration Software Market.

255.    Cognizant has, with specific intent to monopolize, attempted to acquire and maintain monopoly power in the Core Administration Software Market through each individual act of its anticompetitive and exclusionary course of conduct.

256.    Each individual act of Cognizant's anticompetitive and exclusionary course of conduct has harmed, or at a minimum was capable if fully successful of harming, competition and the competitive process in the Core Administration Software Market.

257.    In undertaking its anticompetitive and exclusionary conduct, individually and as a whole course of conduct, Cognizant has acted with specific intent to monopolize, and to destroy effective competition in, each of the Core Administration Software Market. There is a dangerous probability that, unless restrained, Cognizant will succeed in monopolizing the Core Administration Software Market.

258.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, has increased, or at a minimum was capable if fully successful of increasing, Cognizant's market power in each of the Core Administration Software Market to the level of monopoly power.

259.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, has foreclosed, or at a minimum was capable if fully successful of foreclosing, a substantial share of Core Administration Software Market.

260.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, lacks any non-pretextual procompetitive justification that could offset the harms and potential harms caused by the conduct.

261.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, has harmed and continues to harm Infosys.

262.    For all these reasons, Cognizant has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

263.    As a direct and proximate result of Cognizant's violations of Section 2 of the Sherman Act, Infosys has suffered and continues to suffer injury to its business and property, and further injury is threatened if Cognizant's actions are not enjoined.

264.    Infosys is entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under the Clayton Act, 15 U.S.C. § 15; and equitable relief to cure Cognizant's unlawful conduct and restore competition in the Core Administration Software Market.

**E.    Count IV: Claim for Relief, in the Alternative, for Attempted Monopolization of the Core Administration IT Services Market and Submarkets in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

265.    Infosys incorporates and realleges in full the allegations of paragraphs 1 through 220.

266.    Each of the Core Administration IT Services Market and Submarkets constitutes a relevant antitrust market.

267.    Cognizant has attempted to monopolize each of the Core Administration IT Services Market and Submarkets.

268.    Cognizant has monopoly power or, at a minimum, a dangerous probability of acquiring monopoly power in each of the Core Administration IT Services Market and Submarkets.

269.    Cognizant has, with specific intent to monopolize, attempted to acquire and maintain monopoly power in each of the Core Administration IT Services Market and Submarkets through the anticompetitive and exclusionary course of conduct described above in this Counterclaim.

270.    Cognizant's anticompetitive and exclusionary course of conduct has harmed, or at a minimum was capable if fully successful of harming, competition and the competitive process in each of the Core Administration IT Services Market and Submarkets.

271.    Cognizant has, with specific intent to monopolize, attempted to acquire and maintain monopoly power in each of the Core Administration IT Services Market and Submarkets through each individual act of its anticompetitive and exclusionary course of conduct.

272.    Each individual act of Cognizant's anticompetitive and exclusionary course of conduct has harmed, or at a minimum was capable if fully successful of harming, competition and the competitive process in each of the Core Administration IT Services Market and Submarkets.

273.    In undertaking its anticompetitive and exclusionary conduct, individually and as a whole course of conduct, Cognizant has acted with specific intent to monopolize, and to destroy effective competition in, each of the Core Administration IT Services Market and Submarkets. There is a dangerous probability that, unless restrained, Cognizant will succeed in monopolizing each of the Core Administration IT Services Market and Submarkets.

274.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, has increased, or at a minimum was capable if fully successful of increasing, Cognizant's market power in each of the Core Administration IT Services Market and Submarkets to the level of monopoly power.

275.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, has foreclosed, or at a minimum was capable if fully successful of foreclosing, a substantial share of each of the Core Administration IT Services Market and Submarkets.

276.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, lacks any non-pretextual procompetitive justification that could offset the harms and potential harms caused by the conduct.

277.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, has harmed and continues to harm Infosys.

278.    For all these reasons, Cognizant has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

279.    As a direct and proximate result of Cognizant's violations of Section 2 of the Sherman Act, Infosys has suffered and continues to suffer injury to its business and property, and further injury is threatened if Cognizant's actions are not enjoined.

280.    Infosys is entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under the Clayton Act, 15 U.S.C. § 15; and equitable relief to cure Cognizant's unlawful conduct and restore competition in the Core Administration IT Services Market and Submarkets.

F.  **Count V: Claim for Relief for Unreasonable Restraint of Trade in the Core Administration Software Market in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

281.    Infosys incorporates and realleges in full the allegations of paragraphs 1 through 220.

282.    The Core Administration Software Market constitutes a relevant antitrust market.

283.    Cognizant's NDAAs, licensing agreements, contracts, and agreements imposing allocations, MFV rights, restrictions, and prohibitions described above in this Counterclaim are contracts, combinations, or conspiracies that unreasonably restrain trade and commerce in the Core Administration Software Market.

