# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| COGNIZANT TRIZETTO SOFTWARE GROUP, INC.,<br><br>      Plaintiff,<br><br>  v.<br><br>INFOSYS LIMITED,<br><br>      Defendant. | **Case No. 3:24-cv-2158-X**<br><br>Hon. Brantley Starr, District Judge<br>Hon. David L. Horan, Magistrate Judge |
| INFOSYS LIMITED,<br><br>      Counterclaim Plaintiff,<br><br>  v.<br><br>COGNIZANT TECHNOLOGY SOLUTIONS CORP. and COGNIZANT TRIZETTO SOFTWARE GROUP, INC.,<br><br>      Counterclaim Defendants. | |

**COGNIZANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS INFOSYS' AMENDED COUNTERCLAIMS AND STAY DISCOVERY**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................... 2

    A.    Products at Issue ...................................................................................... 2

    B.    Infosys' Amended Market Allegations................................................... 2

    C.    Infosys' Conduct Allegations ................................................................. 3

III.   LEGAL STANDARD........................................................................................... 5

IV.   ARGUMENT ....................................................................................................... 5

    A.    Infosys' Monopolization Claim Fails .................................................... 6

        1.    Infosys' Market Definitions Remain Facially Implausible....................... 6

        2.    Infosys Still Does Not Allege Anticompetitive Conduct........................... 8

        3.    Infosys Fails to Allege a Cognizable Antitrust Injury ............................. 14

    B.    Infosys' Attempted Monopolization Claim Fails ................................ 17

    C.    Infosys Fails To Allege A Section 1 Claim ......................................... 19

    D.    Infosys Parallel State Law Claims Also Fail ....................................... 23

    E.    The Court Should Stay Discovery While This Motion Remains Pending........... 23

CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*,
735 F.2d 884 (5th Cir. 1984) ................................................... 19

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ............................................................ 24

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
300 F.3d 620 (5th Cir. 2002) ................................................. 6, 8

*ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*,
137 F. App'x 694 (5th Cir. 2005) ............................................... 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................... 5, 13, 19

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ............................................................ 10

*Assoc. Radio Serv. Co. v. Page Airways, Inc.*,
624 F.2d 1342 (5th Cir. 1980) ............................................ 2, 12, 14

*Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328 (1990) ......................... 14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................... 5, 23

*C.E. Servs., Inc. v. Control Data Corp.*,
759 F.2d 1241 (5th Cir. 1985) .................................................. 17

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) ........................ 19

*Cates v. Crystal Clear Techs., LLC*,
2016 WL 4379220 (M.D. Tenn. Aug. 17, 2016) .................................... 22

*Clorox Co. v. Sterling Winthrop, Inc.*,
117 F.3d 50 (2d Cir. 1997) ..................................................... 10

*Club Retro, L.L.C. v. Hilton*,
568 F.3d 181 (5th Cir. 2009) ................................................... 5

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
846 F.2d 284 (5th Cir. 1988) ................................................... 20

*Cubicle Enters. LLC v. Rubik's Brand Ltd.*,
2018 WL 11224256 (S.D.N.Y. July 19, 2018) ..................................... 24

ii

# TABLE OF AUTHORITIES
*(Continued)*

Page(s)

*Dickson v. Microsoft Corp.,*
    309 F.3d 193 (4th Cir. 2002) ............................................... 21

*Drs. Hosp. of Laredo v. Cigarroa,*
    782 F. Supp. 3d 406 (W.D. Tex. 2025).................................. 13

*Edgenet, Inc. v. GS1 AISBL,*
    742 F. Supp. 2d 997 (E.D. Wis. 2010).................................. 16

*In re Educ. Testing Serv. Litig.,*
    429 F. Supp. 2d 752 (E.D. La. 2005)..................................... 12

*Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.,*
    556 F. Supp. 3d 1156 (D. Or. 2021) ...................................... 24

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.,*
    2021 WL 6072512 (D. Kan. Dec. 23, 2021)........................... 19

*Fed. Trade Comm'n v. Qualcomm Inc.,*
    969 F.3d 974 (9th Cir. 2020) ......................................... 11, 15

*United States ex rel. Grubbs v. Kanneganti,*
    565 F.3d 180 (5th Cir. 2009) ................................................. 5

*IDX Sys. Corp. v. Epic Sys. Corp.,*
    285 F.3d 581 (7th Cir. 2002) ........................................... 1, 11

*Intergraph Corp. v. Intel Corp.,*
    195 F.3d 1346 (Fed. Cir. 1999)............................................. 9

*Johnson v. Harris Cnty.,*
    83 F.4th 941 (5th Cir. 2023) ............................................... 13

*Leegin Creative Leather Prods, Inc. v. PSKS, Inc.,*
    551 U.S. 877 (2007)............................................................ 20

*Location Servs., LLC v. Dig. Recognition Network, Inc.,*
    2018 WL 5787317 (N.D. Tex. Nov. 5, 2018)........................ 14

*Loren Data Corp. v. GXS, Inc.,*
    501 F. App'x 275 (4th Cir. 2012) ........................................ 18

*Marucci Sports, L.L.C. v. NCAA,*
    751 F.3d 368 (5th Cir. 2014) ..................................... 19, 20, 21

*Med-line Indus., Inc. v. C.R. Bard, Inc.,*
    2016 WL 5871501 (N.D. Ill. Oct. 7, 2016)........................... 25

iii

# TABLE OF AUTHORITIES
*(Continued)*

Page(s)

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
    859 F.3d 408 (7th Cir. 2017) ............................................................................17

*Nasdaq, Inc. v. Miami Int'l Holdings, Inc.*,
    2023 WL 4740753 (D.N.J. July 25, 2023) ........................................................24

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ...............................................................9, 10, 11

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)...........................................................................................19

*Oxford Glob. Res., Inc. v. Weekley-Cessnun*,
    2004 WL 2599898 (N.D. Tex. Nov. 12, 2004)....................................................8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)........................................................................................1, 9

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*,
    9 F.4th 247 (5th Cir. 2021) ...............................................................................19

*Petrus v. Bowen*,
    833 F.2d 581 (5th Cir. 1987) ..............................................................................5

*In re Pool Prods. Dist. Mkt. Antitrust Litig.*,
    940 F. Supp. 2d 367 (E.D. La. 2013)................................................................21

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
    158 F. Supp. 3d 544 (E.D. La. 2016)................................................................23

*PrimeSource Building Prods., Inc. v. Lee Group Int'l, Inc.*,
    2020 WL 6140462 (N.D. Tex. Aug. 12, 2020)............................................23, 24

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (7th Cir. 2010) ..............................................................................17

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) ............................................................................15

*Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*,
    786 F. Supp. 2d 1202 (S.D. Tex. 2009) ............................................................17

*SCFC ILC, Inc. v. Visa USA, Inc.*,
    36 F.3d 958 (10th Cir. 1994) ............................................................................19

*Schiller v. Physicians Res. Grp., Inc.*,
    342 F.3d 563 (5th Cir. 2003) ..............................................................................5