284.    Cognizant has monopoly power, or at a minimum market power, in the Core Administration Software Market.

285.    Cognizant's unreasonable restraints of trade and commerce, individually and as a whole, have harmed competition and the competitive process in the Core Administration Software Market.

286.    Cognizant's unreasonable restraints of trade and commerce, individually and as a whole, have foreclosed a substantial share of the Core Administration Software Market.

287.    Cognizant's unreasonable restraints of trade and commerce, individually and as a whole, lack any non-pretextual procompetitive justification that could offset the harms caused by the restraints.

288.    Cognizant's unreasonable restraints of trade and commerce, individually and as a whole, have harmed and continue to harm Infosys.

289.    For all these reasons, Cognizant has violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

290.    As a direct and proximate result of Cognizant's violations of Section 1 of the Sherman Act, Infosys has suffered and continues to suffer injury to its business and property, and Infosys is threatened with further injury to its business and property if Cognizant's actions are not enjoined.

291.    Infosys is entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under the Clayton Act, 15 U.S.C. § 15; and equitable relief to cure Cognizant's unlawful conduct and restore competition in the Core Administration Software Market.

G.    **Count VI: Claim for Relief for Unreasonable Restraint of Trade in the Core Administration IT Services Market and Submarkets in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

292.    Infosys incorporates and realleges in full the allegations of paragraphs 1 through 220.

293.    Each of the Core Administration IT Services Market and Submarkets constitutes a relevant antitrust market.

294.    Cognizant's NDAAs, licensing agreements, contracts, and agreements imposing allocations, MFV rights, restrictions, and prohibitions described above in this Counterclaim are contracts, combinations, or conspiracies that unreasonably restrain trade and commerce in each of the Core Administration IT Services Market and Submarkets.

295.    Cognizant has monopoly power, or at a minimum market power, in each of the Core Administration IT Services Market and Submarkets.

296.    Cognizant's unreasonable restraints of trade and commerce, individually and as a whole, have harmed competition and the competitive process in each of the Core Administration IT Services Market and Submarkets.

297.    Cognizant's unreasonable restraints of trade and commerce, individually and as a whole, have foreclosed a substantial share of each of the Core Administration IT Services Market and Submarkets.

298.    Cognizant's unreasonable restraints of trade and commerce, individually and as a whole, lack any non-pretextual procompetitive justification that could offset the harms caused by the restraints.

299.    Cognizant's unreasonable restraints of trade and commerce, individually and as a whole, have harmed and continue to harm Infosys.

300.    For all these reasons, Cognizant has violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

301.    As a direct and proximate result of Cognizant's violations of Section 1 of the Sherman Act, Infosys has suffered and continues to suffer injury to its business and property, and Infosys is threatened with further injury to its business and property if Cognizant's actions are not enjoined.

302.    Infosys is entitled to damages as may be determined by a jury; automatic trebling of damages, reasonable attorneys' fees, and costs under the Clayton Act, 15 U.S.C. § 15; and equitable relief to cure Cognizant's unlawful conduct and restore competition in the Core Administration IT Services Market and Submarkets.

**H.    Count VII: Claim for Relief for Violations of the Texas Free Enterprise and Antitrust Act (TFEAA), Tex. Bus. & Com. Code § 15.05(a) and (b)**

303.    Infosys incorporates and realleges in full the allegations of paragraphs 1 through 302.

304.    Cognizant's anticompetitive and exclusionary conduct described above, individually and as a whole course of conduct, has occurred in and substantially affected trade and commerce occurring wholly or partly within the State of Texas.

305.    Cognizant's anticompetitive and exclusionary conduct described above, individually and as a whole course of conduct, has caused and continues to cause substantial adverse effects and harm to economic competition in trade and commerce in the State of Texas.

306.    Cognizant's anticompetitive and exclusionary conduct, individually and as a whole course of conduct, was willful and flagrant.

307.    For all these reasons, Cognizant has:

a.    Monopolized the Core Administration Software Market and the Core Administration IT Services Market and Submarkets, in violation of Section 15.05(b) of the TFEAA, Tex. Bus. & Com. Code § 15.05(b);

b.    In the alternative, attempted to monopolize the Core Administration Software Market and the Core Administration IT Services Market and Submarkets, in violation of Section 15.05(b) of the TFEAA, Tex. Bus. & Com. Code § 15.05(b); and

c.    Unreasonably restrained trade and commerce in the Core Administration Software Market and the Core Administration IT Services Market and Submarkets, in violation of Section 15.05(a) of the TFEAA, Tex. Bus. & Com. Code § 15.05(a).

308.    As a direct and proximate result of Cognizant's violations of the TFEAA, Tex. Bus. & Com. Code § 15.05(a) and (b), Infosys has suffered and continues to suffer injury to its business and property, and Infosys is threatened with further injury to its business and property if Cognizant's actions are not enjoined.