## TABLE OF AUTHORITIES
*(Continued)*

Page(s)

*Shah v. VHS San Antonio Partners, L.L.C.*,
   985 F.3d 450 (5th Cir. 2021) .................................................................7

*Smith v. Intel Corp.*,
   745 F. Supp. 3d 853 (N.D. Cal. 2024) ..................................................25

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,
   841 F.3d 827 (10th Cir. 2016) ..............................................................11

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993)...............................................................................17

*Spinelli v. Nat'l Football League*,
   2015 WL 7302266 (S.D.N.Y. Nov. 17, 2015).......................................24

*Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*,
   940 F. Supp. 1026 (E.D. Tex. 1996)......................................................20

*Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*,
   68 F.4th 792 (2d Cir. 2023) .............................................................4, 10

*Syrstad v. NECA-IBEW Welfare Tr. Fund*,
   2022 WL 22876269 (E.D. Wis. Aug. 31, 2022).....................................25

*Taylor Pub. Co. v. Jostens, Inc.*,
   216 F.3d 465 (5th Cir. 2000) ..........................................2, 12, 13, 15

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ................................................................15

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919)...............................................................................9

*United States v. New Hill Homes Assocs., Ltd. P'ship*,
   2000 WL 306623 (D. Conn. Feb. 29, 2000) ..........................................25

*United States v. Topco Assocs. Inc.*,
   405 U.S. 596 (1972)...............................................................................22

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
   2015 WL 225328 (N.D. Ill. Jan. 15, 2015).............................................16

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)...............................................................................10

*Walker v. Beaumont Indep. Sch. Dist.*,
   938 F.3d 724 (5th Cir. 2019) ................................................................5

v

## TABLE OF AUTHORITIES
*(Continued)*

<u>Page(s)</u>

*In re Webkinz Antitrust Litig.*,
    695 F. Supp. 2d 987 (N.D. Cal. 2010) ...................................................................16

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)...................................................................22

**Statutes**

15 U.S.C. § 1 ...................................................................................................................19

Tex. Bus. & Com. Code § 15.04...................................................................................23

**Other Authorities**

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust*
    *Principles and Their Application* ¶ 2030 ...............................................................22

**Rules**

Fed. R. Civ. P. 26(c)(1)...................................................................................................5

## I.    INTRODUCTION

Infosys is an IT company that, among other lines of business, provides services for Cognizant's software products. That work gave Infosys access to Cognizant's most sensitive intellectual property. After Cognizant learned that Infosys misappropriated that intellectual property—and refused to let Cognizant exercise its contractual audit rights to assess the extent of Infosys' theft—Cognizant brought trade secret and other claims against Infosys. Seeking to distract from its own misconduct, Infosys has tried to recast Cognizant's industry-standard methods of protecting intellectual property—which Infosys' own conduct underscores the need for—as antitrust violations. But try as Infosys might, "[n]othing in the antitrust laws gives one producer a right to sponge off another's intellectual property." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 585 (7th Cir. 2002) (Easterbrook, J.). After denying Infosys' motion to dismiss Cognizant's trade secret claims, the Court granted Cognizant's motion to dismiss Infosys' counterclaims, finding them "legally insufficient" based on Infosys' market-definition allegations alone. Infosys' Amended Counterclaims neither cure the basic deficiencies identified in the Court's order nor plead any anticompetitive conduct or cognizable antitrust injury.

As a threshold matter, Infosys' Amended Counterclaims continue to put forward gerrymandered market definitions that rely on contradictory and vague allegations. Beyond that, Infosys continues to complain of lawful, competition-enhancing conduct, including that Cognizant limits Infosys' access to and use of Cognizant's intellectual property in various ways. But a firm has no duty to deal with its competitors *at all*, much less to "deal under terms and conditions that the rivals find commercially advantageous." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 449–50 (2009). And while Infosys alleges that Cognizant engaged in "predatory hiring" when it hired *three* Infosys executives (out of the more than *300,000* employees), "the mere hiring away

of employees from a rival is *per se legal* under the antitrust laws," *Assoc. Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1354 (5th Cir. 1980) (emphasis added), because "there is a high social and personal interest in maintaining a freely functioning market for talent." *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 479 (5th Cir. 2000) (citation omitted). None of the narrow exceptions to that rule is alleged here. In sum, Infosys has not alleged any conduct the law recognizes as anticompetitive, dooming both its federal and state law claims. The Court should dismiss Infosys' antitrust claims with prejudice and stay all antitrust discovery while this motion remains pending.

## II.    BACKGROUND

Cognizant accepts the allegations in Infosys' Amended Counterclaims as true for purposes of this motion. The cited paragraphs throughout are to those Amended Counterclaims.

### A.    Products at Issue

TriZetto offers software solutions to healthcare companies for processing healthcare insurance claims, and CTS provides IT services to companies that use such software solutions—those sold by TriZetto (such as Facets and QNXT) and also other software providers. ¶¶ 4–8. CTS purchased TriZetto in 2014. ¶¶ 7, 33–35. Infosys offers a product called Helix, which it alleges competes with Facets and QNXT. Licensees of healthcare software like Facets and QNXT often turn to outside IT service providers to help maintain their systems. *See* ¶ 135. Some choose CTS; others choose different third-party IT service providers, including Infosys. *See* ¶¶ 40–41.

### B.    Infosys' Amended Market Allegations

Infosys alleges two new relevant markets. The first, the Core Administration Software Market (hereinafter, "Software Market"), is comprised of software for healthcare payors (*i.e.*, Health Plans). Core Administration Software is specifically designed to serve Health Plans' three

2

MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS INFOSYS' AMENDED COUNTERCLAIMS AND STAY DISCOVERY
CASE NO. 3:24-CV-2158-X

core needs—"member management," "claims processing," and "provider management." ¶ 119. According to Infosys, Health Plans generally will buy Core Administration Software from a single provider that can "handle all their core functions in an end-to-end fashion." ¶ 125. Infosys alleges that Cognizant's Facets and QNXT products and Infosys' Helix product are Core Administration Software. Yet Infosys also alleges that Helix does not provide all three core health plan functions; it offers member and provider management, but no claims-processing capabilities. ¶ 179. Other than Facets, QNXT, and Helix, Infosys does not identify any other Core Administration Software, nor make allegations about the other vendors that compete in this alleged market.

Infosys' second alleged market, the Core Administration IT Services market, is comprised of three submarkets and includes provision of IT services that Health Plans "need to ensure their Core Administration Software performs effectively" (hereinafter "IT Services Market"). ¶ 132. The three alleged submarkets relate to integration, testing, and migration services. Infosys contends that services and technicians are not interchangeable across these submarkets—*i.e.*, a testing technician is not interchangeable with a migration technician. *See* ¶ 154. Infosys does not address interchangeability *across software platforms*. For example, Infosys does not address whether testing services or deliverables for Infosys' Helix product are interchangeable with testing services and deliverables for Facets.