309. Infosys is entitled to damages as may be determined by a jury; treble damages, or at a minimum interest, under Section 15.21(a)(1) of the TFEAA, Tex. Bus. & Com. Code § 15.21(a)(1); injunctive relief to permanently enjoin Cognizant's unlawful practices and restore competition in the Core Administration Software Market and the Core Administration IT Services Market and Submarkets under Section 15.21(b) of the TFEAA, Tex. Bus. & Com. Code § 15.21(b); and the cost of suit including reasonable attorneys' fees under and Section 15.21(a)(1) and (b) of the TFEAA, Tex. Bus. & Com. Code § 15.21(a)(1) and (b).

## PRAYER FOR RELIEF

310. Accordingly, Infosys requests that the Court:

a. Adjudge and decree that Cognizant has committed violations of Section 2 of the Sherman Act, 15 U.S.C. § 2;

b. Adjudge and decree that Cognizant has committed violations of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c. Adjudge and decree that Cognizant has committed violations of the TFEAA, Tex. Bus. & Com. Code § 15.05(a) and (b);

d. Award Infosys three times its damages sustained from Cognizant's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

e. Award Infosys three times its damages sustained from Cognizant's violations of the TFEAA, Tex. Bus. & Com. Code § 15.05(a) and (b), to the extent authorized under Section 15.21(a) of the TFEAA, Tex. Bus. & Com. Code § 15.21(a);

f. Order injunctive relief to end Cognizant's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2, in accordance with the Section 16 of the Clayton Act, 15 U.S.C. § 26;

g.    Order injunctive relief to end Cognizant's violations of the TFEAA, Tex. Bus. & Com. Code § 15.05(a) and (b), in accordance with Section 15.21(b) of the TFEAA, Tex. Bus. & Com. Code § 15.21(b);

h.    Order equitable and injunctive relief to restore competitive conditions in each of the relevant markets affected by Cognizant's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2, and the TFEAA, Tex. Bus. & Com. Code § 15.05(a) and (b), in accordance with 15 U.S.C. § 26 and Tex. Bus. & Com. Code § 15.21(b);

i.    Declare void, invalid, and unenforceable Cognizant's contracts in restraint of trade or commerce, including Cognizant's NDAAs with Infosys and Cognizant's licenses and contracts with customers in any of the relevant markets containing any of the unlawful provisions harming the competitive process and Infosys alleged in this Counterclaim;

j.    Enjoin and restrain Cognizant and its subsidiaries, affiliates, officers, directors, partners, agents, and employees, and all persons acting or claiming to act on their behalf of in concert with them, from continuing to engage in any of the unlawful conduct alleged in this Counterclaim and from engaging in the future in any conduct with a similar purpose or effect to the unlawful conduct alleged in this Counterclaim;

k.    Award Infosys its costs of this case and reasonable attorneys' fees under the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and the TFEAA, Tex. Bus. & Com. Code § 15.21(a)(1) and (b);

l.    Award Infosys pre- and post-judgment interest to the extent allowed by law, including 15 U.S.C. § 15(a), 28 U.S.C. § 1961, and Tex. Bus. & Com. Code § 15.21(a)(1); and

99

       m.     Order and award any additional relief in law or equity the Court finds just and proper.

**JURY DEMAND**

311.    Pursuant to Federal Rule of Civil Procedure 38(b), Infosys requests a trial by jury of all issues properly triable to a jury in this case.

Dated: November 6, 2025

Respectfully submitted,

By: /s/ *Douglas E. Litvack*
    Douglas E. Litvack (*pro hac vice*)

Christopher J. Schwegmann (SBN 24051315)
Joshua Lang (SBN 24109450)
LYNN PINKER HURST &
SCHWEGMANN, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Tel: (214) 981-3835
cschwegmann@lynnllp.com
jlang@lynnllp.com

Douglas E. Litvack (*pro hac vice*)
Jariel A. Rendell (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
DLitvack@jenner.com
JRendell@jenner.com

Brent Caslin (*pro hac vice*)
Nick Saros (*pro hac vice*)
Kelly M. Morrison (*pro hac vice*)
Sarah S. Lee (*pro hac vice*)
JENNER & BLOCK LLP
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071
Tel.: (213) 239-5100
BCaslin@jenner.com
NSaros@jenner.com
KMorrison@jenner.com

SLee@jenner.com

Shoba Pillay (*pro hac vice*)
Laura E. Pelanek (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
SPillay@jenner.com
LPelanek@jenner.com

*Attorneys for Defendant and Counterclaim*
*Plaintiff Infosys Limited*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of November, 2025, I caused (1) a redacted version of the foregoing to be electronically filed with the Clerk of Court for the U.S. District Court, Northern District of Texas, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record and (2) an unredacted version of the foregoing, which is being filed subject to a motion to file under provisional, to be served on all counsel of record via email.

<u>/s/ *Douglas E. Litvack*      </u>
Douglas E. Litvack (*pro hac vice*)

102