## C.    Infosys' Conduct Allegations

Infosys alleges that Cognizant engages in three purported forms of anticompetitive conduct: (1) contractual restrictions, (2) denial of training, and (3) hiring Infosys' employees.

**1. Contractual Restrictions.** Cognizant allows rivals like Infosys to access its software to provide competing IT services. *See, e.g.*, ¶ 46. Such arrangements create risk for TriZetto, be-

3

cause they permit third parties to access TriZetto's intellectual property and potentially misappropriate its trade secrets. Underscoring that reality, the same software at issue in this case has been misappropriated. *See Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 806 (2d Cir. 2023) (affirming misappropriation finding). To guard against these risks, TriZetto requires such third-party IT servicers to sign NDAAs. *See, e.g.*, ¶ 49.

According to Infosys, these NDAAs can contain restrictions on a third-party IT servicer's work, including "limitations on the scope of work they can perform for Health Plan clients," "restrictions on which of [the IT servicer's] employees can service customer accounts," "prohibitions on developing complementary products that could interface with Cognizant's software," and "one-way non-solicitation provisions that protect Cognizant's employees from poaching." ¶ 10. Infosys further alleges that TriZetto includes in some license agreements "most-favored-vendor provisions" ("MFV provisions") that give Cognizant some oversight over third-party vendors. ¶ 43.

**2. Training.** Infosys alleges that Cognizant offers training via a "comprehensive certified service partner" program, but that Infosys and other unspecified "significant competitors" have been excluded from that program. ¶ 75. Although Infosys acknowledges that it can perform IT services without this training, it complains that it could perform "more . . . projects" and do so "more efficiently" if it had access to the program. ¶ 77.

**3. Hiring.** Infosys alleges that Cognizant's hiring of its now-CEO Ravi Kumar, as well as Shveta Arora (Cognizant's Senior Vice President and Global Head of Consulting) and Ravi Kiran Kuchibhotla (Cognizant's Chief Strategy Officer), was part of a "scheme to undermine the development of Infosys Helix." ¶ 15; *see* ¶¶ 78–107.

### III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must assert "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court may dismiss claims "on the basis of a dispositive issue of law" or if the plaintiff fails to plead sufficient facts to "state a claim to relief that is plausible on its face." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) (citations omitted). Although the Court must accept well-pleaded facts in a complaint as true, the "allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and must "make relief plausible, not merely conceivable, when taken as true," *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009). It is within a court's discretion whether to dismiss a claim with prejudice, *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 215 n.34 (5th Cir. 2009), and "at some point a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit," *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567 (5th Cir. 2003) (citation omitted).

"The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" Fed. R. Civ. P. 26(c)(1). Thus a trial court has "broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined." *Petrus v. Bowen*, 833 F.2d 581, 583 (5th Cir. 1987).

### IV.    ARGUMENT

The Amended Counterclaims fail many times over. The Section 2 claims fail because Infosys pleads no plausible market, anticompetitive conduct, or antitrust injury. The remaining claims fail for similar reasons, and others.

### A.    Infosys' Monopolization Claim Fails

Infosys' Amended Counterclaims have not corrected the deficiencies in its market defini-

tions, much less plausibly alleged anticompetitive conduct or antitrust injury.

### 1.    Infosys' Market Definitions Remain Facially Implausible

The Court previously found Infosys' proposed markets—one for software and one for IT

services—"infirm" and dismissed its counterclaims on that basis. Dkt. 141 at 5–6. With respect to

the software market, Infosys limited its market definition "to Facets, QNXT, and Helix" and did

not include "substitute products"—including "non-specialized" and "in-house products," despite

admitting that customers substituted in-house products for commercial software. *Id.* at 5. With

respect to the IT services market, the Court held that Infosys did not "explain the boundaries of its

proposed IT services market or whether technicians and updates are interchangeable ***across soft-***

***ware platforms***." *Id.* at 6 (emphasis added). Infosys repeats both failings in its new market defini-

tions—it excludes acknowledged substitutes from its Software Market and does not address inter-

changeability across software platforms in its IT Services Market. As a result, its counterclaims

should again be dismissed, now with prejudice. *See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,

300 F.3d 620, 628 (5th Cir. 2002) (market that excludes substitutes or fails to address interchange-

ability is "legally insufficient, and a motion to dismiss may be granted").

**The Core Administration Software Market.** While Infosys now includes in-house prod-

ucts in its market definition (as it must), ¶¶ 125–26, it still makes directly inconsistent allegations

about what products are substitutes in the market. Infosys alleges the Software Market is limited

to *only* the highly specialized software offering "three core functions that are unique to Health

Plans: (1) member management, (2) claims processing, and (3) provider management." ¶ 119.

There is allegedly "no software other than Core Administration Software that Health Plans would

6

be able to use—or consider using." ¶ 128. Further, Infosys alleges Health Plans will license Core Administration Software only "from a single company" to "handle all their core functions in an end-to-end fashion." ¶ 125; *see also* ¶ 127 ("[F]ew Health Plans use more than one Core Administration Software."). Thus Infosys narrowly defines its Software Market to include *only* software that meets all three core needs of Health Plans, and nothing else.

Directly defeating the plausibility of that market, however, Infosys admits healthcare payors have adopted Helix for their Core Administration Software, even though Helix offers only "two of the three core Health Plan functions—member management and provider management." ¶ 179. And Infosys alleges that, for example, Plan 1 relied on a mixture of in-house software and Helix to cover the core Health Plan functionalities. ¶¶ 81, 179. If Helix is in the Software Market despite not offering all core functions, and if Health Plans in fact mix and match products to cover those functions, this market *must* include more than Infosys has alleged; it cannot be limited to only those products that offer, in a single package, all three core Health Plan functions. *See Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 455 (5th Cir. 2021) (rejecting market definition that excluded "viable alternatives"). In other words, Infosys again puts forward a market definition that excludes products it elsewhere acknowledges are substitutes, warranting dismissal.

**The Core Administration IT Services Market.** Despite adding dozens of new allegations, and identifying three purported submarkets, Infosys still does not address the interchangeability of technicians, services, and software updates **across software platforms**. Infosys instead adds new allegations concerning the interchangeability of technicians across **types of IT services**. *See, e.g.*, ¶¶ 138 (testing technicians are "reasonably interchangeable with each other but not with technicians (of any experience level) specializing in Core Administration Migration"), 146 (same),

154 (same), 162 (same). None of these allegations addresses whether, for example, a Core Admin-istration Testing engineer who services Facets is capable of servicing Helix or third-party Core Administration Software. And if Core Administration IT Services for Facets and for Helix require different specialization and different deliverables—which they almost certainly do given the many alleged differences between the software products, *see, e.g.*, ¶¶ 14, 17, 83, 177—then integration, testing, and migration services for each of these platforms are not interchangeable with integration, testing, and migration for the others, and they do not belong in the same markets. By ignoring this issue, Infosys has once again failed to "define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," and thus "the relevant mar-ket is legally insufficient, and a motion to dismiss may be granted." *See Apani*, 300 F.3d at 628.

## 2. Infosys Still Does Not Allege Anticompetitive Conduct

A Section 2 claim requires that "plaintiffs allege predatory or exclusionary conduct." *Ox-ford Glob. Res., Inc. v. Weekley-Cessnun*, 2004 WL 2599898, at *2 (N.D. Tex. Nov. 12, 2004). Infosys attempts to meet this requirement by alleging that Cognizant's contractual provisions (in both markets), training practices (in the IT Services Market), and hiring practices (in the Software Market) were anticompetitive. All of these allegations fail.

**Cognizant's Contractual Provisions.** Infosys challenges several provisions in Cogni-zant's license agreements for QNXT and Facets as well as NDAAs that allow third parties to per-form IT services for those products. These provisions restrict use of TriZetto's trade secrets and intellectual property, and which employees at third-party servicers may do the work. *See, e.g.*, ¶¶ 43, 46–63. At bottom, Infosys has a single gripe: Cognizant does not offer its software products in a manner sufficiently favorable to Infosys. That complaint has no purchase in the antitrust laws.

*First*, Cognizant has no duty to deal in terms that are favorable to Infosys or any other rival. For over a century, the Supreme Court has recognized that the antitrust laws do not "restrict the . . . right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). A market participant has no "antitrust duty to deal with its rivals at all" and "certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." *linkLine*, 555 U.S. at 449–50; *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.) (the antitrust laws are not a means "to pick and choose the applicable terms and conditions" governing a course of dealing).

Infosys' efforts to get around this black-letter law fail, because Cognizant is free to withhold its intellectual property without running afoul of the antitrust laws. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1358 (Fed. Cir. 1999). Infosys claims for itself the power to rewrite the MFV provisions in Cognizant's software licenses to allow *any* rival firm to perform IT services work for Cognizant's software and thereby access its confidential information. ¶¶ 43–45, 66–71. The antitrust laws allow no such thing. Nor do they immunize Infosys from violating NDAA provisions that: (1) prevent IT services personnel from using Cognizant's confidential information to aid a competitor without any restrictions, ¶¶ 49, 62–65 (non-compete clauses); (2) circumscribe how rivals may use Cognizant's confidential information, ¶¶ 51–54 (reasonable use clauses); (3) impose limitations on the number of non-Cognizant employees who may access confidential information, ¶¶ 50, 55–58 (staffing clauses); and (4) prevent rivals from soliciting Cognizant employees with deep knowledge of its trade secrets, ¶¶ 59–61 (non-solicitation clauses). Cognizant need not offer unfettered access at all, much less on terms that Infosys finds commercially advantageous. *See linkLine*, 555 U.S. at 449–50.

9

*Second*, none of Infosys' allegations fits the narrow exception to the refusal-to-deal doctrine outlined in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), which applies only when a firm terminates a voluntary, profitable course of dealing with a rival and expresses a "willingness to forsake short term profits to achieve an anticompetitive end." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004). This exception exists "at or near the outer boundary of § 2 liability" and applies only in "certain egregious circumstances" not present here. *ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 F. App'x 694, 698 (5th Cir. 2005) (quoting *Trinko*, 540 U.S. at 409). Thus, while Infosys alleges that TriZetto's use of NDAAs has evolved and become more stringent over time, ¶¶ 39–41, it fails to allege that Cognizant forsook any short-term profits in making such changes. Moreover, Cognizant's contractual terms are not "irrational but for [their] anticompetitive effect," *Novell*, 731 F.3d at 1075. Infosys does not address Cognizant's legitimate interest in protecting its intellectual property from theft and misappropriation in this case and others. *See Syntel Sterling*, 68 F.4th at 806.[1]

*Third*, Cognizant's NDAAs and software license agreements *promote* competition. Cognizant's MFV provisions protect trade secret information while allowing rival firms, including Infosys, to service Facets and QNXT. *See* ¶¶ 43, 46–68 (describing multiple instances in which Infosys provided Core Administration IT services for Cognizant software, even though Cognizant's

---

[1] Infosys' conclusory assertions that some of Cognizant's contract provisions are overbroad and thus have no "legitimate purpose to protect intellectual property" in particular circumstances, ¶ 50; *see also* ¶¶ 53, 70, 202, 208, does not change the analysis. Even if a contract "only marginally advances [intellectual property] policies, the antitrust laws do not exist to protect competitors from agreements that in retrospect turn out to be unfavorable to the complaining party." *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 57 (2d Cir. 1997) (evaluating an allegedly anticompetitive trademark agreement). And Infosys *acknowledges* the pro-competitive reasons a software vendor would exercise some control over service providers apart from protecting intellectual property: "higher quality of services" can lead to "greater overall satisfaction with Core Administration Software, which encourages adoption and retention." ¶ 73.

licensing agreements "typically include a [MFV] provision"). Cognizant's non-compete clauses, reasonable use clauses, staffing clauses, and non-solicitation clauses present in its NDAAs help safeguard that commercially valuable IP. Courts have been crystal clear that "[e]ven a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival." *Novell*, 731 F.3d at 1074; *see also SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 843 (10th Cir. 2016). That's because "experience teaches that the process of firms investing in their own infrastructure and intellectual property . . . promotes competition and consumer gains." *Novell*, 731 F.3d at 1078. And although the contractual provisions at issue "may compel rivals such as [Infosys] to do more work to develop software independently," those clauses too "promote[] rather than restrict[] competition." *IDX*, 285 F.3d at 585.

Finally, while Infosys contends that Cognizant's contracts constitute anticompetitive conduct in both its Software and IT Markets, it makes no attempt to explain how these contracts could impede Infosys' ability to make its own Health Plan software. To the extent Infosys' complaint is that if it had unfettered access to Cognizant's software it would be better able to copy it, "[n]othing in the antitrust laws gives one producer a right to sponge off another's intellectual property." *Id.*; *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 988 (9th Cir. 2020) ("Antitrust law, . . . is aimed at encouraging innovation, industry and competition." (internal quotation marks omitted)).

**Refusing To Train A Competitor Is Not Anticompetitive Conduct.** Infosys also alleges that Cognizant has not permitted Infosys (or other "significant competitors") to be part of its "certified service partner program," which Infosys labels a "prohibition on training access." ¶¶ 75, 77. But the antitrust laws do not require Cognizant to train its competitors so that they can be more efficient. *See In re Educ. Testing Serv. Litig.*, 429 F. Supp. 2d 752, 759 (E.D. La. 2005) (allegations that a firm failed "to make its test booklets and answer sheets available to its competitors" did not

11

plead anticompetitive conduct). Nor does Infosys plead any facts that meet the narrow *Aspen Skiing* exception. While Infosys includes conclusory allegations that Cognizant "foregoes substantial profits from training," ¶ 76, and points out that *prior owners* of QNXT and Facets (QCSI and TriZetto) offered training, ¶¶ 73–74, it does not allege that those predecessors even charged for—much less actually made *profits* off of—training, nor does it explain how Cognizant would do so. Regardless, Infosys concedes that it performs Core Administration IT Services without said training, ¶ 77, undercutting any argument of competitive harm. *See Educ. Testing Serv.*, 429 F. Supp. 2d at 759 ("[P]laintiffs concede that two other companies are capable of developing [competing products] without any help from [defendant]."). Cognizant has no obligation to train its rival in Cognizant's software, and that conduct cannot form the basis of a Section 2 claim.

**Cognizant's Hiring Of Infosys Employees Is Not Anticompetitive Conduct.** Infosys alleges Cognizant committed anticompetitive "predatory hiring" when it hired *three* Infosys employees over the span of two years. *See* ¶¶ 102, 106. But "the mere hiring away of employees from a rival is *per se legal* under the antitrust laws," *Assoc. Radio*, 624 F.2d at 1354 (emphasis added); a reality that Infosys admits, ¶ 107 ("In general, simply hiring talent is not exclusionary conduct."). The two limited exceptions the Fifth Circuit has recognized do not apply here: a competitor's hiring pairs with the inducement of disloyal performance, or the hiring is purely to deny talent to a competitor. *See Taylor*, 216 F.3d at 479–82.

To succeed on the first theory, Infosys must plausibly allege Cognizant induced disloyal behavior while recruiting away Infosys employees. *See Taylor*, 216 F.3d at 479–82. The sum total of Infosys' allegation about what *Cognizant* did are: (1) Cognizant and Kumar discussed Kumar's potential hiring in 2022, ¶ 92; (2) Kumar met with Cognizant's Chief of Staff to the CEO in August

2022 and agreed to join Cognizant in September 2022, ¶¶ 99–100; (3) Kumar left Infosys in October 2022 and joined Cognizant in January 2023 as CEO, ¶ 102; and (4) Arora joined Cognizant in December 2023, and Kuchibhotla joined Cognizant in July 2024, ¶ 106. Infosys now abandons its former theory that Cognizant "timed the[] departures" to harm Infosys Helix, *see* Dkt. 46 at 33, and replaces it with a conclusory allegation that Cognizant used its power in the relevant markets "to lure away Kumar, incentivizing disloyal behavior." ¶ 100. But this threadbare recitation is facially deficient, *Iqbal*, 556 U.S. at 678; *Johnson v. Harris Cnty.*, 83 F.4th 941, 945 (5th Cir. 2023), and Infosys does not even bother to make similar assertions for Arora or Kuchibhotla. Because Infosys alleges no facts showing Cognizant asked or otherwise induced Kumar, Arora, or Kuchibhotla to do anything that would harm Infosys or Helix, its inducement theory fails out of the gate. *See Taylor*, 216 F.3d at 481; *Drs. Hosp. of Laredo v. Cigarroa*, 782 F. Supp. 3d 406, 453 (W.D. Tex. 2025) (rejecting similar claim where "there is no evidence that Defendants intended to, or did, induce [employee] to 'act disloyally'").

Infosys' second theory—that Cognizant hired these employees "solely to harm Infosys," ¶ 107—fares no better. Meeting this exception requires factual allegations that the "talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor." *Taylor*, 216 F.3d at 480 (internal quotation marks omitted). But Infosys does not allege that Kumar, Arora, or Kuchibhotla go unused by Cognizant. *See Cigarroa*, 782 F. Supp. 3d at 453 (rejecting similar claim where plaintiffs failed to present "any evidence that Defendants sought to hire [employees] 'for purposes of denying [them] to [plaintiff]'"). To the contrary, Infosys acknowledges that Kumar serves as Cognizant's CEO, Arora as a Senior Vice President and Global Head of Consulting, ¶¶ 102, 106, and Kuchibhotla as Chief Strategy Officer, ¶ 106.

Tilting at windmills, Infosys points out that Kuchibhotla is not currently on Cognizant's

13

website. ¶ 107. But that says nothing about *why* he was hired, and permitting an inference of anti-competitive intent (or nonuse) on this basis would flip the rule on its head. *See Assoc. Radio*, 624 F.2d at 1354 (hiring away by competitors is "per se legal"). Nor is it plausible; the vast majority of Cognizant's tens of thousands of employees are not on its website. To the extent Infosys asserts that Cognizant "publicly touts its other executives with similar and lower roles" on the same webpage, ¶ 107, Infosys' own executive leadership webpage fails to list its Chief Technology Officer, Rafee Tarafdar, and Chief Risk Officer, Deepak Bhalla. Infosys Management Profiles: Executive Committee, https://tinyurl.com/mkmh3r2d. Where hiring from a competitor is per se lawful, the court should not create a "website" exception from whole cloth.

### 3.    Infosys Fails to Allege a Cognizable Antitrust Injury

Infosys also does not plead antitrust injury. "The antitrust laws were enacted for the protection of *competition*, not *competitors*." *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 338 (1990) (cleaned up). "Thus, to pursue claims under the Sherman Act, plaintiff must allege an antitrust injury, that is, a loss stemming from a competition-reducing aspect or effect of defendant's behavior. The injury must be to the market as a whole, not just to the particular plaintiff." *Location Servs., LLC v. Dig. Recognition Network, Inc.*, 2018 WL 5787317, at *2 (N.D. Tex. Nov. 5, 2018). Infosys' allegations focus on alleged harm *to Infosys* and fail to allege any plausible harm "to the market as a whole." *Id.*

For each form of alleged anticompetitive conduct, Infosys alleges injury only to itself. With respect to Cognizant's contractual restrictions, it complains that it has "los[t] valuable Core Administration IT Services contracts" in some cases and also had to "spend additional time and money" to perform on the contracts it did win. ¶ 54. But it includes no nonconclusory allegations—despite having the benefit of discovery—that these contractual restrictions caused market-wide

14

MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS INFOSYS' AMENDED COUNTERCLAIMS AND STAY DISCOVERY
CASE NO. 3:24-CV-2158-X

injury. Despite alleging that Cognizant implemented these restrictions around 2018, there is no suggestion that any IT products or services were driven from the market. Similarly, Infosys complains that Cognizant hired away three of Infosys' executives as part of a scheme to stall Helix, but it includes no plausible allegations that this act harmed or could harm *competition*—it alleges that Helix continued to grow during this period.[2] ¶ 104. And while Infosys argues that Cognizant denied it access to trainings via its partner programs, ¶ 77, Infosys admits that Cognizant allows other competitors to complete its "certified service partner program," ¶ 75, and again does not plausibly allege any market-wide contraction in the availability or quality of IT services.[3]

Nor are Infosys' alleged injuries traceable to any (non-conclusory) "competition-reducing aspect" of Cognizant's behavior, because Infosys pleads no competition reduction at all. Infosys labels Cognizant's prices "supracompetitive," ¶¶ 76, 169, but pleads no *facts* showing that Cognizant charged a price "above the competitive level." *See U.S. v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) ("[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level."). Infosys pleads nothing non-conclusory about Cognizant's pricing for Facets and QNXT relative to other platforms. And while Infosys does allege that *health insurance premiums* charged by *Health Plans* are higher for those plans that use Cognizant software, ¶ 169, that says nothing about Cognizant's pricing for *software*, *see Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008) (rejecting market power allegations based on total gasoline

---

[2] This is unlike the Fifth Circuit's *Taylor* case, where the nature and extent of the hiring was such that it could have put the rival out of business, thereby eliminating products and services from the market. *Taylor*, 216 F.3d at 482.

[3] To the extent that Infosys alleges an injury to Cognizant employees who cannot "get[] better jobs" as a result of the challenged no-poach clauses, ¶ 59, such an injury would occur in neither the alleged Software or IT Services Markets, and "actual or alleged harms . . . outside the relevant markets are beyond the scope of antitrust law." *Qualcomm*, 969 F.3d at 993.

15

sales to consumers because relevant market related to sale of franchises to retail station operators).
Likewise for IT Services, where the only *factual* allegation Infosys makes to support its su-
pracompetitive pricing conclusion is the total contract value for IT services that Cognizant has
provided over the last several years, ¶ 184, figures that provide *no* support for the assertion that
these services were offered at *higher than competitive* prices.

Infosys' allegations of reduced output are similarly conclusory. Infosys' allegations that
Cognizant has not improved its own software do not establish that Cognizant prevented competi-
tors from increasing output. *Cf. VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 225328
(N.D. Ill. Jan. 15, 2015) ("[A] lack of innovation is not a cognizable antitrust injury. To claim an
antitrust injury, a plaintiff must show that its loss comes from acts that reduce output or raise prices
to consumers." (cleaned up)); *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1013 (E.D. Wis.
2010) ("Alleging reduced innovation as a result of defendants' conduct does not create an infer-
ence of raised consumer prices or reduced output."). Nor could it; Infosys' allegations about suc-
cessfully launching Helix show *increased output*.[4] And Infosys' bare allegation of output re-
striction in the IT Services Market "is not actually supported by any facts currently alleged[.]" *See*
¶ 188; *see also In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 996 n.1 (N.D. Cal. 2010).

Indeed, Infosys' allegations belie any claim of injury at all. In the alleged IT Services Mar-
ket, Infosys admits to having "outcompeted" Cognizant for a contract valued at "hundreds of mil-
lions of dollars." ¶¶ 46, 48. So too with the Software Market, where Helix "competes with Cogni-
zant's Core Administration Software," ¶ 179, and has had "hard-fought successes," ¶ 109, even

---

[4] Infosys alleges that its market share for Helix "remains minimal" because of Cognizant's con-
duct, ¶ 180, but this argument is belied by its own admission that Helix offers less functionality
than QNXT and Facets, ¶ 179.

though Helix offers *less* functionality than QNXT and Facets, ¶ 179. These admissions establish that Infosys "had the clear opportunity to compete and did compete, sometimes successfully" in its alleged markets, and thus "never suffered the kind of injury that gives rise to an antitrust claim." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76, 83–84 (7th Cir. 2010) ("[C]ompetition to be an exclusive supplier may constitute a vital form of rivalry . . . which the antitrust laws encourage[.]"); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 411 (7th Cir. 2017) (similar).

### B.    Infosys' Attempted Monopolization Claim Fails

A claim for attempted monopolization requires "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). As with a monopolization claim, a plaintiff alleging attempted monopolization must allege a relevant market, anticompetitive conduct, and antitrust injury. *Id.* (anticompetitive conduct); *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1244 (5th Cir. 1985) (relevant market); *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1202, 1213–14 (S.D. Tex. 2009) (antitrust injury). Infosys fails to plausibly allege any of these elements. *See supra* § IV.A. Its attempted monopolization claims therefore fail from the start.

Infosys also falls short on the third unique element, "specific intent to monopolize." None of the handful of facts that purport to show specific intent to monopolize comes close.

First, Infosys selectively quotes from TriZetto's November 11, 2024 brief in opposition to Infosys' motion to dismiss. ¶ 199 ("Cognizant admitted its specific intent to exclude competition from Infosys through its 'strict' NDAAs that are aimed at preventing Infosys from 'develop[ing] competing products.'" (quoting Dkt. 38, at 1, 25)). But TriZetto did not "admi[t]" that it sought to

"exclude competition" in any market. *See id.* Rather, TriZetto stated that it sought to protect its intellectual property through "strict" NDAAs, but Infosys nevertheless breached those NDAAs, misappropriated TriZetto's trade secrets, and used those trade secrets "to develop competing products for Infosys' own financial gain." Dkt. 38, at 1, 25. Read in context, these quotations show TriZetto's intent to protect its intellectual property, not to monopolize. And Infosys' Amended Counterclaims "allege[] just the opposite" of a specific intent to monopolize by admitting that Cognizant supports other IT servicers by providing them training on Facets and QNXT, ¶ 75; *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 285 (4th Cir. 2012), and partnering with them through "TriZetto['s] Consulting Partner Network," ¶ 42.

Second, Infosys quotes two uncited fragments of Cognizant's public statements to investors to support its allegations of specific intent. *See* ¶ 197 ("In 2023, [Kumar] said Cognizant's Core Administration Software was 'the fulcrum and the nucleus of our health care ecosystem' and Cognizant intended to 'double down on it.'"); ¶ 198 ("Ravi Kumar, said that Cognizant has an 'entire health care ecosystem that is built on a thesis of platforms in the middle and creating a multiplier of services underneath it.' Referring to Cognizant's dominance in healthcare, he reiterated Cognizant's intent to 'double down.'"). But Cognizant simply told investors, unremarkably, that it would "invest and double down" on its products. Cognizant Technology Solutions Corp. Q4 2023 Earnings Call, https://tinyurl.com/5n82c4h9 (last visited Nov. 18, 2025) ("So we're going to invest and double down on [Cognizant's healthcare platforms] and seize the opportunities which come on this transformational journey for our clients.").[5]

---

[5] Cognizant respectfully requests that this Court take judicial notice of the SEC-related filing cited above "only for the purpose of determining what statements the documents contain." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 255 (5th Cir. 2021).

18

Regardless, a "statement about doub[ling] [down] doesn't show a specific intent to monop-olize," *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2021 WL 6072512, at *1 (D. Kan. Dec. 23, 2021), since an "intent to harm a rival, protect and maximize profits, or 'do all the business [Cognizant] can' is neither actionable nor sanctioned by the antitrust laws." *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 969 (10th Cir. 1994) (citation omitted). Cognizant's public statements show nothing more than "vigorous competition," which is "pre-cisely what the antitrust law are designed to foster." *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 887 (5th Cir. 1984); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) ("[C]ompetition for increased market share[] is not activity forbidden by the antitrust laws.").

### C.    Infosys Fails To Allege A Section 1 Claim

Section 1 makes unlawful "[e]very contract, combination . . ., or conspiracy, in restraint of trade." 15 U.S.C. § 1. Courts have long held that Section 1 "outlaw[s] only unreasonable re-straints." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quotation omitted). Accordingly, to state a Section 1 claim, Infosys must allege (1) an agreement (2) that unreasonably restrained trade (3) in the relevant market. *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 373 (5th Cir. 2014).

Infosys alleges that Cognizant's NDAAs and MFV rights "are contracts, combinations, or conspiracies that unreasonably restrain trade and commerce" in the relevant markets.[6] ¶ 283. A Section 1 claim must be dismissed if it fails to properly allege the relevant markets, *Marucci*, 751 F.3d at 375–76, or if the plaintiff fails to allege antitrust injury, *Stewart Glass & Mirror, Inc. v.*

---

[6] Infosys also alludes to unspecified "licensing agreements, contracts, and agreements imposing allocations, [], restrictions, and prohibitions." ¶ 283. To the extent that these are distinct from the NDAAs and MFV rights, Infosys does not specify and such claims fail. *See Iqbal*, 556 U.S. at 678.

*U.S.A. Glas, Inc.*, 940 F. Supp. 1026, 1035 (E.D. Tex. 1996). Infosys' alleged product markets are legally insufficient, *supra* § IV.A.1, and it fails to allege an antitrust injury, *supra* § IV.A.3; and for these reasons alone, its Section 1 claims should be dismissed. Infosys has also not alleged facts establishing either the second or third element of its Section 1 claim, further warranting dismissal.

**Cognizant's NDAAs And MFV Provisions Do Not Unreasonably Restrain Trade.** In evaluating whether a practice restrains trade in violation of Section 1, "[t]he rule of reason is the accepted standard," under which a "factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (quotation omitted). Although the Supreme Court has recognized a narrow subcategory of per se illegal restraints, "includ[ing] horizontal agreements among competitors to fix prices or to divide markets," *id.* at 886, it has made clear that vertical restraints (those between parties at different levels of distribution) "are to be judged by the rule of reason," *id.* at 882, 890–92.

Both challenged provisions are vertical restraints. The NDAAs amount to an agreement between Cognizant, as a software provider, and IT services vendors, and the MFV provisions are part of Cognizant's contracts with licensees of its software. Under the rule of reason, Infosys must allege that the NDAAs and MFV provisions created anticompetitive effects in the relevant markets. *Marucci*, 751 F.3d at 374; *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293 (5th Cir. 1988) (anticompetitive effects include reduced output, increased prices, or "reduce[d] consumer welfare"). It is not enough for Infosys to allege that Cognizant's NDAA and MFV provisions collectively harmed competition. Instead, Infosys must allege facts demonstrating that each contractual provision, when "considered individually, [is] capable of causing any substantial harm to competition." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 208 (4th Cir. 2002); *see*

20

*In re Pool Prods. Dist. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 396 (E.D. La. 2013) (analyzing whether agreements, "considered individually, involved unreasonable restraints of trade").

Infosys comes up short in three ways. First, Infosys fails to explain how any individual MFV or NDAA provision harms competition. The Amended Counterclaims do not identify a single contract with an MFV clause or the percentage or number of contracts purportedly containing such provisions. *See* ¶ 43. As to NDAAs, Infosys' allegations reduce to repetition—across four paragraphs, Infosys recites verbatim that Cognizant's NDAA provisions "rais[e] the costs for competitors, including Infosys, and degrad[e] the quality of their [products]." ¶¶ 54, 58, 61, 65. But these generic, speculative harms are not enough, as "[Infosys] must allege *facts* that show that [Cognizant] *actually* harmed competition." *Marucci*, 751 F.3d at 376 (emphases added).

Second, even if Infosys could lump together the effects of the MFV and NDAA provisions, Infosys alleges no facts establishing any anticompetitive effect, whatsoever. *See supra* § IV.A.3. Infosys identifies only six specific NDAAs, ¶¶ 51–70, along with the vague assertion that "[t]here are many other examples" of similar NDAAs that exist, ¶ 69, and includes no allegations regarding any specific MFV provisions. Unsurprisingly, Infosys does not contend that these NDAAs and unspecified MFV provisions somehow prevented Infosys from continuing to offer its IT services, much less that any other competitor was unable to continue its operations.

Third, Infosys' assertions are belied by its own admission that it has continued to successfully compete in both alleged markets. *See, e.g.*, ¶¶ 41, 108.

**Infosys' Passing References To Market Allocation Fail.** In half a dozen paragraphs, Infosys alleges that Cognizant has engaged in "market allocation" via its "Partner Network" because Cognizant allows "smaller" firms to join the Network while excluding "larger" companies like Infosys. ¶¶ 15, 42, 203, 204, 283, 294. As an initial matter, Infosys' allegations about the Partner

Network are inherently contradictory—on the one hand it contends that it is anticompetitive to deny Infosys access to the Network, ¶¶ 73, 77, while on the other it argues that it was anticompetitive to let "smaller" firms in, ¶ 44—a contradiction rendering all of this facially implausible.

In any event, a market allocation requires horizontal competitors *agreeing not to compete* for specific customers, products, or territories. *United States v. Topco Assocs. Inc.*, 405 U.S. 596, 608 (1972); *Cates v. Crystal Clear Techs., LLC*, 2016 WL 4379220, at *9 (M.D. Tenn. Aug. 17, 2016) (same); Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2030 ("[T]he important element is that the agreements at issue are arrangements among competitors that give one firm the right to restrict the way that a rival expands or innovates."). Infosys alleges nothing of the sort here; its only real gripe is that it is excluded from the Partner Network, ¶ 42—a textbook lawful refusal to deal, *supra* § IV.A.2. While Infosys alleges in conclusory fashion that "small competitors have agreed with Cognizant to limit competition" via the Partner Network, the only "example" it provides is one where Cognizant—in an agreement with a *software customer*—prohibited the customer from using certain providers while allowing "minimal" work to be performed by members of the Partner Network. ¶ 42. But allegations about an agreement *between Cognizant and a customer* do not suffice to plead that Cognizant agreed with its *horizontal competitors* to allocate a market. *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 375 (S.D.N.Y. 2016) (market allocation claim insufficient where plaintiffs "d[id] not directly allege that defendants agreed to allocate the markets for zinc and aluminum and to split up their dominance geographically," instead "alleg[ing] only that 'there was market allocation'").

Nor does Infosys present non-conclusory allegations sufficient to support the inference of a market allocation agreement. "Where there is an independent business justification for the defendant's behavior, no inference of conspiracy can be drawn." *In re Pool Prods. Distribution Mkt.*

*Antitrust Litig.*, 158 F. Supp. 3d 544, 559 (E.D. La. 2016) (quotation marks omitted). Thus no inference of a conspiracy to allocate a market is plausible here, where Infosys admits that small competitors would join the Partner Network to be "more efficient" and better able to provide "higher quality services," ¶ 73.

### D.    Infosys Parallel State Law Claims Also Fail

The Texas Free Enterprise and Antitrust Act ("TFEAA") must be "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes." Tex. Bus. & Com. Code § 15.04. The failure of Infosys' federal claims thus requires dismissal of its TFEAA claims.

### E.    The Court Should Stay Discovery While This Motion Remains Pending

The Court previously denied Cognizant's motion to stay, finding in part that the costs associated with substantial completion were largely sunk and that the motion was premature before Infosys' filed its Amended Counterclaims and Cognizant moved to dismiss. Dkt. 163. With both filings complete, the Court should stay antitrust discovery before the parties incur substantial costs for upcoming antitrust-related depositions, document review, and expert discovery.

This Court has inherent power to stay discovery when the outcome of a pending motion to dismiss may eliminate the need for it altogether. *See PrimeSource Building Prods., Inc. v. Lee Group Int'l, Inc.*, 2020 WL 6140462, at *1 (N.D. Tex. Aug. 12, 2020). That discretion is informed by "the breadth of discovery sought, the burden of responding to such discovery, and the strength of the dispositive motion filed by the party seeking a stay." *Id.* Each factor favors a stay here.

First, the breadth of the discovery sought, and the burden thereof, is enormous. The scope and expense of discovery in antitrust cases is well known, *see, e.g.*, *Twombly*, 550 U.S. at 546, and this case will be no exception. To date, Infosys has produced 6.7 million pages of documents, which will require significant resources to analyze, and has issued 33 subpoenas to non-parties,

each containing dozens of document requests seeking confidential information. App'x 4 (Whittaker Decl.) ¶ 3. Costs will further multiply as the parties prepare for and conduct depositions and expert discovery. Cognizant estimates that it could spend as much as $4 to $8 million on depositions alone (approximately 50% of which relate to the counterclaims), many of which will require international travel. *See id.* at 4–5 ¶¶ 5, 6. And antitrust expert discovery costs could conservatively total another $1.5 million. *See id.* at 5 ¶ 8; *see also Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 231 (2013) (noting a single antitrust expert can exceed $1 million). Absent a stay of discovery, Cognizant will incur millions of dollars in *future* costs to defend against Infosys' insufficiently pleaded counterclaims. Recognizing the massive costs associated with antitrust discovery, courts routinely bifurcate and stay discovery of antitrust claims for pending dispositive motions. *See, e.g.*, *Cubicle Enters. LLC v. Rubik's Brand Ltd.*, 2018 WL 11224256, at *2 (S.D.N.Y. July 19, 2018); *Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 556 F. Supp. 3d 1156, 1181 (D. Or. 2021); *Nasdaq, Inc. v. Miami Int'l Holdings, Inc.*, 2023 WL 4740753, at *3 (D.N.J. July 25, 2023).[7]

The final stay factor is also satisfied because—with Infosys' Amended Counterclaims now properly before the Court, *see* Dkt. 163—Infosys has not, and cannot, adequately state a claim for a violation of the antitrust laws. A stay is warranted when, "upon a cursory examination," the Court concludes that arguments for dismissal "are not frivolous and merit serious consideration." *Primesource*, 2020 WL 6140462, at *2. This standard is easily met here, because "the grant of the prior motion[] to dismiss indicates that at a minimum [Cognizant] ha[s] substantial arguments for

---

[7] Nor is antitrust discovery inextricably intertwined with trade secret discovery. Antitrust expert discovery is completely severable, and depositions can be limited to trade secrets topics, with limited depositions re-opened for antitrust discovery if later necessary.

24

dismissal of many, if not all, of the claims asserted." *Spinelli v. Nat'l Football League*, 2015 WL 7302266, at * 2 (S.D.N.Y. Nov. 17, 2015) (quotations omitted).[8]

And Infosys' Seventh Affirmative Defense—that Cognizant's NDAAs are unenforceable because they "unreasonably restrain competition and/or have an anticompetitive effect," Dkt. 130 at 63—provides no basis to deny a stay. That affirmative defense relies exclusively on Infosys' now-dismissed original counterclaims, which is grounds for the affirmative defense to be rejected. *See* Dkt. 130 at 63 (citing only to Dkt. 46); *United States v. New Hill Homes Assocs., Ltd. P'ship*, 2000 WL 306623, at *7 (D. Conn. Feb. 29, 2000) (due to dismissal of counterclaim, an affirmative defense, "relying on the allegations contained in the counterclaim, must be stricken"). And regardless, this affirmative defense fails with the Amended Counterclaims. *See, e.g.*, *Med-line Indus., Inc. v. C.R. Bard, Inc.*, 2016 WL 5871501, *3 (N.D. Ill. Oct. 7, 2016) (Defendant's "counterclaims and affirmative defenses [] rise or fall together. This is especially so in this case, because [defendant's] affirmative defense consists of a single paragraph incorporating by reference the contents of [defendant's] counterclaim." (citations omitted)).

## CONCLUSION

The Court should dismiss Infosys' antitrust counterclaims with prejudice and immediately stay antitrust discovery pending its ruling on the sufficiency of Infosys' Amended Counterclaims.

---

[8] If the court does not issue an immediate stay and later dismisses the Amended Counterclaims without prejudice, it should stay discovery until the pleadings are resolved. *Smith v. Intel Corp.*, 745 F. Supp. 3d 853, 869 (N.D. Cal. 2024) (staying discovery after dismissing without prejudice); *Syrstad v. NECA-IBEW Welfare Tr. Fund*, 2022 WL 22876269, at *6 (E.D. Wis. Aug. 31, 2022) (similar).

Dated: November 20, 2025                    */s/ John T. Cox, III*

John T. Cox, III (SBN 24003722)
Betty Yang (SBN 24088690)
Bradley G. Hubbard (SBN 24090174)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, TX 75201-2923 USA
Tel.: 214.698.3226
tcox@gibsondunn.com
byang@gibsondunn.com
bhubbard@gibsondunn.com

Rachel S. Brass (*pro hac vice*)
L. Kieran Kieckhefer (*pro hac vice*)
Elizabeth McCloskey (*pro hac vice*)
Christina E. Myrold (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel.: 415.393.8200
rbrass@gibsondunn.com
kkieckhefer@gibsondunn.com
emccloskey@gibsondunn.com
cmyrold@gibsondunn.com

Samuel G. Liversidge (*pro hac vice*)
Casey J. McCracken (*pro hac vice*)
S. Christopher Whittaker (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel.: 213.229.7000
sliversidge@gibsondunn.com
cmccracken@gibsondunn.com
cwhittaker@gibsondunn.com

Ahmed ElDessouki (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave.
New York, NY 10166
Tel.: 212.351.2345
aeldessouki@gibsondunn.com

*Attorneys for Plaintiff and Counterclaim*

26

*Defendant Cognizant TriZetto Software Group, Inc. and Counterclaim Defendant Cognizant Technology Solutions Corp.*

MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS INFOSYS' AMENDED COUNTERCLAIMS AND STAY DISCOVERY
CASE NO. 3:24-CV-2158-X

**<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that on November 20, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of the filing to all counsel of record.


Dated: November 20, 2025                              *<u>/s/ John T. Cox, III</u>*
                                                    John T. Cox, III